JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone:   (415) 773-5700
Facsimile:   (415) 773-5759

KEVIN M. ASKEW (SBN 238866)
kaskew@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 South Grand Avenue, Suite 2700
Los Angeles, California 90071
Telephone:   (213) 629-2020
Facsimile:   (213) 612-2499

WILLIAM J. FOLEY (*Admitted Pro Hac Vice*)
wfoley@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W 52nd Street
New York, New York 10019
Telephone:   (212) 506-5000
Facsimile:   (212) 506-5151

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| JOHN A. DOUGLAS, Individually, as Trustee of the Lauren L. Douglas Trust, and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HENRIK FISKER, et al.<br><br>Defendants. | Case No. 2:23-cv-09976-FLA (KSx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date:   March 14, 2025<br>Time:  1:30 p.m.<br>Judge: Hon. Fernando L. Aenlle-Rocha<br>Ctrm:  6B<br><br>Date Action Filed:  November 27, 2023 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................1

II.    BACKGROUND ................................................................................3

    A.    Fisker Inc. .............................................................................3

    B.    Fisker Projects Positive Gross Margin In 2023. ..................4

    C.    Fisker Experiences Executive Turnover And Delays 10-Q Filing. .......4

    D.    Fisker Announces Third Quarter Results................................5

    E.    Post-Class Period Disclosures...............................................5

III.    THE RIGOROUS PLEADING STANDARDS GOVERNING THIS
MOTION .........................................................................................6

IV.    ARGUMENT .....................................................................................7

    A.    The AC Fails to Allege An Actionable Misstatement. ..........7

        1.    Statements 7–12:  Statements Made *After* Plaintiff's
Last Stock Purchase ...................................................7

        2.    Statements 1–6:  August 4, 2023 Statements About Gross
Margin ........................................................................8

        3.    Statements 1, 3, and 6:  Accurate Statements of Historical
Results.........................................................................9

        4.    Statements 2 and 4:  Forward-Looking Statements
Protected by the PSLRA Safe Harbor ...................... 10

        5.    Statements 1, 3–6, and 11:  Puffery............................ 11

        6.    Statements 3–6:  Expressions of Opinion and Belief............... 13

        7.    Statement 12:  Statement Regarding a "Highly Complex" Q3 . 15

    B.    The AC Does Not Allege A Strong Inference Of Scienter.................. 15

        1.    Defendants Had No Motive To Commit Fraud......................... 16

        2.    Plaintiff Does Not Adequately Allege Intent Or
Deliberate Recklessness. .......................................... 17

            a.    Defendants' status as executives and/or shareholders. .. 18

b.    Anonymous former employee statements. ..................... 19

c.    Employee and auditor resignations. ............................. 21

d.    Unrelated accounting discrepancies. ............................ 22

e.    Sarbanes-Oxley certifications. .................................... 23

f.    Unrelated arbitration decision and investigation ........... 23

3.    The Nonfraudulent Inference Concerning Fisker's Inventory Adjustment Is More Compelling. ........................... 24

C.    The AC Fails to Plead Loss Causation. ............................... 24

1.    November 8, 2023 Announcement .................................... 25

2.    November 13, 2023 Earnings Release .................................. 26

3.    November 20, 2023 Form 8-K ......................................... 27

D.    The AC Fails to State a Claim for Control Person Liability Under Section 20(a). ....................................... 28

V.    CONCLUSION ....................................................... 28

CERTIFICATE OF COMPLIANCE ..................................... 29

MP&A IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                           **Page(s)**

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
   529 F. Supp. 3d 111 (S.D.N.Y. 2021)........................................................ 19

*In re Alteryx, Inc. Sec. Litig.*,
   2021 WL 4551201 (C.D. Cal. June 17, 2021)............................................ 24

*Anderson v. Peregrine Pharms., Inc.*,
   654 F. App'x 281 (9th Cir. 2016).............................................................. 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 6

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999)................................................................. 2, 7

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020).............................................................. 25, 26

*Brown v. Ambow Educ. Holding Ltd.*,
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014).............................................. 26

*In re Buca Inc. Sec. Litig.*,
   2006 WL 3030886 (D. Minn. Oct. 16, 2006)........................................... 26

*Butala v. Owlet, Inc.*,
   2024 WL 3648141 (C.D. Cal. Aug. 5, 2024)............................................ 17

*In re Caere Corp. Sec. Litig.*,
   837 F. Supp. 1054 (N.D. Cal. 1993)........................................................... 9

*Chiarella v. United States*,
   445 U.S. 222 (1980) ..................................................................................... 8

*In re Cisco Sys., Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013).......................................... 12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017).................................................... 14, 21, 22

# TABLE OF AUTHORITIES (CONTINUED)

**Cases**                                                                                    **Page(s)**

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ....................................................................... 11

*Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
    709 F. Supp. 3d 1217 (D. Nev. 2024) ............................................................ 28

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ......................................................................... 22

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ....................................................................... 15

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) .......................................................................... 28

*Fidel v. Rampell*,
    2005 WL 5587454 (S.D. Fla. Mar. 29, 2005) ............................................... 23

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ......................................................................... 6

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ......................................................... 24

*In re ICN Pharms., Inc., Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ......................................................... 23

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ......................................................... 11

*Kairalla v. Advanced Med. Optics, Inc.*,
    2008 WL 2879087 (C.D. Cal. June 6, 2008) ................................................. 15

*Kelly v. Elec. Arts, Inc.*,
    71 F. Supp. 3d 1061 (N.D. Cal. 2014) ............................................................. 7

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
    242 F. Supp. 3d 950 (C.D. Cal. 2017) ........................................................... 23

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ......................................................... 12

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Cases**      **Page(s)**

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ................................................................. 17

*Lowe v. Tandem Diabetes Care Inc.*,
    2024 WL 1898473 (S.D. Cal. Apr. 30, 2024) ................................. 8, 9

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
    2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ....................................... 8

*MacPhee v. MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023) ........................................................... 26

*In re Maxwell Techs., Inc. Sec. Litig.*,
    18 F. Supp. 3d 1023 (S.D. Cal. 2014) ............................................... 22

*McCasland v. FormFactor Inc.*,
    2009 WL 2086168 (N.D. Cal. July 14, 2009) ................................... 20

*Mehedi v. View, Inc.*,
    2024 WL 3236706 (N.D. Cal. June 28, 2024) .............................. 26, 27

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................... 18, 23

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ............................................................... 16

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
    2011 WL 1842819 (N.D. Cal. May 16, 2011) ................................... 25

*In re Nvidia Corp. Sec. Litig.*,
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ................................... 19

*Perrin v. Sw. Water Co.*,
    2011 WL 10756419 (C.D. Cal. June 30, 2011) ................................. 20

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009) ............................................... 27

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................. 17, 18, 19

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Cases**                                                                                               **Page(s)**

*In re Rigel Pharms., Inc. Sec. Litig.,*
    697 F.3d 869 (9th Cir. 2012)........................................................6, 16, 17

*Ryan v. FIGS, Inc.,*
    2024 WL 187001 (C.D. Cal. Jan. 17, 2024).......................................22

*In re Solarcity Corp. Sec. Litig.,*
    274 F. Supp. 3d 972 (N.D. Cal. 2017)................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S 308 (2007) ........................................................................7, 15

*In re U.S. Aggregates, Inc. Sec. Litig.,*
    235 F. Supp. 2d 1063 (N.D. Cal. 2002)..............................................18

*Vignola v. FAT Brands,*
    2019 WL 6138473 (C.D. Cal. June 14, 2019)...............................12, 13

*Wanca v. Super Micro Comput., Inc.,*
    2018 WL 3145649 (N.D. Cal. June 27, 2018) .......................................7

*Webb v. Solarcity Corp.,*
    884 F.3d 844 (9th Cir. 2018) ..............................................................16

*In re Wet Seal, Inc. Sec. Litig.,*
    518 F. Supp. 2d 1148 (C.D. Cal. 2007).........................................13, 20

*Yourish v. Cal. Amplifier,*
    191 F.3d 983 (9th Cir. 1999) ................................................................8

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ........................................................*passim*

