Robert V. Prongay (SBN 270796)
  rprongay@glancylaw.com
Leanne H. Solish (SBN 280297)
  lsolish@glancylaw.com
Raymond D. Sulentic (SBN 316913)
  rsulentic@glancylaw.com
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN A. DOUGLAS, Individually, as Trustee of the Lauren L. Douglas Trust, and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HENRIK FISKER, GEETA GUPTA-FISKER, and JOHN FINNUCAN, <br><br> Defendants. | Case No. 2:23-cv-09976-FLA (KSx) <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** <br><br> Judge: Hon. Fernando L. Aenlle-Rocha <br> Date: March 14, 2025 <br> Time: 1:30 p.m. <br> Courtroom: 6B |

OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     FACTUAL BACKGROUND .............................................................................2

        A.    Fisker And Its Highly Touted "Asset-Light" Business Model ..............2

        B.    Defendants Report Positive Margins On The First Vehicles Sold .........2

        C.    The Truth About Fisker's Asset-Light Model Emerges ........................3

              1.    Fisker Delays Reporting Its 3Q23 Financial Results ...............3

              2.    Fisker Announces Negative Gross Margins For 3Q23 And
                    Material Weaknesses In Internal Controls ...............................3

              3.    Fisker's New CAO Abruptly Resigns ......................................4

        D.    Post-Class Period Events Reveal Even *More* Abysmal Gross Margins
              And Additional Troubles ......................................................................4

III.    LEGAL STANDARD ......................................................................................5

IV.     PLAINTIFF STATES A §10(b) CLAIM..........................................................5

        A.    Plaintiff Alleges Material Falsity.........................................................6

              1.    August 4 Statements...............................................................6

        a)    Plaintiff Does Not Challenge Fisker's 2Q23 Gross Margin Results .....8
        b)    The PSLRA Safe Harbor Does Not Apply ...........................................9
        c)    Statements Challenged As Puffery And Opinion Are Actionable........10
              2.    November 13 Statements .......................................................13

              3.    Plaintiff Has Standing For The November 13 Statements......14

        B.    Plaintiff Adequately Alleges Scienter..................................................16

              1.    Defendants Had Motive .........................................................16

              2.    Plaintiff Alleges Deliberate Recklessness.............................18

        a)    Defendants' Access To Information Supports Scienter.......................18
        b)    Plaintiff's FE Allegations Support Scienter.........................................19

c)  Multiple Suspicious Resignations Support Scienter.............................20

d)  Multiple Material Discrepancies And The Simplicity Of The
Accounting Support Scienter ................................................................21

e)  SOX Certifications Support Scienter ....................................................22

f)  Gupta-Fisker's Prior Perjury And The Undisclosed SEC Investigation
Support Scienter ...................................................................................22

g)  Gupta-Fisker's Response To Analyst Questions Supports Scienter.....23

h)  Core Operations Supports Scienter ......................................................23

2.  Plaintiff Alleges At Least A Tie When Allegations Viewed
Holistically ...........................................................................................24

C.  Plaintiff Adequately Alleges Loss Causation .......................................25

V.  PLAINTIFF STATES A §20(a) CLAIM ...........................................................28

VI.  CONCLUSION ..................................................................................................28

# **TABLE OF AUTHORITIES**

CASES

*Alfus v. Pyramid Tech. Corp.*,
764 F. Supp. 598 (N.D. Cal. 1991) ........................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................5

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ............................................13, 22

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .............................................................24, 26

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ...........................................................15, 16

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................7

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ............................................26

*Butala v. Owlet, Inc.*,
2024 WL 3648141 (C.D. Cal. Aug. 5, 2024) ......................................16, 18

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023) ...........................................28

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ........................................................................25, 26

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .............................................................18, 19

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ...............................................................16

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)................................................................................28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023)............................................................................12, 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ......................................................................................6

*Hanon v. Dataproducts Corporation*,
  976 F.2d 497 (9th Cir. 1992)...........................................................................15, 16

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000).........................................................................17, 22

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021)..........................................................................18, 19, 23

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)......................................................8, 19

*In re Atossa Genetics Inc Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017)................................................................................9

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)...............................................................................25

*In re Buca Inc. Sec. Litig.*,
  2006 WL 3030886 (D. Minn. Oct. 16, 2006) ......................................................26

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015)...............................................................................17

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................................13

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023)...............................................................................10

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024)...............................................................................27

OPPOSITION TO MOTION TO DISMISS

*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008)..................................................................................5, 25

*In re Immune Response Sec. Litig.*,
 375 F. Supp. 2d 983 (S.D. Cal. 2005)......................................................................6

*In re Lattice Semiconductor Corp. Sec. Litig.*,
 2006 WL 538756 (D. Or. 2006)................................................................................22

*In re Lucid Grp., Inc. Sec. Litig.*,
 2024 WL 3745605 (N.D. Cal. Aug. 8, 2024)...........................................................12

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000)................................................................21, 22

*In re Portal Software, Inc. Sec. Litig.*,
 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)........................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017).........................................................................passim

*In re Questcor Sec. Litig.*,
 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)............................................................5

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
 266 F. Supp. 2d 1150 (C.D. Cal. 2003)...................................................................18

*In re UTStarcom, Inc. Sec. Litig.*,
 617 F. Supp. 2d 964 (N.D. Cal. 2009)....................................................................21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012)....................................................................................6

*In re VeriSign, Inc.*,
 2005 WL 88969 (N.D. Cal. Jan. 13, 2005).............................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. L*iab. Litig.,
 2017 WL 3058563 (N.D. Cal. July 19, 2017).........................................................15

*Institutional Invs. Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009).....................................................................................23

OPPOSITION TO MOTION TO DISMISS

v

*Kelly v. Elec. Arts, Inc.*,
71 F. Supp. 3d 1061 (N.D. Cal. 2014) ............................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...........................................................5, 6, 12, 14

*LB Partners, L.P. v. Neutrogena Corp.*,
1995 WL 714447 (C.D. Cal. Aug. 9, 1995) ...................................................15

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...................................................................25, 27

*Longo v. OSI Sys., Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ...............................................24

*MacPhee v. MiMedx Grp., Inc.*,
73 F.4th 1220 (11th Cir. 2023) ......................................................................27

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012) ............................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .....................................................................................6, 16

*Mauss v. NuVasive, Inc.*,
2016 WL 3681831 (S.D. Cal. July 12, 2016) ...........................................26, 28

*Mehedi v. View, Inc.*,
2024 WL 3236706 (N.D. Cal. June 28, 2024) ................................................27

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) ...................................................................14, 15

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..........................................................20

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) .......................................................................6, 14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ..........................................................................25

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................19

*Mulligan v. Impax Lab's., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................8, 10, 12

*No. 12 Pension Fund v. Ambassador's Grp.*,
717 F. Supp. 2d 1170 (E.D. Wash. 2010) ...........................................................23