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Statutes and Rules**                                                                                 **Page(s)**

15 U.S.C.
   § 78u-4(b)(1) ................................................................................................... 6
   § 78u-4(b)(2) ................................................................................................... 6
   § 78u-4(b)(4) ................................................................................................. 25
   § 78u-5(c)(1)(A)(i) ........................................................................................ 10
   § 78u-5(c)(1)(B) ............................................................................................ 11
   § 78u-5(i)(1) .................................................................................................. 10

Fed. R. Civ. P.
   Rule 9(b) ......................................................................................................... 6
   Rule 12(b)(6) ................................................................................................... 6

1  I.      **INTRODUCTION**

2          Fisker Inc. ("Fisker" or the "Company") is an American automotive

3  company that designed, developed, and sold electric vehicles, including the Fisker

4  Ocean®, an all-electric SUV designed to be the world's most sustainable vehicle.

5  Unfortunately, Fisker was impacted by industry-wide macroeconomic events and

6  significant liquidity challenges, and ultimately filed for bankruptcy protection in

7  June 2024.  Plaintiff, a one-time Fisker shareholder, tries to recoup his purported

8  investment losses through the amended complaint ("AC"), which claims that two

9  former Fisker executives made fraudulent misstatements in connection with the

10 Company's financial disclosures in the second and third quarters of 2023.

11 Specifically, Plaintiff argues that on August 4, 2023, Fisker management

12 incorrectly predicted that the Company's 2023 gross margin would be positive, and

13 that on November 13, 2023, Fisker's preliminary earnings results miscategorized

14 $20 million in expenses as "selling, general and administrative expenses" rather

15 than "cost of goods sold."  When Fisker later disclosed that its third quarter 2023

16 ("3Q23") gross margin was negative and that certain of its expenses had been

17 recategorized, investor-plaintiffs pounced, claiming that Defendants' earlier

18 statements must have been fraudulent.

19         The AC runs into multiple well-established principles of securities law, each

20 of which independently mandates dismissal.

21         ***The allegedly false statements are not actionable***.  None of the challenged

22 statements supports a securities fraud claim.  The allegations concerning Fisker's

23 August 4 disclosures are a classic example of "fraud-by-hindsight" pleading.

24 Plaintiff simply assumes that because Fisker announced a negative third quarter

25 gross margin in November 2023 as a result of an accounting adjustment,

26 Defendants *must have known* back in August that the Company's comparatively

27 optimistic full-year forecast was wrong.  Yet Plaintiff never alleges specific

28 contemporaneous *facts* showing that the need for this accounting adjustment was

already apparent in August. This conclusory, fact-free pleading style violates the heightened pleading standards of the Private Securities Litigation Reform Act (the "PSLRA"). Moreover, the November 13 statements are inactionable because they were made *two months after* Plaintiff's last purchase of Fisker stock, and only those statements made "before investors purchase the securities" are "actionable under Rule 10b-5[.]" *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999).

There are still more problems with Plaintiff's theory of falsity. Some of the challenged statements are indisputably accurate statements concerning Fisker's historical financial results, which are inactionable as a matter of law. Others constitute "forward-looking statements" concerning Fisker's future performance, and therefore are protected by the PSLRA's "safe harbor." Others are inactionable expressions of opinion or belief. Still others are merely vague or generalized assertions of corporate optimism (or "puffery"), which are insufficient to support a fraud claim because no reasonable investor could rely on them. In sum, all of the challenged statements are inactionable, and most on multiple, independent grounds.

***Plaintiff does not adequately allege an intent to defraud***. As a threshold matter, Plaintiff's narrative of fraud is completely implausible, which alone is dispositive. The AC lacks any of the traditional hallmarks of scienter—such as insider stock sales during the class period—and fails to articulate any logical reason why Defendants would lie about Fisker's financials in August only to come clean in November, without ever attempting to profit from their fraud. Additionally, while Plaintiff runs through a series of "scienter allegations," none supports the premise that Defendants knew or had access to any facts inconsistent with their public statements. For example, the AC purports to quote two anonymous "former employee" witnesses, but neither witness had any knowledge of, or insight into, what Defendants knew and when. Taken individually or collectively, Plaintiff's allegations fall well short of establishing the "strong inference" of scienter required by the PSLRA.

*Plaintiff does not adequately allege loss causation*.  Plaintiff claims that he was injured when his "artificially inflated" Fisker stock declined in value following three partially "corrective disclosures" (on November 8, 13 and 20), which he says revealed "the truth" concerning Defendants' supposed misrepresentations.  But two of those disclosures were made *after* Plaintiff sold all his Fisker stock, and thus could not possibly have contributed to his "losses."  And the remaining disclosure (a press release regarding a delayed 10-Q filing) was not "corrective" in that it did not reveal any "truth" about any challenged statement.

For these reasons and as further shown below, the AC should be dismissed.

## II.     BACKGROUND

### A.     Fisker Inc.

Fisker is an electric vehicle company focused on developing the "most sustainable" vehicles in the world.  AC ¶ 2.  The Company was launched in 2016 by its two co-founders, legendary car designer and automotive entrepreneur, Henrik Fisker ("Mr. Fisker"), and Dr. Geeta Gupta-Fisker ("Dr. Gupta-Fisker").  *Id.* ¶¶ 1– 2.  Mr. Fisker served as CEO and board chairman, while Dr. Gupta-Fisker served as CFO and COO, as well as a director.  *Id.* ¶¶ 29–30.  The Company went public in 2020, and its shares were traded on the New York Stock Exchange until late March 2024 (it was delisted shortly thereafter in April 2024).  *Id.* ¶¶ 33, 88.  On June 19, 2024, Fisker filed for bankruptcy protection.  *Id.* ¶ 1 n.2.

While the Company designed several ground-breaking vehicles, its only model to reach market was the award-winning Fisker Ocean, an all-electric SUV that has the longest battery range of any electric vehicle in its class.  *Id.* ¶¶ 2, 34– 36.  In connection with its development of the Ocean, Fisker pursued a "technology-enabled, asset-light" business model that relied in part on outsourcing vehicle production and other services to Magna Steyr—a leading contract manufacturer—in order to reduce development cost and time to market.  *Id.*

### B.    Fisker Projects Positive Gross Margin In 2023.

On August 4, 2023, Fisker issued a press release and filed a Form 8-K disclosing that the Company was "already making a positive profit margin on [its] first vehicles," a margin of 7.5% in the second quarter.  AC ¶¶ 111–14; *see* Ex. 1 at 6.[1]  Fisker also announced that it "anticipate[d] an 8–12% gross margin range for full year 2023, provided input costs do not change dramatically."  AC ¶¶ 111–14; *see* Ex. 1 at 9.  Fisker cautioned investors that its projection of gross margin "involve[d] risks and uncertainties," including that its "supply partners [might] not meet agreed upon timelines or experience capacity constraints," which "could cause actual results to differ materially from the forward-looking statements contained" in the press release.  Ex. 1 at 10.  The Company also disclosed that 1,022 Oceans were produced in the second quarter.  AC ¶ 51; Ex. 1 at 6.

The same day, Fisker held an earnings call to discuss its financial results, which included commentary concerning the Company's gross margin forecast.  *Id.* ¶¶ 111–19.  As with the press release, Fisker management expressly cautioned during the call that "[a]ctual results . . . are subject to risks and uncertainties that could cause our results to differ materially from those projected."  Ex. 2 at 19.

### C.    Fisker Experiences Executive Turnover And Delays 10-Q Filing.

On September 22, 2023, the Company reported in a Form 8-K filed with the SEC that, on September 19, 2023, its chief accounting officer ("CAO"), John Finnucan, had given notice of his resignation from Fisker to "become the chief financial officer of a private company that is focused on refueling solutions."  AC ¶ 64; Ex. 3 at 39.  The press release noted that "Mr. Finnucan's departure [was] not related to the operations, policies, or practices of the Company," and that he would "remain an employee of the Company through at least October 27, 2023" in order to "facilitate an orderly transition[.]"  AC ¶ 64; Ex. 3 at 39.