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ..............................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ............................................................................................10

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ..............................................................................14

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009) .................................................................26

*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) .................................................................................6

*Rihn v. Acadia Pharms. Inc.*,
2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ....................................................11

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ..............................................................................24

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ..........................................................................7, 23

*SEC v. Jasper*,
883 F. Supp. 2d 915 (N.D. Cal. 2010) ................................................................22

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................18, 21

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
2020 WL 6128223 (C.D. Cal. June 25, 2020) ....................................................22

OPPOSITION TO MOTION TO DISMISS

vii

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................5, 16

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................................23

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ..............................................9

*U.S.A. v. Boyajian*,
    2016 WL 225724 (C.D. Cal. Jan. 19, 2016) ...............................................23

*Wanca v. Super Micro Comput., Inc.*,
    2018 WL 3145649 (N.D. Cal. June 27, 2018) .............................................16

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
    2024 WL 1327247 (N.D. Cal. Mar. 27, 2024)........................................10, 15

STATUTES

15 U.S.C. §78u-4(b)(2) ...................................................................................16

RULES

Fed. R. Evid. 608 ............................................................................................23

Lead Plaintiff John A. Douglas ("Plaintiff") responds to Defendants'[1] Motion to Dismiss (Dkt. 64, the "Motion")[2] the Amended Class Action Complaint (Dkt. 59, the "AC").

## I.    INTRODUCTION

Defendants repeatedly touted to investors that Fisker, a tightly-controlled electric vehicle company, had a unique business model that generated a gross profit as soon as it began selling cars—a remarkable feat that enticed the market. Because cars cost a lot of money to manufacture, they are an *asset-intensive* business. Accordingly, analysts questioned how Fisker could overcome such heavy production costs—costs that other car companies expensed—and become profitable so quickly. Defendants said Fisker was different—that it had an "asset-light" business model, one that essentially outsourced its manufacturing costs via contracts with overseas suppliers. Given that structure, Defendants said Fisker would realize positive gross margins as soon as its cars were sold.

Defendants' narrative was a sham. Their false claims rested on concealing mounting production and overhead costs, which they grossly misclassified and eventually restated. But this is not a case of complex accounting with innocent misclassifications: the alleged fraud here coincided with or preceded abrupt and highly-suspicious resignations by *two* Chief Accounting Officers (CAO) within weeks of one another—with one resigning after just eight days on the job.

These CAO departures, coupled with delayed financial filings, the eventual admission of material weaknesses in internal controls, and an auditor departure,

---

[1] "Defendants" refers to Henrik Fisker ("H. Fisker") and Geeta Gupta-Fisker ("Gupta-Fisker").

[2] Defendants' brief is cited as "Mot. __," citations to the AC are "¶__." Capitalized terms not defined here have the same meanings ascribed to them in the AC, and all dates fall in 2023 (*e.g.*, "August 4" means August 4, 2023). Unless noted, alterations, citations, and quotations are omitted, and emphasis is added.

revealed a company markedly different from Defendants' Class Period representations. As the truth was revealed over a series of partial disclosures, Fisker's stock plummeted. Today, Fisker is bankrupt and under investigation by the SEC. This is not a case of fraud by hindsight, nor a strike suit. There is real fraud here. Defendants' Motion should be denied.

## II. FACTUAL BACKGROUND

This is a securities class action alleging §§10(b) and 20(a) claims under the Securities Exchange Act of 1934 against Defendants.

### A. Fisker And Its Highly Touted "Asset-Light" Business Model

Fisker is an electric vehicle ("EV") company founded in 2016 by Defendants. ¶¶2, 34. H. Fisker served as CEO and Chairman, and Gupta-Fisher served as CFO and COO, as well as a director. ¶¶29-30. Although Fisker designed several vehicles, only one, the Fisker Ocean, reached the market in mid-2023. ¶¶36, 46, 51.

To differentiate themselves from other EV manufacturers, Defendants touted Fisker's "asset-light" business model that purportedly enabled Fisker vehicles to be sold immediately at a profit. ¶¶3, 34. Accordingly, Defendants touted positive gross margins from the get-go, confidently repeating an 8-12% annual gross margin forecast, and assuring that these margins were based on GAAP. ¶¶3, 37-42, 47-49, 94-99. Analysts and investors reacted positively to Fisker's model and Defendants' representations. *E.g.*, ¶¶4, 43-45.

### B. Defendants Report Positive Margins On The First Vehicles Sold

On August 4, 2023, following the first sales of the Fisker Ocean, Fisker announced its 2Q23 financial results, reporting 7.5% gross margins, or 18.5% gross margins when excluding sales to early-stage investors. ¶53. Defendants repeatedly stated that these margins proved Fisker's business model, and that investors could anticipate similar margins for the year. ¶¶53-60, 111-118. Although the market was disappointed with the low sales, analysts were reassured by the positive gross margin. ¶¶61-62.

**C.      The Truth About Fisker's Asset-Light Model Emerges**

**1.      Fisker Delays Reporting Its 3Q23 Financial Results**

On November 8, 2023, Fisker announced a delay in the release of its 3Q23 financials, attributing the delay to the recent resignation of Fisker's CAO, John Finnucan, and the appointment of a new CAO, despite previously assuring the market that Finnucan was staying through at least October 27 to "facilitate an orderly transition." ¶¶63, 64, 179. On this news, Fisker's shares fell 8.7%. ¶¶65, 179.

**2.      Fisker Announces Negative Gross Margins For 3Q23 And Material Weaknesses In Internal Controls**

On November 13, Fisker announced its 3Q23 financial results, reporting a $91.0 million net loss, despite $71.8 million revenue. The earnings release highlighted that "***gross margin was -17% on a GAAP basis (adjusted gross margin was 9%)***[.]" Defendants explained that this adjusted gross margin excluded an $18.226 million "inventory valuation adjustment associated with lower levels of production during the ramp-up phase which we expect to continue until we reach full production." ¶66.

This "inventory valuation adjustment" related to the expensing of fixed production overhead costs as a part of a company's cost of goods sold ("COGS") when production levels are lower than normal capacity due to, for example, a ramp-up period in production – and is required under GAAP. ¶¶101-105. In highlighting *adjusted* gross margins, Defendants told investors that if they ignored material costs essential for producing Fisker's vehicles, the car was profitable.

That same day, Fisker also revealed that it could not timely file its 3Q23 10-Q and that Fisker had material weaknesses in its internal control over financial reporting. ¶¶67, 180.

On this news, Fisker's shares fell 18.7%. ¶¶70, 180. Analysts responded negatively. ¶¶71-76. For example, BNP Paribas stated that it "tread[s] cautiously" because "gross profit [is] now negative" and emphasized that "we do not like the aesthetics of FSR's recent Chief Accounting Officer departure, followed by Mon.'s

announced 10Q filing delay, citing 'material weakness in internal financial reporting controls.'" ¶72 (emphasis in original). Wolfe Research noted that Fisker's COGS was a fundamental "challenge" to operations. ¶76.