---

[1] All "Ex. __" references are to the exhibits attached to Defendants' Request for Judicial Notice.

1    The Company hired Florus Beuting to take over as CAO effective November
2    6, 2023.  AC ¶ 77.  As a result of the CAO transition, Fisker announced on
3    November 8, 2023 that it needed to briefly delay both the release of its third quarter
4    results and the filing of the 10-Q.  *See id.* ¶¶ 63, 67.

5        **D.    Fisker Announces Third Quarter Results.**

6        On November 13, 2023, Fisker released the Company's third quarter
7    preliminary financial results, advising, among other things, that the Company's
8    third quarter gross margin was negative on a GAAP basis.  AC ¶¶ 66, 120.
9    Specifically, Fisker disclosed that its third quarter: (i) "gross margin was -17%" on
10   a GAAP basis, (ii) "adjusted gross margin was 9%, which exclude[d] an inventory
11   valuation adjustment associated with lower levels of production during the ramp-up
12   phase which [Fisker] expect[ed] to continue until [it] reach[ed] full production,"
13   (iii) "cost of goods sold" was $83.92 million, and (iv) "net loss totaled $91
14   million."  AC ¶¶ 66, 120–23.  The press release specifically warned that "[t]he
15   financial results discussed herein are presented on a preliminary basis" and that
16   "final data will be included in Fisker's Quarterly Report on Form 10-Q."  Ex. 4
17   at 51.  During Fisker's earnings call later that day, Dr. Gupta-Fisker referred to the
18   quarter as "highly complex," noting that during the quarter the Company "went
19   from $800,000 of revenue to $71 million of revenue" in "multiple countries,"
20   further explaining that Fisker was experiencing "growing pains" that management
21   was working "tirelessly" to address.  AC ¶¶ 69, 126; Ex. 5 at 68.  The Company
22   also disclosed that "[i]n the course of completing the preparation of the [10-Q], the
23   Company determined that it has material weaknesses in the Company's internal
24   control over financial reporting," which would be further discussed in the
25   forthcoming 10-Q.  AC ¶ 67.

26       **E.    Post-Class Period Disclosures.**

27       On November 20, 2023, Fisker announced that Mr. Beuting, the Company's
28   CAO, had tendered his resignation.  AC ¶ 77.

Fisker filed its 10-Q on November 22, 2023, disclosing, among other things, that "approximately $20 million of expenses" had been "incorrectly recorded primarily as selling, general and administrative expenses in our preliminary earnings results, but were later determined to be associated with production set-up activities and are now appropriately reflected in cost of revenues." *Id.* ¶ 79.

## III.   THE RIGOROUS PLEADING STANDARDS GOVERNING THIS MOTION

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Rather, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Rule 9(b) and the PSLRA impose additional, exacting pleading requirements in securities fraud cases. "Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading [] about the statement[s] and why the statements were false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). The PSLRA similarly requires a complaint to specify each statement alleged to have been misleading and the reasons why it was misleading when made, and to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires a complaint to "state with particularity facts giving rise to a strong inference that [each] defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2). A "strong inference" of scienter must be "more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S 308, 314 (2007).

## IV.   ARGUMENT

### A.   The AC Fails to Allege An Actionable Misstatement.

#### 1.   Statements 7–12[2]: Statements Made *After* Plaintiff's Last Stock Purchase

Plaintiff last purchased Fisker stock in September 2023.  *See* ECF No. 26-2 (Plaintiff's PSLRA Certification).  But half of the challenged statements were made nearly two months *later*—on November 13, 2023.  The claims based on these November 2023 statements are inactionable as a matter of law.  A cause of action under Section 10(b) "applies only to misrepresentations or omissions made 'in connection with the purchase or sale of any security.'"  *Binder*, 184 F.3d at 1066 (quoting 15 U.S.C. § 78k(b)).  "Statements issued after a plaintiff's purchase of stock" do not satisfy this requirement as they "could not have affected the plaintiff's decision to purchase stock."  *Kelly v. Elec. Arts, Inc*., 71 F. Supp. 3d 1061, 1069 (N.D. Cal. 2014) (citing *Hanon v. Dataproducts Corp*., 976 F.2d 497, 501 (9th Cir. 1992)).  "[C]onduct actionable under Rule 10b-5 must occur *before* investors purchase the securities."  *Binder*, 184 F.3d at 1066 (emphasis added).  Here, Plaintiff does not allege that he purchased Fisker stock after November 13, 2023.  Accordingly, the alleged misstatements made on November 13, 2023 are "inactionable as a matter of law because they post-date lead plaintiff[']s purchase of stock."  *Kelly*, 71 F. Supp. 3d at 1069; *Wanca v. Super Micro Comput., Inc*., 2018 WL 3145649, at *7 (N.D. Cal. June 27, 2018) (dismissing claim based on statements made after plaintiffs' stock purchase).

---

[2] For the Court's convenience, attached as Appendix A is a chart identifying each of the challenged statements raised in the AC.  As used in this brief, "Statement 1" refers to the statement identified in the row numbered "1" in Appendix A, and so on.

2.    **Statements 1–6**:  August 4, 2023 Statements About Gross
Margin

According to Plaintiff, Defendants' August 4, 2023 statements were misleading because they failed to disclose that Fisker's gross margin was "being adversely impacted by excess fixed production overhead costs that could not be fully allocated to inventory due to lower levels of production during Fisker's ramp-up in production[.]"  AC ¶¶ 115, 117, 119.  But Plaintiff alleges no specific ***facts*** suggesting that Fisker's gross margin was being adversely impacted as of August 4, 2023.  Instead, Plaintiff relies on a fraud-by-hindsight theory, merely ***assuming*** that because Fisker made an inventory valuation adjustment when reporting its ***Q3*** results three months later, there must have been an overhead cost issue necessitating an accounting adjustment when the Company reported its ***Q2*** results on August 4, 2023.  *See* AC ¶ 101.  This failure to back up allegations of falsity with particularized, contemporaneous facts is fatal to Plaintiff's claim.  Plaintiff must plead that the challenged statements were untrue or misleading when made. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999); *Lowe v. Tandem Diabetes Care Inc.*, 2024 WL 1898473, at *10 (S.D. Cal. Apr. 30, 2024).  "It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *7 (C.D. Cal. Aug. 20, 2017) (internal citation omitted).

Relatedly, Plaintiff does not adequately plead that Defendants had a duty to disclose information that was not in their hands in August 2023.  A duty to disclose material information to investors can exist only when the party in question actually "has [the] information that" investors are "entitled to know." *Chiarella v. United States*, 445 U.S. 222, 228 (1980).  Here, Plaintiff alleges that Fisker reported an "$18.2 million inventory valuation adjustment" on November 13 that had a "significant impact on the Company's reported gross margins."  AC ¶ 101.  But

- 8 -

Plaintiff does not plead specific facts showing that Defendants had this information on August 4, 2023. The bare assertion that Defendants "were aware that 3Q23 gross margins would be adversely impacted," AC ¶ 101, does not pass muster. *See, e.g.*, *Lowe*, 2024 WL 1898473, at *10 (complaint dismissed where plaintiff alleged "no contemporaneous facts" to "show that the challenged statements were materially false or misleading ***when made***") (emphasis added).

### 3.    Statements 1, 3, and 6: Accurate Statements of Historical Results

Several of the challenged statements made on August 4, 2023 concern Fisker's historical performance—specifically, Fisker's gross margin for the already-concluded second quarter. *See* Statements 1 ("we are already making a positive profit margin on the first vehicles we are selling") (AC ¶ 111; Ex. 1 at 6) and 3 ("talking about profitability, I don't know of any EV start-up that ever made a double-digit profit margin on the very first cars that we have delivered") (AC ¶ 113, Ex. 2 at 19). Portions of Statement 6 are also historical, as Mr. Fisker noted he was "really excited about [Fisker's] positive gross margins . . . because normally in an EV start-up, you are . . . running 2 or 3 years with massive losses, which obviously means you need to raise a lot of money just to cover those losses" and Fisker was "not in that position." AC ¶ 118; Ex. 2 at 35.