### 3.    Fisker's New CAO Abruptly Resigns

On November 20, Fisker disclosed that its recently-hired CAO resigned on November 14—just one day after the 3Q23 earnings release and after just eight days on the job. ¶¶77, 181. On this news, Fisker's shares fell 14.89%. ¶¶77, 181. Analysts were alarmed: Evercore ISI commented that with the new CAO resigning, "still without audited financials[,]" "we typically refrain from inflammatory language, but it is fair to say this continues to be nothing short of a PR/stock/media investor disaster/circus w/ stock reaching all-time low $2. **Time is fleeting to rectify…**[.]" ¶78.

### D.    Post-Class Period Events Reveal Even *More* Abysmal Gross Margins And Additional Troubles

On November 22, Fisker released its 3Q23 10-Q, admitting that *an additional* "$20 million of expenses that were related to services performed after the start of production of salable vehicles" were erroneously classified as SG&A expenses, rather than as COGS—resulting in the overstatement of the gross margins reported on November 13. Actual GAAP gross margin was ***negative 46%*** and actual non-GAAP gross margin was ***negative 20%***. The 3Q23 10-Q also corrected the misclassification of other expenses that resulted in Fisker overstating its reported operating income and net income in its November 13 financials. ¶79.

All these errors were straightforward expense misclassifications that understated the expenses and overstated the GAAP gross margin (by 170%) announced on November 13. ¶¶79, 107-110.

Fisker's 3Q23 10-Q also revealed material weaknesses related to inventory accounting, including that it "did not design and maintain effective controls in response to the risks of material misstatement over the accounting for inventory and

OPPOSITION TO MOTION TO DISMISS

4

related income statement accounts." ¶80.

On February 29, 2024, Fisker announced its preliminary 4Q23 financials, reporting gross margins of -35%. ¶84. On March 25, 2024, Fisker was delisted and analysts dropped coverage. ¶85. Fisker filed for bankruptcy in June 2024 and it was further revealed that the SEC is investigating Fisker. ¶93.

## III.   LEGAL STANDARD

When deciding a motion to dismiss, the Court "must…accept all factual allegations…as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018) ("courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage"). A complaint need only "contain sufficient factual matter…to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[A] district court ruling on a motion to dismiss is not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *8 (C.D. Cal. Oct. 1, 2013); *Khoja*, 899 F.3d at 1008 ("Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory").

## IV.   PLAINTIFF STATES A §10(b) CLAIM

To state a claim for securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). Defendants challenge just falsity, scienter, and loss causation.

### A.   Plaintiff Alleges Material Falsity

A complaint adequately alleges falsity when it "specifi[es] each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Even "literally true" statements may be misleading due to "their context and manner of presentation." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *Khoja*, 899 F.3d at 1008-09 ("Even if a statement is not false, it may be misleading if it omits material information."). Although there is not "an affirmative duty to disclose any and all material information[,] [d]isclosure is required…when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

Falsity is subject to heightened pleading, but "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss." *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005). "Such a regime would defeat the remedial goals of the federal securities laws." *Id.*

#### 1.   August 4 Statements

On August 4, Defendants announced Fisker's 2Q23 financials, including a 7.5% gross margin, or 18.5% when excluding early-stage investor vehicles, on the handful of cars sold. ¶53. H. Fisker stated that Fisker's 2Q23 margins "prove[d]" Fisker's business model (¶111), set the stage for the future (¶113), and demonstrated that Fisker was "not in [the] position" to have massive losses in its first years (¶118).

The announcement also provided anticipated annual gross margins of 8-12%, "provided input costs do not change dramatically," which Gupta-Fisker reiterated

during an earnings call, explaining this guidance "balances our asset-light model." ¶¶112, 114. On the earnings call, Gupta-Fisker was asked how Fisker managed to avoid pricing pressures during its ramp-up phase and whether gross margins would improve as production increased. Her response focused on how Fisker designed vehicles with the gross margin inputs in mind and by discussing positive trends for Fisker's gross margins. ¶116.

These statements were false and misleading for what they failed to disclose. ¶¶115, 117, 119. By August 4, Fisker's gross margins were already being adversely impacted by significant, excess fixed production overhead costs—*i.e.*, material costs essential for producing the vehicles—during Fisker's ramp-up phase and demonstrated that Fisker required significant assets to operate and thus was not an asset-light business. ¶¶101-105. And, as later admitted, by this time it "became apparent that the Company was facing potential financial distress." ¶¶52, 119. Therefore, Defendants' statements "create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) ("once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.").

Defendants argue that Plaintiff's allegations constitute fraud by hindsight. Mot. 8-9. To the contrary, Defendants repeatedly assured investors that: (1) they were intimately familiar with gross margin inputs and how changes to these inputs would, and did, affect gross margin; (2) they were actively tracking Fisker's production costs; and (3) their gross margin calculations were GAAP based. ¶¶4, 39-42, 48-49, 52, 56, 58-59, 94-100. Analysts understood that, under GAAP, fixed costs are treated differently during a ramp-up and can affect gross margin, and tried to clarify whether

that would happen here. Gupta-Fisker assured them they would not. ¶¶41, 44, 50, 95, 99.

Moreover, by August 4, Fisker was well within its production ramp-up. *E.g.*, ¶51 (exceeding 80 units/day by July 7); ¶56 (noting "costs associated with the initial production ramp"); ¶¶62, 116 (analysts understood Fisker was in ramp-up phase). While Defendants may have characterized the $18.2 million in fixed overhead costs an "inventory valuation adjustment" at the end of 3Q23, these contemporaneous allegations plausibly demonstrate that it was known or knowable as of August 4 that fixed overhead costs during the ramp-up phase were to be expensed as incurred, affecting gross margins. *See also* ¶¶101-105 (detailing relevant GAAP). Just because an admission came later (¶52), does not make it hindsight. *E.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *6 (N.D. Cal. Nov. 4, 2020).

### a)  Plaintiff Does Not Challenge Fisker's 2Q23 Gross Margin Results

Defendants argue that H. Fisker's statements are nonactionable because they are "accurate statements of historical results." Mot. 9 (citing ¶¶111, 113, 118). In so doing, Defendants improperly cherry-pick portions of the misstatements. *Cf. Mulligan v. Impax Lab's., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) ("the Court may not assess the statements listed in the [complaint] in a vacuum, plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently vague so as to constitute puffery, but rather will examine the entire statement and its circumstances to determine if it is actionable.") (emphasis in original).