The AC does not allege with particularity that these historical statements relating to Fisker's gross margin in Q2 were inaccurate when made. Though the AC focuses heavily on the later disclosure of the inventory valuation adjustment implemented in connection with the announcement of gross margin numbers for ***Q3*** (*see* AC ¶¶ 18, 79), there is no particularized allegation that the gross margin numbers for Q2 were erroneous. Indeed, the Q2 gross margin numbers were never restated. Accurate statements of historical performance like these are not actionable as a matter of law because they "contain no implicit prediction that those events or conditions will continue in the future." *In re Caere Corp. Sec. Litig.*, 837

- 9 -

F. Supp. 1054, 1058 (N.D. Cal. 1993) (internal citations omitted).

### 4.    <u>Statements 2 and 4</u>:  Forward-Looking Statements Protected by the PSLRA Safe Harbor

The AC also challenges certain forward-looking statements[3]:

- "Fisker anticipates an 8-12% gross margin range for full year 2023, provided input costs do not change dramatically," AC ¶ 112 (Statement 2); and

- "We still anticipate gross margins for the full year 2023 in the 8% to 12% range . . . provided input costs do not change dramatically," AC ¶ 114 (Statement 4).

These statements are protected by the PSLRA safe harbor, and are thus inactionable as a matter of law, because (1) they were identified as forward-looking statements; (2) they were accompanied by adequate cautionary language; and (3) even if they lacked such cautionary language (they do not), the AC is devoid of facts—specific or otherwise—to suggest that Defendants had actual knowledge that the statements were false when made.  15 U.S.C. § 78u-5(c)(1)(A)(i).

***First***, these statements were identified as forward-looking.  Ex. 1 at 10 ("This press release includes forward-looking statements, which are subject to the 'safe harbor' provisions of the [PSLRA]."); Ex. 2 at 19 ("Please note that today's discussion includes forward-looking statements about our expectations.").

***Second***, these statements were accompanied by language cautioning that "such forward-looking statements are not guarantees of future performance and are subject to risks and uncertainties."  Ex. 1 at 10 (Statement 2); Ex. 2 at 19 (Statement 4).  The press release and relevant investor calls also directed listeners

---

[3] A forward-looking statement is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues. 15 U.S.C. § 78u-5(i)(1).

to the more detailed risk factors outlined in Fisker's SEC filings.[4]  These materials specifically warned of the risks Plaintiff asserts later came to pass, including that Fisker's "forecast relie[d] in large part upon assumptions and analyses developed by [Fisker]," and "[i]f these assumptions or analyses prove[d] to be incorrect, [its] actual operating results may be materially different from [its] forecasted results." Ex. 6 at 76.

*Finally*, even if these statements were not accompanied by cautionary language (they are), none of them would be actionable because the AC does not allege specific facts showing Defendants' actual knowledge that any forward-looking statement was false when made.  *See* 15 U.S.C. § 78u-5(c)(1)(B). Conclusory allegations that Defendants knew the statements were false based on "their positions and access to material non-public information available to them" (AC ¶ 32) are not enough.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (dismissing claims based on forward-looking statements supported only by "conclusory allegations" of knowledge); *see also infra* § IV(B).

### 5.   <u>Statements 1, 3–6, and 11</u>:  Puffery

Plaintiff also challenges numerous statements of corporate optimism, or "puffery," which are not actionable because they employ terms "not capable of objective verification and lack a standard against which a reasonable investor could expect them to be pegged."  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (cleaned up).

For example, the alleged misrepresentations include various optimistic statements about Fisker's future:

- "We are currently in a quarter that truly marks the inflection for Fisker," AC ¶ 111 (Statement 1);

---

[4] *See* Ex. 1 at 10; Ex. 2 at 19 (referring to press release and Fisker's "filings with the [SEC]"); Ex. 5 at 56 (referring to press release and Fisker's "filings with the [SEC].").

- "I think that really sets the stage for where we're going in the future," *id.* ¶ 113 (Statement 3);

- "I'm also really excited about our positive gross margins," *id.* ¶ 118 (Statement 6); and

- "The positive adjusted gross margin demonstrates the benefit of our unique vehicle capabilities within the company and points towards a faster path towards positive EBITDA," *id.* ¶ 124 (Statement 11).

These are the types of generalized expressions of optimism that courts routinely dismiss at the pleading stage. *See, e.g., In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) ("[w]e are pleased with our progress," "we feel very positive," and "[w]e are also strengthening our operations group" were inactionable puffery).

Other alleged misrepresentations include generic descriptions of Fisker's business model and asset-light strategy:

- "[O]ur business model has now been proven," AC ¶ 111 (Statement 1);

- "This guidance balances our asset-light model," *id.* ¶ 114 (Statement 4);

- "So again, from our perspective, we have an asset-light strategy," *id.* ¶ 116 (Statement 5); and

- "The positive adjusted gross margin demonstrates the benefit of our unique vehicle capabilities within the company," *id.* ¶ 124 (Statement 11).

These types of "vague," "generalized," and "unspecific" expressions are inactionable. *See In re Cisco Sys., Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (references to "compelling financial model" inactionable puffery). *Vignola v. FAT Brands*, 2019 WL 6138473, at *12 (C.D. Cal. June 14, 2019), is instructive. There, the court dismissed a claim premised on statements about the company's "asset-light franchisor model," holding that the "[s]tatements

- 12 -

about the advantages of the Company's business model," including that it "provides the opportunity for strong profit margins," are "not much different than optimistic, aspirational predictions about the Company's business."  *Id.*

Defendants' statements comparing Fisker to its competitors and others in the market are also the type of generic expressions of optimism that have been held inactionable.  These statements include:

- "[W]e have an asset-light strategy, a very different business model to other start-ups or legacy OEMs," AC ¶ 116 (Statement 5); and

- "[N]ormally in an EV start-up, you are running obviously companies running 2 or 3 years with massive losses. . . .  ***So we are not in that position***," *id.* ¶ 118 (Statement 6).

*See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) ("we're the leader in a rapidly growing market" was inactionable puffery).

Finally, insofar as the alleged misrepresentations include Defendants' categorization of issues as "straightforward" or "complex," those statements are not capable of objective verification and thus are inactionable.  These statements include:

- "So from a program lifetime, we have a 50,000 annual volume. And those volumes are fairly straightforward," AC ¶ 116 (Statement 5); and

- "Some other areas that were extremely complex . . ." and "extremely complex as you look at IT integrations," *id.* ¶ 126 (Statement 12).

*Cf. Wet Seal*, 518 F. Supp. 2d at 1168 ("we have an extremely broad product line" inactionable puffery).

### 6.    Statements 3–6:  Expressions of Opinion and Belief

The AC further challenges a number of statements of opinion and belief, including:

- "I don't know of any EV start-up that ever made a double-digit profit margin on the very first cars that we have delivered," AC

¶ 113 (Statement 3);

- "I think that really sets the stage for where we're going in the future," *id.*;

- "This guidance balances our asset-light model," *id.* ¶ 114 (Statement 4);

- "I expect those trends to continue to further go down," *id.* ¶ 116 (Statement 5);

- "I think number three, what's really critical is to look at volumes in terms of the program lifetime," *id.*;

- "From our perspective, we have an asset-light strategy," *id.*; and

- "I'm also really excited about our positive gross margins," *id.* ¶ 118 (Statement 6).

For these statements to be actionable, Plaintiff must allege specific facts establishing "both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–17 (9th Cir. 2017). Further, "when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id*. at 616.

The AC, however, does not allege any facts to show what Defendants knew as of August 4, 2023, and thus fails to show what subjective "belief" Defendants held at the time any of these statements were made. Nor does the AC allege that any of the statements were "objectively untrue." For instance, it does not allege facts to show that "I think . . . [it's] critical [] to look at volumes in terms of the program lifetime" or Fisker "thought about selling a $37,000 car, not [a] $100,000 car" (AC ¶ 116) were false at the time they were made. Finally, the AC does not allege any particularized contemporaneous facts "going to the basis for" Defendants' opinions whose omission rendered any of these statements misleading.