Plaintiff doesn't allege that Fisker's 2Q23 gross margins were inaccurate. *Contra* Mot. 9. Rather, Plaintiff alleges it was misleading to tout 2Q23 gross margins while claiming that Fisker's "business model ha[d] now been proven," that these gross margins "set the stage" for Fisker's future, and that Fisker was not in the position to have "massive losses"—when, at that time, large fixed costs were impacting Fisker's

gross margins and it was "apparent that the Company was facing potential financial distress." ¶¶52, 115, 119.

### b)      The PSLRA Safe Harbor Does Not Apply

Defendants argue two statements (¶¶112, 114) are protected by the statutory safe harbor. But "to the extent Plaintiffs also challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply." *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (emphasis in original); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016). Plaintiff alleges that it was misleading to tell the market that Defendants anticipated gross margins of 8-12% for the year, "provided input costs do not change dramatically" (¶¶112, 114), when gross margins were already being adversely impacted by significant, excess fixed production overhead costs—*i.e.*, Fisker's input costs were already dramatically changing. ¶115; §IV.A.1 *supra*. Accordingly, these statements are not protected by the safe harbor.

Similarly, to fall under the safe harbor, statements must be accompanied by "meaningful cautionary language" that identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017). Defendants must make a "stringent showing: There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading. To meet this standard, the language bespeaking caution must relate directly to that to which plaintiffs claim to have been misled." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017). Defendants' cited risk warnings are entirely generic (Mot. 10-11) and are in no way "directly related" to the alleged omissions, coming nowhere close to meeting their required "stringent showing." *E.g.*, *Atossa*, 868 F.3d at 798 (disclosures regarding FDA's concerns about its core product were insufficient where they were "vague enough to cover any concern the FDA might have had"). Moreover, the cautionary language that

OPPOSITION TO MOTION TO DISMISS

9

actually accompanied Fisker's gross margin guidance—"provided input costs do not change dramatically"—was insufficient. ¶¶112, 114, 115. That is because "[v]ague and general disclosures may not be sufficient if the defendants are aware of specific risks, and risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 2024 WL 1327247, at *16 (N.D. Cal. Mar. 27, 2024); *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 951 (9th Cir. 2023) ("broad pronouncements without meaningful acknowledgement of the known risks…does not suffice to invoke the safe harbor provision"). Plaintiff alleges these warnings were misleading; they cannot bring the statements within the safe harbor. *York Cnty.*, at *17 (warning of "potential future risk did not adequately convey the risks posed by then-existing" issues).

### c)  Statements Challenged As Puffery And Opinion Are Actionable

Defendants argue that all but one of the August 4 statements are nonactionable puffery. Mot. 11-13 (citing ¶¶111, 113, 114, 116, 118). While generally vague, generalized statements are not actionable, "determinate, verifiable statement[s]" of fact, as here, are not puffery. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). "[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143.

Defendants' puffery argument relies on improperly de-contextualized snippets, however "the court must analyze the context in which the statements were made." *Mulligan*, 36 F. Supp. 3d at 966; *Quality Sys.*, 865 F.3d at 1143. "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and

induce reliance upon such a representation." *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *7 (S.D. Cal. Sept. 19, 2016).

The context of Defendants' alleged misleading statements undercuts their argument. At the time of Defendants' statements, Fisker was finally reporting its first revenues and gross margins—after years of development. Fisker had cut production targets multiple times. And Defendants had repeatedly promised positive gross margins as proof of its asset-light business model, despite some market skepticism. *See generally* ¶¶37-60. The statements in ¶¶111, 113, 114, 116, 118 were intended to provide certainty to the market about the core of Fisker's business. Analysts relied on these statements, commenting that the "positive gross margin…made clear the benefits of its asset-light business model that mgmt has long touted, and we believe this deserves credit." ¶62; ¶61 (gross margin guidance "reiterate[s] the company's underlying profitability profile…profitability per vehicle remains a focal point for investors"), *id.* ("power of contract manufacturing shown through" gross margin).

Accordingly, Defendants' statements are not puffery because they "affirmatively created an impression of a state of affairs that differ[ed] in a material way from the one that actually existed." *Quality Sys.*, 865 F.3d at 1144. Defendants' citation to *Vignola v. FAT Brands*, is thus inapt: statements about the asset-light business model there were "aspirational predictions" and "do not speak to its actual state of affairs." 2019 WL 6138473, at *12. Here, the August 4 statements spoke to the actual core of Fisker's ***then existing*** business—Defendants were differentiating Fisker from other EV manufacturers—that it could manufacture cars without incurring massive manufacturing costs. *E.g.*, ¶111 (asset-light "business model has now been proven"); ¶118 (Fisker "not in th[e] position" to have "massive losses").

Defendants likewise cite snippets of ¶116 as inactionable puffery and opinion. Mot. 12-14. Plaintiff does not allege that Gupta-Fisker's response to the analyst's question was literally false, but was misleading by omitting that Fisker's gross margins were being adversely impacted by significant, excess fixed production

overhead costs in the ramp-up phase. *See Khoja*, 899 F.3d at 1008-09. Her answer "affirmatively created an impression of a state of affairs" (that Fisker's business model was different and avoided significant manufacturing costs) that "differ[ed] in a material way from the one that actually existed" (Fisker did have significant manufacturing costs). *Quality Sys.*, 865 F.3d at 1144.

Defendants' arguments that certain statements are inactionable opinions fare no better. Mot. 13-14 (citing ¶¶113-114, 118). Viewed in context, these statements are not statements of opinion and belief, but "contain factual representations at their core." *Mulligan*, 36 F. Supp. 3d at 967; *In re Lucid Grp., Inc. Sec. Litig.*, 2024 WL 3745605, at *20 (N.D. Cal. Aug. 8, 2024) (statements that "express certainty about specific issues and their effects on [company's] operations" were not opinions). For example, stating that Fisker's gross margin guidance "balances our asset-light model" conveyed that gross margin is an appropriate indicator of the success of the asset-light model. ¶114. Likewise, in context, H. Fisker's statement that he was "excited" about Fisker's gross margins expressed certainty that Fisker would not be "running…with massive losses" (¶118), as did his comment that Fisker's double-digit profit margin "sets the stage for…the future." ¶113. "[T]hat certain statements are predicated with indications that the speaker 'thought' or 'believed' a given statement does not change this result." *Id*.

Even if read as opinions, Plaintiff "identif[ies] particular material facts regarding the basis for the issuer's opinion, the omission of which make the statement[s] misleading to a reasonable person reading the statement fairly and in context." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023); §IV.A.1, *supra*. As the Ninth Circuit reiterated, "a reasonable investor expects that the issuer's opinion "fairly aligns with the information in the issuer's possession at the time." *Id*. Defendants repeatedly assured investors that they followed GAAP when calculating gross margins, were intimately familiar with the gross margin inputs and their effects on gross margin, and actively tracked production costs.

Against this backdrop, Defendants' assurances about gross margins and Fisker's future "did not fairly align with the information in [Defendants'] possession at the time"—they are actionable. *Id.* at 771.