- 14 -

7.    **Statement 12**:  Statement Regarding a "Highly Complex" Q3

Plaintiff alleges Statement 12 (AC ¶ 126) was misleading because Dr. Gupta-Fisker said that Q3 was a "highly complex quarter" while allegedly failing to disclose that "many of the [later-disclosed] accounting errors were not complex." But Dr. Gupta-Fisker was not talking about "accounting errors" in the cited statement.  AC ¶ 127; *see also* Ex. 5 at 68.  Instead, she was responding to an analyst who asked her "to talk about the delay in the 10-Q" and "given the personnel changes, how long before [the material weakness would be] rectified as well."  Ex. 5 at 67.  Dr. Gupta-Fisker's response discussed Fisker's revenue increase, foreign exchange, convertible notes and derivatives, and "a lot of complexity in the business."  *Id.* at 68.  Neither the alleged misstatement nor the question preceding it says or implies anything about accounting "errors," let alone anything about the level of complexity of any accounting errors, and thus cannot be said to be misleading or inconsistent with the information Plaintiff alleges was omitted.  *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *3 (C.D. Cal. June 6, 2008) ("Statements are not misleading where they are 'not [] inconsistent with the underlying true facts.'").

**B.    The AC Does Not Allege A Strong Inference Of Scienter.**

Plaintiff's claims should be dismissed for the independent reason that the AC does not adequately allege a "strong inference" of scienter, *i.e.*, a defendant's intention "to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 313.  An inference of scienter must be both "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  This "inquiry is inherently comparative" and requires the Court to "take into account plausible opposing inferences."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Plaintiff's burden to establish a strong inference of scienter "is not an easy standard to comply with."  *Eminence Cap., LLC v. Aspeon*,

- 15 -

*Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (the "strong inference" requirement "is an 'exacting' pleading obligation" that "has teeth").

### 1.    Defendants Had No Motive To Commit Fraud.

Plaintiff has not articulated a plausible motive for the purported fraud. Instead, he asks this Court "to check [its] disbelief at the door," *Nguyen*, 962 F.3d at 415, and find that Defendants intentionally misled investors about Fisker's anticipated gross margin in August only to disclose "the truth" three months later, without anyone attempting to capitalize on that supposed knowledge.

Notably, Plaintiff does not allege that either Defendant tried to profit from the purported scheme by selling stock during the putative class period. *See, e.g.*, *id.* ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock . . . the theory might have more legs."). The absence of insider stock sales during the class period is powerful evidence of a lack of scienter. *See, e.g.*, *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) ("[A] lack of stock sales can detract from a scienter finding."); *Rigel Pharms.*, 697 F.3d at 884–85 (that "none of the defendants sold stock during the [class] period" undermines "an inference of scienter").[5]

Plaintiff's only allegation concerning a supposed motive to defraud is that Defendants "were motivated to raise $450 million in desperately needed capital" through two "convertible note" loan transactions. *See* AC ¶¶ 149–50. But this is misleading. The more significant note transaction, which Plaintiff claims raised $300 million, "closed on July 11, 2023," *i.e.*, almost a month before the putative class period began, AC ¶ 151, and thus it could not possibly have provided

---

[5] In *Nguyen*, the Court asked why the defendants would "promise the market that the FDA would approve Nellix if defendants knew the FDA would eventually figure out that Nellix could not be approved," concluding that the "theory does not make a whole lot of sense," particularly where the defendants did not sell their stock during the class period. 962 F.3d at 415.

motivation for alleged misstatements in August and November.[6]  In any event, the Ninth Circuit has repeatedly declined to find that "attempts at securing capital . . . support an inference of scienter." *Anderson v. Peregrine Pharms., Inc.*, 654 F. App'x 281, 281 (9th Cir. 2016); *see also Rigel Pharms.*, 697 F.3d at 884 (alleged motivation to obtain financing is insufficient because "to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("[Defendant's] alleged desires to obtain favorable financing . . . cannot normally be alleged to be motivations for fraud.").[7]

### 2.  Plaintiff Does Not Adequately Allege Intent Or Deliberate Recklessness.

Lacking a plausible theory of motive, Plaintiff points to a broad assortment of "scienter allegations," the rhetorical equivalent of "throwing everything at the wall to see what sticks."  Nothing does.  To plead a "strong inference of scienter," a

---

[6] The second note transaction, which Plaintiff claims resulted in $150 million in proceeds, closed "on September 29, 2023," *see* AC ¶ 152, and thus, even accepting Plaintiff's narrative, Defendants had no motivation to make false or misleading statements in November 2023.

[7] This Court has held that the "desire to raise company financing, combined with the 'red flags' of a company's financial condition," can be sufficient to plead scienter. *Butala v. Owlet, Inc.*, 2024 WL 3648141, at *6 (C.D. Cal. Aug. 5, 2024). Here, however, Plaintiff does not allege that there were any known financial "red flags" when the convertible note transactions were negotiated.  At best, Plaintiff points to a declaration filed in an unrelated proceeding by Fisker's chief restructuring officer (who did not join the Company until *April 25, 2024*) and claims it establishes that Defendants "knew" by August 2023 that the Company "was facing potential financial distress." AC ¶ 150.  As an initial matter, this vague allusion to the "potential" of unspecified future financial issues is not a particularized allegation of a financial "red flag."  Even more importantly, third party statements cannot support a strong inference of scienter if the speaker "lack[s] first hand knowledge regarding what the individual defendants knew or did not know." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).  In any event, Plaintiff misleadingly omits the fact that the declaration was amended to correct inaccuracies, including by removing the reference upon which Plaintiff purports to rely. *See* Ex. 8.

- 17 -

plaintiff must show that the defendant "made false or misleading statements either intentionally or with deliberate recklessness," the latter of which is "a form of intentional or knowing misconduct" wherein the "danger of misleading [investors] is either known . . . or is so obvious that [defendant] must have been aware of it." *Zucco*, 552 F.3d at 991.  Plaintiff's scattershot allegations do not come close to meeting this standard.

### a.   Defendants' status as executives and/or shareholders.

Plaintiff first attempts to establish that Defendants *must have known* the truth about Fisker's gross margin because they were "senior executives" with a "hands on" approach to operations.  AC ¶¶ 132–35, 138–44, 169.  For example, Plaintiff observes that Defendants were responsible for the content of SEC filings and public statements, spoke on the Company's behalf, and were a "vital part" of the Company's operations.  *Id.* ¶¶ 130, 134–35.  However, an executive's "awareness of the day-to-day workings of the company's business does not establish scienter . . . absent some additional allegation of specific information conveyed to management and related to the fraud."  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008).  A plaintiff "must do more than allege that . . . key officers had the requisite knowledge by virtue of their 'hands on' positions"—a standard that "would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position."  *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002).

Next, Plaintiff alleges that Defendants "possess[ed]" or "had access to" information about the Company's financial condition through corporate reports, documents, and meetings.  AC ¶ 136.  The AC, however, does not identify or describe the contents of any specific report, document, or meeting, let alone allege that something therein contradicted any of Defendants' statements.  *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1063 ("Missing are allegations linking specific

reports and their contents to the executives[.]"). A defendant's "[m]ere access to reports containing undisclosed [information] is insufficient to establish a strong inference of scienter." *Id.* (citing *Zucco*, 552 F.3d at 1001).

Plaintiff also claims that the Company was "tightly controlled" by Defendants, who held "greater than 90% of the voting power of Fisker's capital stock." AC ¶ 129. But even were this true, Defendants' voting control over the Company is not probative of scienter because it does not suggest that they possessed information contradicting the Company's disclosures. *See, e.g., In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 171 (S.D.N.Y. 2021) (allegations that defendants collectively "owned sufficient shares to influence control over [the company]" insufficient to plead scienter).

### b.  Anonymous former employee statements.

The AC references supposed accounts from two anonymous "former employees" of Fisker ("FE1" and "FE2") in an effort to "corroborate a strong inference of scienter." *See* AC ¶¶ 160–69. However, Plaintiff's own allegations demonstrate that both "witnesses lack[ed] first hand knowledge regarding what the individual defendants knew or did not know about [the Company's] financial health" during the class period—and thus are insufficient to support a strong inference of scienter. *Intuitive Surgical*, 759 F.3d 1051 at 1063.