### 2.    November 13 Statements

On November 13, Fisker announced its preliminary 3Q23 financials (¶120), reporting: (1) gross margin of -17%; (2) adjusted gross margin of 9%; (3) net loss of $91.0 million; (4) COGS of $83.92 million; (5) gross margin of -$12.12 million; and (6) net loss before taxes of $89.123 million. ¶¶120-123. Gupta-Fisker repeated these results during an earnings call and highlighted Fisker's positive adjusted gross margin. ¶124.

These results were admittedly false: $20.628 million in expenses related to "services performed after the start of production of salable vehicles" were erroneously "recorded primarily as selling, general and administrative expenses" rather than COGS; and certain expenses were not recorded during 3Q23 but were instead erroneously capitalized as inventory (an asset). ¶¶79, 107-110, 125 (detailing restated results). Defendants don't challenge the alleged falsity of these financial results, nor could they as "the existence of restated financials results is sufficient to support plaintiff's belief that the statements were misstated." *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1180-81 (S.D. Cal. 2009) (restating preliminary financial results sufficient to allege falsity).

Instead, Defendants make specious arguments challenging the earnings call statements. Defendants claim "….***The positive adjusted gross margin*** demonstrates the benefit of our unique vehicle capabilities…and points towards a faster path towards positive EBITDA[]" (¶124) is puffery. Mot. 11-12. Defendants focus on an un-emphasized portion of this statement that Plaintiff does not allege to be false. Different portions of her statement are false: Fisker's gross margin figures; and characterizing adjusted gross margin as ***positive***. ¶¶124-25 ("the foregoing statements

emphasized…were materially false….”), 125(b)-(d). These figures—and whether the adjusted gross margin was positive—are objectively verifiable, not puffery. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

Defendants also contend that, because Gupta-Fisker did not discuss accounting errors–when asked to provide details on the 10-Q delay and “rectif[ying]” Fisker’s material weaknesses–that her response was not misleading. Mot. 15. Yet “literally true” statements can be misleading for what they omit. *Miller*, 519 F.3d at 886; *Khoja*, 899 F.3d at 1008-09. Plaintiff doesn’t allege that Gupta-Fisker’s response was literally false, or question her characterization that the quarter was “complex.”[3] Rather, Plaintiff alleges that it *was misleading* to attribute complexities and “growing pains” as leading to the 10-Q delay and Fisker’s material weaknesses (¶126), while omitting that: (1) the delay was also due to misclassifying expenses to understate COGS and overstate gross margins (¶¶107-110) and related friction with Fisker’s auditor (¶163) (PwC was “uncomfortable” with COGS figures and would not sign-off on 3Q23 10-Q by filing deadline)); and (2) Fisker’s material weakness was in inventory and related income statement accounts (¶80).

### 3.     Plaintiff Has Standing For The November 13 Statements

Defendants assert that the November 13 statements are inactionable because Plaintiff cannot challenge statements made after his last stock purchase (Mot. 7), conflating the substantive element of falsity in a Rule 12(b)(6) analysis with standing in a Rule 12(b)(1) analysis. Because Defendants’ Motion was noticed under Rule 12(b)(6), the Court need not consider their standing argument. Indeed, “once the [lead] plaintiff demonstrates [his] individual standing to bring a claim, the standing inquiry is concluded[.]” *Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015). So long as the lead plaintiff has a claim, he has standing to challenge a defendant’s common conduct relating to the “same type of relief or the same kind of injury” as

---

[3] *Contra* Mot. 13 (challenging portion of response statement as puffery).

unnamed class members. *Id.* at 1263.

Under *Melendres*, Plaintiff has standing by purchasing during the Class Period and selling after at least one corrective disclosure. ¶27; Dkt. 26-2. *Melendres*, 784 F.3d at 1263. Plaintiff brings claims, on behalf of all Fisker investors during the Class Period (¶¶1, 182), that stem from common misrepresentations and omissions. Any adequacy issue should be decided *at class certification*. *Melendres*, 784 F.3d at 1263.

Since *Melendres*, courts in this Circuit have almost universally rejected similar arguments. For example, the court in *Ferris v. Wynn Resorts Ltd.* acknowledged that although under *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999), "conduct actionable under Rule 10b–5 must occur before investors purchase the securities[,] …when the alleged misrepresentations are part of a 'common course of conduct,' the questions common to all investors will be relatively substantial." 2021 WL 3216462, at *13 (D. Nev. July 28, 2021). The *Ferris* court determined that plaintiffs sufficiently alleged a common course of conduct for the post-purchase statements, and that the issues raised by defendants "may be more relevant at the class certification stage." *Id.*; *York Cnty.*, 2024 WL 1327247, at *4-*5 (examining *Melendres*); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 3058563, at *4 (N.D. Cal. July 19, 2017) (plaintiff had standing to represent class members who purchased "bonds in different tranches or offerings").[4]

Defendants' cases are inapt. In both *Binder* and *Hanon v. Dataproducts Corporation*, 976 F.2d 497 (9th Cir. 1992), the Ninth Circuit affirmed *summary judgment*, holding that the respective ***individual*** plaintiffs could not bring claims for

---

[4] *See also, e.g.*, *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991) (rejecting similar argument as "arbitrary," noting it would wrongly "imply that only someone who bought on the last day of a class period would be able to bring an action based on the logical dates alleged"); *In re VeriSign, Inc.*, 2005 WL 88969, at *4 (N.D. Cal. Jan. 13, 2005); *LB Partners, L.P. v. Neutrogena Corp.*, 1995 WL 714447, at *8 (C.D. Cal. Aug. 9, 1995).

post-purchase misrepresentations. *Binder*, 184 F.3d at 1066; *Hanon*, 976 F.2d at 501. Importantly, neither *Binder* nor *Hanon* contended with class claims. *See Binder*, 184 F.3d at 1062 (class decertified); *Hanon*, 976 F.2d at 500 (class certification denied). And Defendants' two other cases rely on *Binder* and *Hanon*. *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1069 (N.D. Cal. 2014); *Wanca v. Super Micro Comput., Inc.*, 2018 WL 3145649, at *7-*8 (N.D. Cal. June 27, 2018) (overlooking *Melendres*).

**B.    Plaintiff Adequately Alleges Scienter**

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144.