With respect to FE1, the AC cites only one vague statement about either of the Defendants:  that "generally, many at Fisker, including Gupta-Fisker, would provide feedback" on financial statements. AC ¶ 164. This bland observation— which could be made about virtually every CFO in America—is irrelevant to the scienter inquiry. *See, e.g., In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *6 (N.D. Cal. Oct. 19, 2010) ("[B]road statements [about] a general practice" do not "provide[] any particularized details about" the alleged misstatements).[8]   FE2's

---

[8] FE1's other purported statements consisted of rank speculation about the reasons for Beuting's resignation ("Beuting *may have been* uncomfortable with what was

primary accusation is that in "1Q24," Defendants were "rushing" a model for a partnership between the Company and Nissan before there was "time to vet the numbers."  AC ¶ 168.  Not only does FE2's critique come well after the relevant period, but it has *nothing* to do with Plaintiff's allegations here.  Additionally, Plaintiff does not allege that FE2 raised his concerns about "rushing" the partnership model with Defendants or that Defendants shared his concerns.  *Id.*  In sum, none of the former employee statements remotely suggests that Defendants had information inconsistent with their challenged statements.  *See, e.g.*, *McCasland v. FormFactor Inc.*, 2009 WL 2086168, at *5 (N.D. Cal. July 14, 2009) (confidential witness allegations inadequate because they did not "allege that any CW heard or read any specific private statement by a defendant that contradicted a public statement").

Plaintiff also cites the anonymously sourced July 9, 2024 Car Buzz article, which reported a challenging work environment at Fisker, with unnamed sources complaining that Defendants had questionable judgment, their actions "didn't make sense," and employees felt that they "couldn't speak up."  AC ¶¶ 147–48.  The Car Buzz article, however, does not provide any details from which to infer that its unnamed sources offered "reliable personal knowledge concerning the [Defendants'] mental state."  *Perrin v. Sw. Water Co.*, 2011 WL 10756419, at *12 (C.D. Cal. June 30, 2011); *see also Wet Seal*, 518 F. Supp. 2d at 1172 (allegations based on anonymously sourced news reports "do Plaintiffs little good because they provide no specific facts to corroborate the reliability of the report").  In any event, the grievances relayed in the article concern Defendants' temperament, competence and operational decision-making—i.e., they do not concern what Defendants knew

---

going on"), PwC's feelings concerning Fisker's financial statements ("PwC *may have been* uncomfortable with how Fisker was reporting its COGS"), and the Company's rollout of SAP ("the implementation of SAP *may have been* rushed").  AC ¶¶ 160–63, 165 (emphasis added).  None of this speculation, however, is related to Defendants or offers any insight into what they knew or did not know.

- 20 -

1    and when, let alone what Defendants knew about the facts relevant to Plaintiff's
2    misstatement claims.

3                    **c.    Employee and auditor resignations.**

4          Plaintiff next argues that the "resignations of multiple Fisker executives,"
5    including John Finnucan, Florus Beuting, and Burkhard Huhnke, support an
6    inference of scienter.  AC ¶ 156.  But it is well-established that a plaintiff must
7    "differentiate between a suspicious change in personnel and a benign one." *Zucco*,
8    552 F.3d at 1002.  Conclusory allegations that an employee "resigns or retires
9    during the class period . . . cannot support a strong inference of scienter." *Id.*
10   Rather, an employee's resignation is relevant only when "'the resignation at issue
11   was uncharacteristic . . . or was accompanied by suspicious circumstances.'" *City*
12   *of Dearborn Heights*, 856 F.3d at 622 (quoting *Zucco*, 552 F.3d at 1002).

13         Here, the only allegations about Mr. Finnucan's resignation as CAO state his
14   notice and effective dates, that he was one of Fisker's "highest paid employee[s],"
15   and that the Company later announced a delay in filing its financial statements due
16   to his resignation.  *Id.* at ¶¶ 156–57.  None of this suggests that Finnucan's
17   departure was "uncharacteristic" or "suspicious."   Indeed, the Company's 8-K
18   disclosed that Finnucan left Fisker to pursue another opportunity as "the chief
19   financial officer of a private company," *see* Ex. 3 at 39, and thus the overriding
20   inference is that this was merely "a benign" change in personnel. *Zucco*, 552 F.3d
21   at 1002.

22         With respect to Mr. Beuting, Plaintiff points out that he served as CAO for
23   only eight days, November 6, 2023 through November 14, 2023.  AC ¶ 157.  But
24   the AC offers no other detail concerning Beuting's resignation and certainly does
25   not connect his relatively brief tenure to any purported wrongdoing or fraudulent
26   activity.  *See, e.g.*, *Zucco*, 552 F.3d at 1002 (inference of fraud not as compelling as
27   inference that departures were due to "unrelated personal or business reasons").
28   Insofar as Plaintiff is pointing to the fact that Beuting resigned a day after Fisker

announced its quarterly financial results, courts have routinely found allegations regarding the *timing* of an employee's departure deficient. *See, e.g.*, *City of Dearborn Heights*, 856 F.3d at 622 ("[M]ere conclusory allegation that a financial manager resigns or retires . . . shortly before the corporation issues its restatement, . . . without more, cannot support a strong inference of scienter." (cleaned up)).[9]

Plaintiff further alleges that in May 2024, well after the class period ended, Fisker disclosed that PwC would not stand for reappointment for the fiscal year ending December 31, 2024. AC ¶ 170; Ex. 7. But the AC provides no detail concerning PwC's decision-making. *See, e.g.*, *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1040 (S.D. Cal. 2014) ("Without additional explanation about the reasons for [independent auditor's] resigning . . . , the resignation alone does not indicate that the individual defendants had scienter.").

### d.    Unrelated accounting discrepancies.

Plaintiff points to a handful of "accounting discrepancies" in Fisker's financials and claims they suggest "deliberate recklessness or intentional manipulation." AC ¶ 159. Most of these supposed discrepancies are minor, e.g., an alleged $3,000 difference between a press release and financial statement related to $763,000 worth of expenses. *Id.* And it is not clear how these alleged accounting errors are related in any way to the substantive fraud claims in this case. In any event, "the mere publication of inaccurate accounting figures . . . without more, does not establish scienter." *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002).

---

[9] For the same reasons, Plaintiff's allegations that Dr. Burkhard Huhnke "abruptly" resigned "just nine days before Fisker announced a delay in completion" of the Company's financials (AC ¶ 158) are insufficient, particularly given the lack of any allegations connecting Huhnke to the facts relevant to Plaintiff's misstatement claims. *See, e.g.*, *Ryan v. FIGS, Inc.*, 2024 WL 187001, at *12 (C.D. Cal. Jan. 17, 2024) (finding a CFO's "unexpected" departure insufficient to establish scienter and declining "to speculate as to the reasons behind a change of leadership positions").

1    Further, the AC does not suggest that either Defendant was involved in
2    making the alleged errors, much less that they "knowingly and recklessly engaged
3    in an improper accounting practice."  *See Metzler*, 540 F.3d at 1068–69; *see also In*
4    *re ICN Pharms., Inc.*, *Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004)
5    (dismissing action where plaintiffs failed to "provide detailed evidence of the
6    contemporaneous decision-making behind the alleged accounting errors that would
7    combine to show the required scienter").