"Courts must consider the complaint in its entirety…. The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "In making this determination, the court must review all the allegations holistically." *Matrixx*, 563 U.S. at 48. A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. A "tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

**1.    Defendants Had Motive**

As Defendants concede (Mot. 17, n.7), "courts have held a desire to raise company financing, combined with the 'red flags' of a company's financial condition, is sufficient to plead scienter." *Butala v. Owlet, Inc.*, 2024 WL 3648141, at *6 (C.D. Cal. Aug. 5, 2024); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12

(N.D. Cal. Aug. 10, 2005) (allegations that "defendants were motivated to inflate artificially [company's] stock price…and obtain much-needed capital" evidenced "a palpable motive for fraud" that was "stronger than the generic desire to raise capital which can be attributed to every company").[5] Plaintiff alleges exactly that (¶¶149-50): Fisker needed to fund its loss-making operations and was on the cusp of securing hundreds of millions of dollars when Defendants were making false statements. ¶97. Indeed, two convertible note transactions were critical to Fisker's ability to secure inventory: at the end of 1Q23, Fisker had only $29 million of inventory on its balance sheet. Yet by the end of 3Q23, Fisker's inventory leapt to $545.6 million. ¶154. H. Fisker admitted that funding was something that he "always repeatedly said" that he "regularly monitor[ed]." ¶141. And with knowledge of potential financial distress by August (¶150), Defendants made false and optimistic statements about Fisker's business during Fisker's August 4 earnings call. *E.g.*, ¶118 ("I'm also really excited about our positive gross margins").[6] One month later, Fisker secured $170 million in additional financing. ¶152. *Cf. Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) ("the potential alarm signals in the face of [Fisker's] possible financial

---

[5] Defendants attempt to distinguish *Owlet* by claiming that no red flags exist here. Mot. 17, n.7. Defendants are wrong. *E.g.*, ¶150 (Fisker's first day declaration establishes that in August, Defendants knew Fisker was facing "potential financial distress."). By Fisker's own admission, something informed Defendants in August 2023 of Fisker's "potential financial distress"—whether a red flag or firsthand knowledge, the awareness of the deteriorating condition is what supports scienter.

[6] Defendants try to muddy the timeframe by claiming that Fisker's First Day Declarant did not join the Company until 2024 (Mot. 17, n.7)—which is irrelevant because he spoke *on behalf of Fisker* and what Fisker knew in August 2023. *Cf. In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015) ("all information known by the agent, at least when received within the scope of authority, is deemed known by the principal."). Moreover, the Amended First Day Declaration (Mot. Ex. 8) doesn't support Defendants' unsupported inference as further explained in Plaintiff's accompanying opposition to Defendants' request for judicial notice.

OPPOSITION TO MOTION TO DISMISS

17

crisis could cast doubt on [Defendants'] optimistic outlook and support a finding of scienter.").

Defendants incorrectly contend that a lack of stock sales negates scienter. Mot. 16. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021) ("allegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter."); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (rejecting contention that "purchases of stock negate an inference of scienter").

### 2.     Plaintiff Alleges Deliberate Recklessness

#### a)     Defendants' Access To Information Supports Scienter

Defendants misidentify what's required to support an inference of knowledge in the Ninth Circuit. Mot. 18. Defendants protest that Plaintiff fails to "describe the contents of any specific report." *Id*. But as this Court recently held: "it is irrelevant that the 10(b) Complaint does not point to any internal company communications showing that Owlet intended to mislead the public." *Butala*, 2024 WL 3648141, at *7. Indeed, Defendants' argument parrots *the dissent* in *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, which the Ninth Circuit rejected. *See* 81 F.4th 918, 947 (9th Cir. 2023).[7]

Plaintiff only needs to allege that Defendants had access to information which contradicts their public statements. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) ("By making detailed factual statements, contradicting

---

[7] For similar reasons, Defendants' argument that the FE's failed to "read any specific statement" (Mot. 20), likewise fails.

important data to which the Defendants had access, a strong inference arises that they knowingly misled the public as to its clear meaning."); *accord Apple*, 2020 WL 6482014, at *12; *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020).

The Court may consider factors such as the executives' positions and detail-oriented nature in assessing access (*contra* Mot. 18). *See Alphabet*, 1 F.4th at 706 ("we may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue."); *NVIDIA*, 81 F.4th at 940 (founder and CEO portrayed "as a highly competent, extremely detail-oriented manager who would have known [of] a significant source of NVIDIA's revenues.").

Here, Plaintiff alleges that Defendants were hands-on (¶¶140, 169); were "intimately involved in [Fisker's] day-to[-]day operations" (¶138); Gupta-Fisker provided feedback to the financial statements (¶164); and couldn't be told that they were wrong (¶148). These facts depict Defendants' broad and unfettered access to information. And combined with Defendants' assurances that they were intimately familiar with gross margin inputs and their effects on gross margin, that they actively tracked production costs, and that gross margins were GAAP based (§IV.A.1, *supra*), they give rise to a strong inference of scienter.

### b) Plaintiff's FE Allegations Support Scienter

Defendants' challenge to Plaintiff's FE allegations (Mot. 19-21) ignores several particularized allegations, including that PwC would not sign off on Fisker's 3Q23 10-Q by the filing deadline (¶163); Gupta-Fisker demanded that the new vehicle and financial models be given to investors even when there was a lack of time to vet the figures (¶168); and evidence of Gupta-Fisker's "hands-on" nature and direct access to information (¶169). "The confidential witnesses were described with sufficient particularity to establish their reliability." *NVIDIA*, 81 F.4th at 940.

### c) Multiple Suspicious Resignations Support Scienter

Abrupt resignations of multiple key executives strongly support scienter. *E.g.*, *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187-1188 (C.D. Cal. 2007) (CFO's resignation was "highly suspicious," and "**leans heavily** towards a finding of scienter"). The resignations here suggest multiple executives distancing themselves from Defendants. ¶¶156-58. Notably, *two* CAOs resigned within weeks of each other. ¶156. Even analysts were spooked. ¶¶72, 78 ("we do not like the aesthetics of FSE's recent Chief Accounting Officer departure, followed by Mon.'s 10Q filing delay.").

Beuting's resignation was extraordinary: coming eight days after taking the job, and just one day after Fisker released its preliminary 3Q23 financial results. ¶157. It seems Beuting took one look at Fisker's books and decided it was better to resign—**effective immediately**—than to stay with Fisker even eight more days when its 10-Q would be released—even if that meant forfeiting restricted stock worth $350,000. ¶157. The cogent and compelling inference is that Beuting did not want to be associated with Fisker's 10-Q. ¶¶157, 162. For a seasoned CAO like Beuting, this is a suspicious resignation—not a "benign one." *Contra* Mot. 21. The inference is more compelling considering Fisker's auditor also cut ties months later, after refusing to timely sign-off on the 3Q23 10-Q. ¶¶163, 170.

Fisker's CTO Huhnke also resigned—effective the next day—on October 30: nine days before Fisker announced a delay in completion of its financial statements.[8]

---

[8] Beuting and Huhnke's abrupt resignations renders Defendants' reliance on *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, inapt. There, "the fact that [CFO] remained an employee of Align for an additional six months after the first goodwill impairment announcement was made further diminishes any inference of scienter based on his resignation." 856 F.3d 605, 622 (9th Cir. 2017). And in *Ryan v. FIGS*, the CFO resigned "shortly before his one-year anniversary with the company"—not after eight days. 2024 WL 187001, at *12 (C.D. Cal. Jan. 17, 2024).