8    **e.    <u>Sarbanes-Oxley certifications.</u>**

9    Plaintiff claims that Defendants' signatures on the Company's Sarbanes-
10   Oxley mandated certifications support an inference of scienter.  AC ¶¶ 173–75.  But
11   these "required certifications," which are made by every public company CEO and
12   CFO in quarterly and annual reports, "add nothing substantial to the scienter
13   calculus."  *Zucco*, 552 F.3d at 1003–04.  "[A]llowing Sarbanes–Oxley certifications
14   to create an inference of scienter in 'every case where there was an accounting error
15   or auditing mistake made by a publicly traded company' would 'eviscerat[e] the
16   pleading requirements for scienter set forth in the PSLRA.'"  *Id.*

17   **f.    <u>Unrelated arbitration decision and investigation.</u>**

18   Plaintiff alleges that Dr. Gupta-Fisker has "been found to lack credibility" by
19   an arbitrator in an unrelated arbitration matter involving a former employee who
20   claimed he was owed "founder's stock" in Fisker.  AC ¶¶ 145–46.  Even if
21   Plaintiff's selective characterization of the arbitrator's decision was accurate (and it
22   decidedly is not), the arbitrator's commentary would not be probative of scienter
23   here.  "[E]ven if a finding of wrongfulness [from another action] was alleged," a
24   court could not "conclude that those allegations are therefore relevant to claims of
25   reckless conduct in the instant case."  *Fidel v. Rampell*, 2005 WL 5587454, at *7
26   (S.D. Fla. Mar. 29, 2005); *see also Knox v. Yingli Green Energy Holding Co. Ltd.*,
27   242 F. Supp. 3d 950, 973 (C.D. Cal. 2017) ("[A] stray allegation of wrongdoing . . .
28   does not help establish scienter.").

- 23 -

Plaintiff also references reports that Fisker "received a subpoena from the Securities and Exchange Commission, indicating the [Company] could be under investigation by [the SEC]." AC ¶ 172. Allegations of the mere existence of SEC subpoenas or investigations are entirely insufficient to support an inference of scienter. *See, e.g.*, *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management."); *see also In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1011 n.8 (N.D. Cal. 2017) ("vague allegations" about an SEC investigation "are insufficient to establish scienter").

### 3.    The Nonfraudulent Inference Concerning Fisker's Inventory Adjustment Is More Compelling.

When evaluating scienter, the Court must "compare the plausibility of its holistic review to alternative, non-culpable explanations." *In re Alteryx, Inc. Sec. Litig.*, 2021 WL 4551201, at *8 (C.D. Cal. June 17, 2021). As noted above, Plaintiff's motiveless, profitless theory of fraud makes no sense. However, there is a far more compelling, nonfraudulent explanation for Fisker's Q3 gross margin announcement and the adjustment of expenses from SG&A to COGS. To wit, although the accounting rules relevant to start-ups and auto manufacturers are complex, Fisker's forecasts and accounting determinations were made in good faith. However, in preparing its third quarter financial disclosures, the Company's accounting team (in consultation with its outside auditor) determined that certain adjustments needed to be made. The Company promptly disclosed the relevant adjustments and explained the impact on Fisker's financials. This suggests transparency, not an intent to mislead.

### C.    The AC Fails to Plead Loss Causation.

Plaintiff must also adequately allege that Defendants "caused the loss for which [he] seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). To do so, Plaintiff

- 24 -

must allege with particularity that "after purchasing h[is] shares and before selling[,] . . . (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). The most common way to prove that the "truth became known" is to "identify one or more corrective disclosures" that "reveal[] new facts that . . . render some aspect of the defendant's prior statements false or misleading." *Id.* at 790; *see also In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *10 (N.D. Cal. May 16, 2011) (corrective disclosure must "relate back to the misrepresentation and not to some other negative information").

Plaintiff alleges that Fisker's stock price fell when "the truth" about Defendants' purported material misrepresentations "was partially revealed" in a series of disclosures made on November 8, 2023; November 13, 2023; and November 20, 2023. AC ¶ 178. But these disclosures are not corrective disclosures because (1) they do not "relate back" to the alleged misrepresentations, and/or (2) they did not "become known" before Plaintiff sold his stock on November 10, 2023.

### 1.   November 8, 2023 Announcement

The first alleged partial corrective disclosure is Fisker's November 8 press release announcing that "the completion of [its quarterly] financial statements would be delayed due to the appointment of a new chief accounting officer . . . and the departure of [its] former CAO." AC ¶ 179. That Fisker was delaying the issuance of its Q3 financial results and the filing of related financial disclosures was the ***only*** "new" fact revealed to the market in this very short press release,[10] and thus there was nothing that could have "render[ed] some aspect" of Fisker's prior statements about its gross margin "false or misleading." *BofI Holding*, 977 F.3d at

---

[10] Fisker had previously announced on September 22, 2023 that the former CAO, John Finnucan, had given notice of his intent to resign. AC ¶ 64.

790; *see also Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *7 (C.D. Cal. Feb. 6, 2014) (announcement of delayed SEC filing was not a partial "corrective disclosure" because it did not "reveal[] to the market any misrepresentations" concerning the "categories of alleged misstatements that Plaintiffs rel[ied] on"); *In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) (news of delayed 10-K filing not corrective disclosure because it "did not disclose the alleged fraud").    Accordingly, the November 8 announcement does not constitute a corrective disclosure, nor can it be a "partial corrective disclosure" for the reasons detailed below.[11]

### 2.    November 13, 2023 Earnings Release

Plaintiff asserts that the Company's November 13, 2023 earnings release was the next "partial disclosure," wherein "Fisker reported a gross margin of -17%" and "further delayed the filing of its 3Q23 10-Q."  AC ¶ 180.  No matter whether the November 13 announcement relates back to Fisker's prior statements concerning gross margin, it is, in any event, irrelevant to the loss causation inquiry because ***Plaintiff sold all of his Fisker stock three days earlier*** and therefore cannot establish any losses attributable to the November 13 release.  *See, e.g.*, *Mehedi v. View, Inc.*, 2024 WL 3236706, at *9 (N.D. Cal. June 28, 2024) (where plaintiff "sold its shares before the truth was revealed," it could "not attribute its losses" to the later "corrective disclosure"); *see also MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1248 (11th Cir. 2023) (announcements did not qualify as "series of partial corrective disclosures" because lead plaintiff sold shares before relevant truth revealed).

---

[11] Defendants acknowledge that in its decision appointing Plaintiff as the lead plaintiff, this Court observed that the November 8 disclosure could be "a partial corrective disclosure" in light of "the successive revelations on November 13 and 20."  *See* ECF No. 56 at 7–8.  As set out below, those "successive revelations" occurred ***after*** Plaintiff sold all of his Fisker shares, and thus they do not constitute "corrective disclosures" to which his alleged losses can be attributed.  *See infra* § IV.C.2.

1    *Mehedi* is instructive.  There, the court rejected the plaintiff's argument that

2    it had sufficiently alleged loss causation when it sold its shares before the revelation

3    of the fraud but after an earlier "partial corrective disclosure" concerning a

4    government investigation.  2024 WL 3236706, at \*8–9.  The plaintiff relied on the

5    Ninth Circuit's decision in *Loos v. Immersion* to argue that the announcement of an

6    investigation could constitute a "partial corrective disclosure"—even if it did not

7    itself reveal a fraud—if the fraud was later disclosed.  *Id.* at \*8 (citing 762 F.3d 880

8    (9th Cir. 2014)).  But *Mehedi* distinguished *Loos* on the ground that the *Mehedi*

9    plaintiff sold its stock before "the relevant truth was revealed," and thus failed to

10   allege loss causation.  *Id.* at \*9.  Like the plaintiff in *Mehedi*, Plaintiff here

11   concedes that he sold his shares before the November 13 announcement that

12   purportedly revealed the alleged fraud when considered together with Fisker's

13   earlier November 8 disclosure.  Accordingly, Plaintiff "cannot attribute [his] losses

14   to the [later] announcement—and thus fails to allege loss causation" in connection

15   with either disclosure.  *Id*.

16                    **3.    November 20, 2023 Form 8-K**

17       Plaintiff's last purported partial corrective disclosure, a one-sentence 8-K

18   dated November 20, 2023 disclosing that Fisker's new CAO, Florus Beuting, had

19   resigned, *see* AC ¶ 181, suffers from the same flaws.  First, Plaintiff sold all his

20   shares before the announcement and thus cannot attribute any of his losses to it.

21   *See supra* § IV.C.2.  Second, even if Plaintiff had not previously sold his shares, the

22   Company's succinct disclosure concerning Mr. Beuting's resignation did not

23   "reveal new facts" about Fisker's gross margin or its alleged accounting

24   irregularities such that it could render Fisker's prior statements misleading.  *See*

25   *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229

26   (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer,

27   without explanation, would not alert investors to any improprieties so as to allege

28   loss causation.").