Collectively, Plaintiff is entitled to the inference that these departures underscore the presence of fraud and are similar to fact patterns where resignations support scienter. *Cf. In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (defendants' terminations and resignations, occurring contemporaneously with company's restatement and initiation of internal and SEC investigations, "add one more piece to the scienter puzzle."); *Shenwick*, 282 F. Supp. 3d at 1148 (resignations close in proximity to corrective disclosure and corroborated by CW accounts contributed to inference of scienter).

### d)   Multiple Material Discrepancies And The Simplicity Of The Accounting Support Scienter

Defendants' multiple accounting discrepancies between sets of financials that ***should be identical***[9] reflect deliberate reckless. ¶159. The existence of these—at times massive—discrepancies,[10] means either (a), Defendants *did not* reconcile their press releases to their 10-Qs and/or 10-Ks (for identical reporting periods); or (b) they *could not* reconcile them. Either way, Defendants gave investors no explanation. Defendants also used alternating definitions for the key metric here: haphazardly calling it "cost of goods sold" or "cost of revenue"—each being defined differently—at times *in the same reporting period*. ¶159(xi). This type of conduct—in an alleged accounting fraud—reflects deliberate recklessness. "Plaintiffs allege 'in your face facts,' that cry out, 'how could defendants not have known that the financial statements were false.'" *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637 (E.D. Va. 2000). "These common-sense observations compel the conclusion that the alleged simplicity of the GAAP rules violated here are relevant and contribute

---

[9] For example, Fisker's actual COGS in any given period should be static, not differ depending on where it is reported (*i.e.*, in an 8-K or a press release).

[10] For instance, when Fisker reported its FY23 results, FY23 COGS was $375.8 million in the earnings release, but leapt to $558.8 million in the FY23 10-K. This led to a $182.9 million difference in Fisker's gross margin. ¶159(iv)-(v).

probative weight to an inference of scienter." *Id*. It was not complex accounting creating these issues: it was deliberate recklessness (¶¶106-110), which supports scienter. *See, e.g.*, *Backe*, 642 F. Supp. 2d at 1186 ("the simplicity of the accounting principles violated" supports scienter); *MicroStrategy*, at 638 (similar).

### e)    SOX Certifications Support Scienter

Sarbanes-Oxley Act ("SOX") certifications add to the scienter puzzle. *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 WL 538756, at *17-18 (D. Or. 2006); *cf. Howard*, 228 F.3d at 1062 (the "court stressed the signing and authorization of statements as critical in determining whether directors could be liable as primary violators under §10(b).").

### f)    Gupta-Fisker's Prior Perjury And The Undisclosed SEC Investigation Support Scienter

After reviewing Gupta-Fisker's deposition transcripts and comparing them to her live testimony, a retired judge concluded in 2022 that, *inter alia*, Gupta-Fisker was "less than credible in numerous instances" and her "conduct at deposition…fell dramatically short" and "should be viewed with skepticism." ¶¶145-46.

Defendants incorrectly contend that prior (uncharged) perjury is irrelevant. Mot. 23. To the contrary, "In a Rule 10(b)-5 claim, the scienter requirement can be partially satisfied by allegations of a regular pattern of related and repeated conduct." *Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128223, at *6 (C.D. Cal. June 25, 2020). Gupta-Fisker's recent perjury is both relevant to and supportive of scienter. "This alleged pattern of related conduct makes Plaintiff's scienter allegations all the more compelling." *Id.*; *cf. SEC v. Jasper*, 883 F. Supp. 2d 915, 928 (N.D. Cal. 2010) *aff'd,* 678 F.3d 1116 (9th Cir. 2012) ("Past violations may permit an inference that future violations will occur."). Suggestions of perjury by a judge just before the Class Period can and should be considered. Judge Steele (Ret.) concluded: "Neither Dr. Fisker's testimony nor inferences from all of the available evidence, made Dr. Fisker's version of the events credible." ¶145. Those credibility findings are

relevant to a case about misrepresentations. *Cf.* Fed. R. Evid. 608 ("A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness"); *U.S.A. v. Boyajian*, 2016 WL 225724, at *10 (C.D. Cal. Jan. 19, 2016) ("even remote acts of untruthfulness may be found to have probative value.").

Moreover, the SEC's ongoing investigation of Fisker (¶172), which was not disclosed *until after Fisker filed for bankruptcy*, further contributes to an inference of scienter. *E.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) ("SEC's ongoing investigation" provided "one more piece of the scienter puzzle"); *Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1179 (E.D. Wash. 2010) (similar).

### g)    Gupta-Fisker's Response To Analyst Questions Supports Scienter

"Defendants' own response to the issue contributes to an inference of scienter here." *Schueneman*, 840 F.3d at 708. Fisker's gross margins were a key metric that analysts focused on during the Class Period generally, and in earnings calls specifically. ¶¶45, 61, 116. Gupta-Fisker's response to analyst questions on those earnings calls, including specifically about the accounting treatment of gross margins (*e.g.*, ¶¶94-95, 100), provides "powerful evidence" of an inference of scienter. *cf. Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("the most powerful evidence of scienter is the content and context of [CFO's]s statements" in response to analysts' questions).

### h)    Core Operations Supports Scienter

The Ninth Circuit recently reiterated that courts "may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue." *Alphabet*, 1 F.4th 687 at 706. Courts may also infer "facts critical to a business's core operations" or "important transactions" which are presumed to be known to company officers.

*Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *9-11 (C.D. Cal. Mar. 31, 2021). Here, both support scienter.

**Importance of gross margins**. Fisker's gross margins were of such prominence that H. Fisker proclaimed that Fisker's "business *model has now been proven*, by the fact that we are already making a positive profit margin on the first vehicles we are selling" on August 4. ¶¶53, 111. He called it "an important milestone." (¶53) and told investors that it was "very important to mention here." ¶55. Gupta-Fisker said being gross margin positive was "an unprecedented never done before by any other start-up." ¶56. In other words, "[t]hese facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008).

**Defendants' Roles**. Defendants' roles at Fisker similarly support scienter, as they were a "vital part" of Fisker's operations. ¶130. Gupta-Fisker was described as "very hands-on," including "dealing with analysts." ¶169. Together, they were "in charge of major decisions" according to former employees. ¶147. Finally, that the CEO and CFO co-founders were husband-and-wife should provide even more evidence of scienter under a core operations theory because such a structure eliminates any checks-and-balances that might otherwise exist between a CEO and CFO. *Cf. S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

2.  **Plaintiff Alleges At Least A Tie When Allegations Viewed Holistically**

Defendants' nonfraudulent inference withstands no scrutiny. Defendants claim "the accounting determinations were made in good faith." Mot. 24. If that were true, why would CAO Beuting resign *after just eight days* on the job? It's reasonable to assume that a CAO like Beuting would have reviewed Fisker's public filings before joining Fisker and presumably nothing about Fisker's accounting concerned Beuting.