- 27 -

Tellingly, the AC acknowledges that the accounting misclassifications and material weaknesses relating to inventory and related income statement accounts—key to the purported "relevant truth"—were not "revealed" to the market until ***the November 22, 2023 filing*** of the third quarter Form 10-Q.  AC ¶¶ 17–18, 79.  While such a disclosure might otherwise—under Plaintiff's theory of the case—constitute the ultimate "corrective disclosure," Plaintiff does not and cannot allege it as such because Fisker's stock price actually ***went up*** following that filing.  Ex. 9; *see In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 953 (9th Cir. 2023) ("[p]leading loss causation requires a showing that the 'share price fell significantly after the truth became known'"); *Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1237 (D. Nev. 2024) (loss causation allegations "unavailing" because "complaint does not allege a drop in stock price during [certain corrective disclosure] dates, let alone a significant drop").

### D.  <u>The AC Fails to State a Claim for Control Person Liability Under Section 20(a).</u>

Plaintiff's Section 20(a) claims should be dismissed because they fail "to adequately plead a primary violation of section 10(b)." *Zucco*, 552 F.3d at 990.

## V.  <u>CONCLUSION</u>

For these reasons, the AC should be dismissed.

Dated:  December 6, 2024       ORRICK, HERRINGTON & SUTCLIFFE LLP

                                      */s/ Kevin M. Askew*
                                   KEVIN M. ASKEW
                                 Attorneys for Defendants

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this brief contains 8,945 words, which complies with the word limit set by court order dated November 14, 2024 (ECF No. 61).

Dated:  December 6, 2024          ORRICK, HERRINGTON & SUTCLIFFE LLP


                                  */s/ Kevin M. Askew*
                                  _____
                                  KEVIN M. ASKEW
                                  Attorneys for Defendants

- 29 -

# APPENDIX A

**\*\*\***

# CHALLENGED STATEMENTS CHART

*Douglas v. Fisker, et al.,*

No. 2:23-cv-09976-FLA (KSx) (C.D. Cal.)

| # | Challenged Statement | Source |
|---|---|---|
| 1 | "We are currently in a quarter that truly marks the inflection for Fisker—our business model has now been proven, by the fact that we are already making a positive profit margin on the first vehicles we are selling[.]" | AC ¶ 111; Ex. 1 at 6[1] |
| 2 | "Fisker anticipates an 8–12% gross margin range for full year 2023, provided input costs do not change dramatically." | AC ¶ 112; Ex. 1 at 9 |
| 3 | "And talking about profitability, I don't know of any EV start-up that ever made a double-digit profit margin on the very first cars that we have delivered.  And I think that really sets the stage for where we're going in the future." | AC ¶ 113; Ex. 2 at 19 |
| 4 | "We still anticipate gross margins for the full year 2023 in the 8% to 12% range despite exceeding targets in Q2, provided input costs do not change dramatically .... this guidance balances our asset-light model[.]" | AC ¶ 114; Ex. 2 at 25 |
| 5 | "But to answer your question on gross margins, the first critical topic is to design and engineer a vehicle where you have thought about gross margins. You have thought about material input, you have thought about the number of parts.  So we—from the get-go created an organization that thought about selling a $37,500 car, not $100,000 car. So the entire organization thinks about a few parts. The entire organization thinks about the steel stamp body, how can, we engineer the car for more efficiency. So that's the first topic.  The second topic is that we've seen battery costs go down.  So the input costs on batteries went down from Q1 from Q2 to Q3. So I expect those trends to | AC ¶ 116; Ex. 2 at 28 |

---

[1] All "Ex." references are to the exhibits attached to Defendants' Request for Judicial Notice.

# APPENDIX A
## ***
## CHALLENGED STATEMENTS CHART
### *Douglas v. Fisker, et al.,*
No. 2:23-cv-09976-FLA (KSx) (C.D. Cal.)

| # | Challenged Statement | Source |
|---|---|---|
| | continue to further go down. And I think number three, what's really critical is to look at volumes in terms of the program lifetime.  So from a program lifetime, we have a 50,000 annual volume.  And those volumes are fairly straightforward.  We also, by the way, don't amortize our investments. I can't comment on what other start-ups do, but legacy—OEMs do amortize their investments.  They also amortize their ED&D that they in-house spend, which we don't amortize, because we actually spend the money with our suppliers.  So again, from our perspective, we have an asset-light strategy, a very different business model to other start-ups or legacy OEMs." | |
| 6 | "I'm also really excited about our positive gross margins, quite frankly, because normally in an EV start-up, you are running obviously companies running 2 or 3 years with massive losses, which obviously means you need to raise a lot of money just to cover those losses. So we are not in that position." | AC ¶ 118; Ex. 2 at 35 |
| 7 | "Gross margin was -17% on a GAAP basis (adjusted gross margin was 9%)[.]" | AC ¶ 120; Ex. 4 at 43 |
| 8 | "Gross margin was -17% on a GAAP basis; adjusted gross margin was 9%, which excludes an inventory valuation adjustment associated with lower levels of production during the ramp-up phase which we expect to continue until we reach full production." | AC ¶ 121; Ex. 4 at 45 |
| 9 | "Net loss totaled $91.0 million[.]" | AC ¶ 122; Ex. 4 at 45 |
| 10 | Reporting cost of goods sold was $83.92 million, gross margin was -$12.12 million, net loss before income taxes was $89.123 million, and net loss was $90.958 million. | AC ¶ 123; Ex. 4 at 48 |

# APPENDIX A

***

# CHALLENGED STATEMENTS CHART

*Douglas v. Fisker, et al.,*

No. 2:23-cv-09976-FLA (KSx) (C.D. Cal.)

| # | Challenged Statement | Source |
|---|---|---|
| 11 | "Our third quarter cost of goods sold totaled $83.9 million, which included $18.2 million of noncash inventory adjustment impact associated with initial production ramp. As our production ramp continues, we expect inventory adjustments to diminish. In the quarter, GAAP gross margin was negative 17% and non-GAAP gross margin was 9%, which excludes the inventory adjustment. We have additional impacts from FX, geographic mix and higher input costs with a first-in first-out inventory treatment that collectively shaved another few points of the margin, which would have ended up in the mid-teens if they were added back. The positive adjusted gross margin demonstrates the benefit of our unique vehicle capabilities within the company and points towards a faster path towards positive EBITDA. Our Q3 operating expenses totaled $87.4 million, which was down 38% year-over-year and down 1% over quarter as launch-related R&D expenses continue to taper off while marketing sales and service investments increased. Loss from operations was $99.6 million, a 29% year-over-year improvement and a 13% quarter-over-quarter increase. Net loss totaled $91 million or $0.27 loss per share compared to $0.49 loss per share last year." | AC ¶ 124; Ex. 5 at 56 |
| 12 | "Q3 was a highly complex quarter. Went from $800,000 of revenue to $71 million of revenue. In multiple countries, ForEx, very complex accounting along with convertible notes and accounting for derivatives. So we experienced quite a lot of complexity in the business, and as you rightly pointed out, personnel changes as well. We, of course, continue to understand all these different areas. We are continuing to hire. We do have already 3 controllers in place, 2 in the U.S., 1 in Europe, and we continue to strengthen the team. We continue to add more experts | AC ¶ 126; Ex. 5 at 68 |

# APPENDIX A
***
# CHALLENGED STATEMENTS CHART
*Douglas v. Fisker, et al.,*
No. 2:23-cv-09976-FLA (KSx) (C.D. Cal.)

| # | Challenged Statement | Source |
|---|---------------------|--------|
| | within the team. Some other areas that were extremely complex were because of contract manufacturing, things like raw material inventory accounting and finished goods inventory accounting, things that we had not done before and extremely complex as you look at IT integrations with Magna, in-house integrations. So these are unfortunately growing pains and we are addressing all these different areas so we can also mature our systems, hire more people, hire more talent to address all these different areas, and it's a work in progress. We are working tirelessly, very hard to get the queue done, so more to come on that." | |