But one brief look under the hood of the tightly controlled company and a mere eight days later, he resigned. Viewing all the facts holistically, Plaintiff alleges an inference that is "at least as compelling" as Defendants' purported non-fraudulent inference.

### C.      Plaintiff Adequately Alleges Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Because "loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "[L]oss causation is a 'context dependent' inquiry, as there are an 'infinite variety' of ways for a tort to cause a loss" (*id.*), including by identifying price declines that accompany the materialization of concealed risks or the disclosure of information previously concealed by fraud. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). A "corrective disclosure need not consist of an admission of fraud, .…reveal the full scope of defendants' fraud in one fell swoop, .…[nor] precisely mirror the earlier misrepresentation." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). Pleading loss causation is "not meant to impose a great burden on a plaintiff." *Dura*, 544 U.S. at 346-47; *First Solar*, 881 F.3d at 753. Loss causation ordinarily should "not to be decided on a Rule 12(b)(6) motion to dismiss." *Gilead*, 536 F.3d at 1057.

Plaintiff sufficiently alleges loss causation: Defendants' misrepresentations and omissions artificially inflated Fisker's stock during the Class Period, and that inflation dissipated following three November 2023 disclosures that partially revealed the truth of Fisker's accounting issues, poor gross margins, and business model that were previously concealed by the fraud, resulting in significant stock declines. ¶¶6-15, 63-78, 177-181; *see supra* §II.C.1-3. Plaintiff provides more than "sufficient detail to give defendants ample notice of [the] loss causation theory, and to give some

assurance that the theory has a basis in fact." *Berson* 527 F.3d at 989-90; *accord Dura*, 544 U.S. at 347.

Defendants argue that none of the disclosures "'relate back' to the alleged misrepresentations, and/or (2) they did not 'become known' before Plaintiff sold his stock on November 10." Mot. 25. As for the November 8 disclosure, Defendants argue that "Fisker was delaying the issuance of its Q3 financial results and the filing of related financial disclosures was the only 'new' fact revealed to the market" and "there was nothing that could have 'render[ed] some aspect' of Fisker's prior statements about its gross margin 'false or misleading.'" Mot. 25.[11] With respect to the November 13 and 20 corrective disclosures, not only do Defendants argue that neither disclosure relates back to prior statements, but Defendants further argue that because Douglas sold his shares before these disclosures, he cannot attribute any losses to it.[12] Mot. 26-27. However, Defendants' relation back argument (Mot. 25) relies on an outdated outlier case that cannot overcome recent Ninth Circuit precedent

[11] *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *7 (C.D. Cal. Feb. 6, 2014) is inapposite, where the disclosure regarded the "notification of late filing" with "no reasons for Defendants' filing delay." Here, Plaintiff specifically alleges that the delay in filing was due to, *inter alia*, the recent resignation of Fisker's CAO, which combined with the subsequent corrective disclosures, is sufficient to plead loss causation. *See infra* 26-27. *In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) fares no better: the delayed SEC filing was not corrective because the delay was due to completing a previously announced restatement.

[12] Defendants' reliance on *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) is misplaced. There, the court found that "[s]tanding alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation." Here, Beuting's departure isn't pled in a vacuum. ¶¶63-78; *supra* §IV.B.c). This is sufficient. *E.g.*, *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016) ("announcement of [defendant]'s resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to the investigation," and finding "combination of partial disclosures" sufficiently pleaded loss causation).

on loss causation. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1188 (9th Cir. 2024) (allegations "that the Stan Lee announcement caused investors 'to realize' that Genius had misrepresented its prospects of being acquired by Disney or Netflix because the purported key business development update on July 6 had ***nothing to do with*** a sale to Disney or Netflix" sufficient to plead loss causation). Fisker investors "understood the [10-Q delay] announcement as bad news", making it a proper corrective disclosure. *See id*.

Defendants rely upon *Mehedi v. View, Inc.*, 2024 WL 3236706 (N.D. Cal. June 28, 2024),[13] but this Court—in this case—confirmed that "[a] lead plaintiff who does not retain stock in the defendant corporation throughout all corrective disclosures may still serve as an adequate representative of the class, as partial corrective disclosures may also establish loss causation." Dkt 56 at 6. As Defendants concede (Mot. 26, n.11), "the November 8, 2023 announcement of delayed financial disclosures due to the appointment of a new CAO alone may not have revealed the presence of fraudulent practices to the market and investors," but recognized that: "the successive revelations on November 13 and 20…***may be fairly characterized as 'subsequent disclosure[s] of actual wrongdoing,' alerting investors to the presence of fraudulent activity so as to render the November 8 announcement a partial corrective disclosure.***" Dkt. 56 at 8.

Indeed, courts regularly find that plaintiffs have met their low burden in pleading loss causation under similar scenarios. *E.g.*, *Lloyd*, 811 F.3d at 1210 (plaintiffs met loss causation burden after agreeing that "announcements of the government investigations were not in themselves enough to establish loss causation,

---

[13] Defendants also rely on *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1248 (11th Cir. 2023), but there no corrective disclosures occurred before the sale of all of plaintiffs' stock, unlike here, where, as noted previously by this Court, Plaintiff adequately alleges a corrective disclosure on November 8.

[but] were sufficient 'when viewed together with the totality of the other alleged partial disclosures.'"); *Mauss*, 2016 WL 3681831, at *11.

Finally, as Defendants concede (Mot. 28), Fisker's accounting misclassifications and material weaknesses over inventory accounting were further revealed on November 22 (*supra* §II.D). This post-Class Period news is not pleaded as a corrective disclosure – instead, it ***confirmed*** the earlier partial disclosures relating to Fisker's accounting issues and poor gross margins. ¶¶79-80.

## V.    PLAINTIFF STATES A §20(a) CLAIM

Defendants' defense to the §20(a) claim rests on primary liability. Mot. 28. Because Plaintiff sufficiently alleges a §10(b) claim, their defense fails. *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14 (C.D. Cal. July 3, 2023).

## VI.    CONCLUSION

The Motion should be denied. If the Court grants any portion of it, Plaintiff requests leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

DATED:  January 21, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Leanne H. Solish*

Robert V. Prongay
Leanne H. Solish
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
Jennifer N. Caringal
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  (619) 231-1058
Facsimile: (619) 231-7423

*Additional Counsel for the Class*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief contains 8,951 words, which complies with the word limit set by the Court order dated November 14, 2024 (Dkt. 61).


                                              s/ Leanne H. Solish
                                              Leanne H. Solish

## **<u>PROOF OF SERVICE</u>**

I hereby certify that on this 21st day of January, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Leanne H. Solish*
Leanne H. Solish

OPPOSITION TO MOTION TO DISMISS