Kara M. Wolke (SBN 241521)
*kwolke@glancylaw.com*
Ex Kano S. Sams II (SBN 192936)
*esams@glancylaw.com*
Leanne H. Solish (SBN 280297)
*lsolish@glancylaw.com*
**GLANCY PRONGAY WOLKE & ROTTER LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff, Named Plaintiff Sachiv Mehta, and Lead Counsel for the Class*

WILLOW E. RADCLIFFE (SBN 200087)
*willowr@rgrdlaw.com*
SHAO-JIA CHANG (SBN 356004)
*schang@rgrdlaw.com*
**ROBBINS GELLER RUDMAN & DOWD LLP**
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

*Additional Counsel for Lead Plaintiff, Named Plaintiff Sachiv Mehta, and the Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JOHN A. DOUGLAS, Individually, as Trustee of the Lauren L. Douglas Trust, and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

HENRIK FISKER and GEETA GUPTA-FISKER,

Defendants.

Case No. 2:23-cv-09976-FLA (KSx)

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 8

IV. SUBSTANTIVE ALLEGATIONS ........ 10

A. Background Of The Company And Its Business ........ 10

B. As Fisker Evolved Into A Revenue-Producing Company, The Key To Displaying The Success Of Its Asset-Light Business Model Was The Company's Gross Margin Figures ........ 11

C. The Truth Begins To Emerge ........ 19

1. Fisker Announces That Its 3Q23 Financial Results Would Be Delayed Due To First Chief Accounting Officer Resignation 19

2. Fisker Announces Negative Gross Margins For 3Q23 And That There Were Material Weaknesses In the Company's Internal Controls ........ 20

3. Fisker Loses Its *Second* Chief Accounting Officer After Just Eight Days On The Job ........ 23

D. Post-Class Period Events Further Reveal Fisker's Abysmal Gross Margins, Financial Results, And A Litany Of Other Troubles ........ 24

E. Defendants Were, At A Minimum, Deliberately Reckless In Reporting And Touting Positive Gross Margins During The Class Period ........ 29

1. Defendants Repeatedly Displayed Their Intimate Familiarity With Fisker's Gross Margins ........ 29

2. Defendants Were Aware that 3Q23 Gross Margins Would Be Adversely Impacted ........ 32

3. The Misstatements In Fisker's 3Q23 Earnings Release Did Not Involve Complex Accounting ........ 34

V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 37

A. False And Misleading Statements And Omissions Relating To Fisker's 2Q23 Financial Results ..... 37

B. False And Misleading Statements And Omissions Relating To Fisker's 3Q23 Financial Results ..... 40

VI. ADDITIONAL SCIENTER ALLEGATIONS ..... 43

A. Fisker Was Tightly Controlled By Its Husband And Wife Executive Team ..... 43

1. Defendants Controlled The Company's Messaging To The Investing Public ..... 44

2. The Company's And Defendants' Public Statements Support A Strong Inference of Scienter ..... 46

3. Multiple Reports Call Into Question Defendants' Credibility 48

B. Defendants Were Motivated to Raise $450 Million in Desperately-Needed Capital Just Before the Truth Was Revealed ..... 52

C. Multiple Abrupt Executive Departures Support A Strong Inference Of Scienter ..... 53

D. Defendants' Multiple And Inexplicable Accounting Discrepancies Evince Deliberate Recklessness Or Intentional Manipulation ..... 54

E. Former Fisker Employee Accounts Corroborate A Strong Inference Of Scienter ..... 60

F. Post-Class Period Events Support Scienter ..... 62

G. Defendants' SOX Attestations Support Scienter ..... 63

VII. LOSS CAUSATION ..... 64

VIII. CLASS ACTION ALLEGATIONS ..... 65

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..... 67

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..... 70

XI. CLAIMS FOR RELIEF ..... 70

XII. PRAYER FOR RELIEF .......... 75

XIII. JURY TRIAL DEMANDED .......... 75

Lead Plaintiff John A. Douglas, on behalf of himself and as Trustee of the Lauren L. Douglas Trust and named plaintiff Sachiv Mehta (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Fisker Inc. ("Fisker" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other public statements issued by and disseminated by Fisker; (c) analyst and industry reports concerning Fisker; (d) media reports about the Company; (e) public court filings; (f) interviews of former Fisker employees; and (g) review of other publicly available information concerning Fisker.[1] Plaintiffs believe that certain relevant information is known only by defendants and is exclusively within their custody or control, and that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased the publicly traded Class A common stock of Fisker, and/or purchased publicly traded call options on such stock, and/or wrote publicly traded put options on such stock, between August 4, 2023 and November 20, 2023, inclusive (the "Class Period"), and who suffered economic losses as a proximate result of the alleged wrongdoing (the "Class"). Plaintiffs pursue claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against two of the Company's senior executives, Henrik Fisker ("H. Fisker") and Geeta Gupta-Fisker

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

("Gupta-Fisker") (collectively, "Defendants").[2]

2. Fisker is an electric vehicle ("EV") company that was launched in 2016 by H. Fisker and his wife Gupta-Fisker. During the Class Period, it launched just one model, the Fisker Ocean (the "Ocean"), an SUV released domestically in June 2023. Defendants asserted that the Ocean was designed to be the most sustainable SUV on Earth.

3. To differentiate themselves from other automotive businesses, Defendants claimed that they had a unique "asset-light" business model touted as among the first of its kind that purportedly enabled their vehicles to be sold immediately at a profit. In 2020, Fisker partnered with Magna International Inc. and its affiliates (collectively, "Magna"), wherein Magna would serve as a "one-stop shop" for all of Fisker's manufacturing needs. Rather than building a factory to manufacture cars itself, Defendants claimed that Fisker's ability to contract out their manufacturing needs gave Fisker unique cost advantages right out of the gate. As a result, Defendants told investors that Fisker was not "under the same pressure as some of our competitors out there" with respect to costs, and that "we're also in a unique situation where we make money on our vehicles from the get-go." Gupta-Fisker repeatedly touted this purported ability to make a profit from inception: "We make these gross margins from the first car, and I think I've highlighted that multiple times in multiple earning calls, and that is because of our asset-light strategy."[3] Gupta-

[2] Fisker Inc. was dismissed as a defendant shortly after it filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended in the United States Bankruptcy Court for the District of Delaware, captioned *In re: Fisker, Inc., et al*, Case No. 24-11390 (the "Bankruptcy Action"), on June 19, 2024. *See* ECF 53.

[3] Defendants used the term "gross margin" to refer to the gross profit made before considering other operating costs not directly attributable to the production of vehicles—such as selling, general and administrative expenses ("SG&A") and research and development ("R&D") expenses. That is, if a car were sold for $65,000 (footnote continued)

Fisker also told investors that "the 8% to 12% gross margins that we have outlined, these are actually GAAP accounting base."

4. Analysts and investors were floored by Fisker's purported ability to sidestep the upfront manufacturing costs inherent to the automotive industry: for example, Evercore ISI commented that Fisker's FY gross margin guide of 8-12% "is much better-than-expected" in its February 27, 2023 report. Morgan Stanley similarly noted that the gross margin guidance was "far ahead of our previous expectations."

5. But Defendants' asset-light-immediately-profitable story was a farce. Defendants' story rested on undisclosed accounting machinations that were unsustainable. And this was possible because H. Fisker installed his wife, Gupta-Fisker, as Fisker's CFO. With the married couple at the helm, combined with their greater than 90% of the voting power of Fisker's outstanding stock, the husband-and-wife apex executives had complete control over the Company.

6. On November 8, 2023, before the market opened, Fisker announced that it was delaying the filing of its quarterly results for the third quarter 2023 ("3Q23").[4] Defendants attributed the delay to, *inter alia*, the then recent resignation of Fisker's chief accounting officer ("CAO"), John Finnucan, and the appointment of a new CAO.

7. On this news, the Company's share price fell $0.38, or 8.7%, to close at $3.99 per share on November 8, 2023, on unusually heavy trading volume.

---

and the cost of that car was $55,000, the $10,000 difference, or gross profit, is referred to by Defendants as "gross margin" – whether referred to on an absolute or percentage basis.

[4] Fisker's fiscal year ("FY") ends on December 31. References to a fiscal year, such as fiscal year 2023, or FY23, mean the year ending December 31. Likewise, references to 1Q23 refers to the Company's fiscal quarter ended March 31, 2023, 2Q23 refers to the Company's fiscal quarter ended June 30, 2023, 3Q23 refers to the Company's fiscal quarter ended September 30, 2023, and 4Q23 refers to the Company's fiscal quarter ended December 31, 2023.

8. Five days later, on November 13, 2023, after the market closed, Fisker announced its 3Q23 financial results, reporting a $91.0 million net loss, despite $71.8 million revenue. Fisker admitted that gross margins were not immediately positive "from the get-go" as Gupta-Fisker had promised. Rather, "***gross margin was -17%*** on a GAAP basis" — a massive variance from the immediately profitable business model that Defendants touted to investors just months prior.

9. To soothe the market, Defendants highlighted a different metric, telling investors that "***adjusted*** gross margin was 9%." Later, in Fisker's 3Q23 earnings release, Defendants further explained that the "adjusted gross margin" of 9% "exclude[d] an inventory valuation adjustment associated with lower levels of production during the ramp-up phase which we expect to continue until we reach full production." As explained herein, such an "inventory valuation adjustment" – *i.e.*, expensing fixed production overhead costs as a part of a company's cost of goods sold ("COGS") when a company's production levels are lower than normal capacity due to, for example, a ramp-up period in production – is required under GAAP.[5] In highlighting *adjusted* gross margins, Defendants told investors that if they ignored material costs essential for producing Fisker's vehicles, the car was profitable. Of course, Defendants never told investors that any contra-GAAP "inventory valuation adjustment" would be excluded from costs when touting the immediately profitable vehicle sales.

10. During the 3Q23 earnings call held the same day, Gupta-Fisker tried to explain away the negative gross margin, saying: "Some other areas that were extremely complex were because of contract manufacturing, things like raw material inventory accounting and finished goods inventory accounting, things that we had not done before and extremely complex as you look at IT integrations with Magna, in-house integrations." But the 3Q23 inventory charge was not complicated. And it was

[5] "GAAP" stands for U.S. generally accepted accounting principles.

entirely foreseeable for a company in a ramp-up phase, as Fisker was during 3Q23.

11. Also on November 13, 2023, after the close of market, the Company revealed that it could not file its quarterly report on Form 10-Q for 3Q23 (the "3Q23 10-Q") as it was required to by securities regulations. Instead, the Company filed a Form NT 10-Q with the SEC, which further revealed that Fisker had material weaknesses in its internal control over financial reporting.

12. On this news, the Company's share price fell $0.77, or 18.7%, to close at $3.34 per share on November 14, 2023, on unusually heavy trading volume.

13. Analysts and the media were surprised and concerned. CNBC reported on November 14, 2023 that, "Shares of electric vehicle startup Fisker sank Tuesday after a disappointing earnings report and a regulatory filing that raised concerns about the company's previous financial statements." BNP Paribas issued a research note stating that it "tread[s] cautiously" because "gross profit [is] now negative" and emphasized that "<u>we do not like the aesthetics of FSR's recent Chief Accounting Officer departure, followed by Mon.'s announced 10Q filing delay, citing 'material weakness in internal financial reporting controls'.</u>" (emphasis in original). Wolfe Research stated that Fisker's cost of goods sold was a fundamental "challenge" to operations in its November 20, 2023 note. Another research firm, CFRA, commented on November 21, 2023 that, "we have major concerns about FSR's viability" and that "it will be difficult for FSR to generate a profit due to the modest price tag of the Ocean ($37.5K starting price tag for the base model)."

14. Just one week later, Fisker announced on November 20, 2023, after the market closed, that its *brand new* Chief Accounting Officer, Florus Beuting, had resigned on November 14, ***just one day after the third quarter earnings release and after a mere eight days on the job***.

15. On this news, the Company's share price fell $0.35, or 15%, to close at $2.00 per share on November 21, 2023, on unusually heavy trading volume.

16. Following Fisker's *second* CAO resignation *in less than two months*—

an extraordinarily rare occurrence in public companies—analyst firm Evercore ISI responded to this news in a November 22, 2023 report by commenting that "we typically refrain from inflammatory language, but it is fair to say this continues to be nothing short of a PR/stock/media investor disaster …."

17. The financials were indeed a disaster. After the Class Period, Fisker released its 3Q23 10-Q, admitting that *an additional* "$20 million of expenses that were related to services performed after the start of production of salable vehicles" were erroneously classified as SG&A expenses, rather than as COGS—resulting in the overstatement of the gross margins reported on November 13, 2023. Fisker's actual GAAP gross margin was ***negative 46%*** and its actual non-GAAP gross margin was ***negative 20%***.

18. The 3Q23 10-Q also corrected the misclassification of other expenses that resulted in Fisker overstating its reported operating income and net income in its November 13, 2023 preliminary financial statements. All these errors were straightforward expense misclassifications, and had the effect of understating Fisker's earlier reported expenses on November 13. The errors caused the Company's earlier reported GAAP gross margin to be overstated by 170% and the Company's reported Net Loss, both before and after accounting for taxes, to be *understated* by 5%. In other words, the additional errors rendered Fisker's financials even worse than initially revealed, and materially so.

19. Moreover, Fisker's reported financials were generally a huge mess during the Class Period and continued to be so after the Class Period. At times, the Company reported two sets of financials *for the same reporting period* that differed by hundreds of millions of dollars. *See* Sec. VI.D, *infra*. For example, when the Company reported its FY23 gross margin, its FY23 press release stated that gross margin for the year was negative $102.9 million. Yet, for the same period, FY23, Fisker's 2023 Form10-K stated that FY23 gross margin was negative $285.9 million. These are the same metrics for the same reporting period and should not differ, let

alone by $182.9 million.

20. Fisker's widespread material accounting discrepancies were not due to neglect, or poor business judgment. Defendants' credibility and candor have already been found lacking by one trier-of-fact. In an Interim Arbitration Award dated July 7, 2022, Judge Steele (Ret.) "found [Gupta-Fisker's conduct and testimony] ***less than credible in numerous instances***" and concluded that it "should be viewed with skepticism."

21. Fisker is now bankrupt, following its Chapter 11 filing on June 19, 2024. *See* ECF 51. Its bankruptcy means investors have incurred even more losses on top of the Class Period peak-to-trough market capitalization decline of $1.7 billion.[6]

22. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located

[6] Based on $343.1 million shares outstanding, the Class Period high of $6.98 per share, and the share price of $2.00 on the day after the Class Period.

in this District.

26. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

27. Plaintiffs:

a. Lead Plaintiff John A. Douglas, on behalf of himself and as Trustee of the Lauren L. Douglas Trust, as set forth in the certification previously filed with the Court, incorporated by reference herein (ECF No. 26-2), purchased Fisker Class A common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

b. Plaintiff Sachiv Mehta, as set forth in the certification filed with the Court, incorporated by reference herein, purchased Fisker Class A common stock during the Class Period on behalf of his wife, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28. Defendant Henrik Fisker ("H. Fisker") is Fisker's co-founder and has served as the Company's Chairman of the Board of Directors and Chief Executive Officer ("CEO") since Fisker's inception in 2016. From 2007 to 2011, H. Fisker served as CEO and Chief Design Officer of Fisker Automotive, Inc., which he co-founded. H. Fisker also served as Executive Chairman of Fisker Automotive from 2012 to 2013. Fisker Automotive went bankrupt in 2013 – shortly after H. Fisker resigned as chairman after the company failed to meet a series of production deadlines. H. Fisker is a well-known automotive designer who designed the BMW Z8 and Aston Martin Vantage models, among others. H. Fisker holds a Bachelor of Science in Automotive Design from the ArtCentre College of Design, California.

29. Throughout the Class Period, H. Fisker spoke to investors and analysts on conference calls. During the Class Period, H. Fisker certified the accuracy of Fisker's Form 10-Q for the quarterly period ended June 30, 2023.

30. Defendant Geeta Gupta-Fisker ("Gupta-Fisker") is Fisker's co-founder and has served as Fisker's Company's Chief Financial Officer ("CFO") and as a member of the board of directors since 2016 and as Chief Operating Officer ("COO") since March 2021. Prior to co-founding Fisker, Gupta-Fisker served as an entrepreneur and Investment Manager for the Fisker family from 2014 to 2020, and as an Investment Advisor at the Alfred Mann Foundation from 2013 to 2014. Gupta-Fisker holds degrees in Zoology/Animal Biology and Biotechnology/Organic Chemistry.

31. Throughout the Class Period, Gupta-Fisker spoke to investors and analysts on conference calls. During the Class Period, Gupta-Fisker signed and certified the accuracy of Fisker's Form 10-Q for the quarterly period ended June 30, 2023.

32. Defendants H. Fisker and Gupta-Fisker (together, the "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Defendants are liable for the false and/or misleading statements pleaded herein.

33. Non-party Fisker is incorporated under the laws of Delaware with its principal executive offices located in 1888 Rosecrans Avenue, Manhattan Beach, California. The Company went public in October 2020 via reverse merger with a special purpose acquisition company called Spartan Energy Acquisition Corp ("Spartan Energy"). Fisker's Class A common stock traded on the New York Stock Exchange ("NYSE") under the symbol "FSR" from the time it went public on October 2020 through the end of the Class Period.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background Of The Company And Its Business

34. Founded in 2016 by H. Fisker and his wife Gupta-Fisker, Fisker is an automotive company that designs, develops, markets, and sells electric vehicles. The Company's stated mission is to create the world's most emotional and sustainable vehicles. Fisker describes itself as "building a technology-enabled, asset-light automotive business model." According to the Company, this business model "involves a focus on vehicle development, customer experience, sales and service" and, in accordance with the asset-light model, Fisker relies on contract manufacturers to produce its vehicles.

35. On October 29, 2020, Fisker announced that it had completed the reverse merger with Spartan Energy, providing the Company with more than $1.0 billion in funds. The Company stated that it could "now fully turn our attention to developing and launching the revolutionary, all-electric Fisker Ocean into the heart of the midsize SUV market, expected to commence in Q4 2022." Less than two months later, Fisker announced that it had entered into definitive "operational phase" platform-sharing and initial manufacturing agreements with Magna. The Company explained that its "relationship with Magna was designed to allow Fisker to maintain an asset-light business model, while leveraging [its] existing production infrastructure."

36. The Company planned to launch four models by 2025: the Ocean SUV, the PEAR compact SUV, the Alaska pickup truck, and the Ronin convertible sports

car. As of May 8, 2023, Fisker had received over 70,000 paid reservations for the Ocean and the PEAR.

### B. As Fisker Evolved Into A Revenue-Producing Company, The Key To Displaying The Success Of Its Asset-Light Business Model Was The Company's Gross Margin Figures

37. Leading up to, and throughout, the Class Period, both Defendants and the market were focused on Fisker's ability to generate revenue – *i.e.*, both producing and delivering Ocean vehicles – and the Company's ability to do so at ***positive gross margins***,[7] which would display the supposed benefits of Fisker's "asset-light" strategy. As promised, Fisker announced on November 17, 2022 that it had started production of the Ocean on time, and confirmed a 42,400 Ocean unit production plan for FY23, broken down by quarter "as follows: Q1 over 300, Q2 over 8,000, Q3 over 15,000, Q4 remainder to get to 42,400."

38. On February 27, 2023, the first earnings announcement after the

---

[7] Gross margin is expressed as a % of revenue and is calculated by taking gross profit divided by revenue. Gross profit consists of revenue minus cost of goods sold. Cost of goods sold, or COGS, is often referenced as COGS but can also be labeled as cost of revenue or cost of sales. During the Class Period, Fisker used the terms "cost of revenue" and "cost of goods sold" interchangeably. Fisker's COGS consisted of expenses related to the production of vehicles including direct parts, material and labor costs, machinery and tooling depreciation, amortization of capitalized manufacturing costs, shipping and logistics costs, reserves for estimated warranty costs related to the production of vehicles, and adjustments to write down the carrying value of inventory. Other expenses that were not directly attributable to the production of vehicles and were included in SG&A or R&D and, thus, did not impact Fiskers' gross margins. SG&A expenses consisted mainly of personnel-related expenses for Fisker's executive and other administrative functions, advertising and marketing expenses, and expenses for outside professional services, including legal, accounting, and other advisory services. R&D expenses consisted primarily of external engineering services in connection with the design of Fisker's vehicles and development of the pre-production vehicles. Improperly classifying vehicle production costs as SG&A or R&D expenses would necessarily understate COGS and overstate gross margin.

Company announced that it had started production of the Ocean, Fisker announced its 4Q22 and FY22 financial results. In this announcement, Defendants highlighted an 8-12% annual gross margin forecast. The Company stated that it was maintaining its production target of 42,400 units for the year, but hedged the estimate by stating that the target assumed that "the supply chain delivers per our forecast and we receive homologation in a timely manner."[8]

39. Later on February 27, 2023, Fisker held an earnings call with investors and analysts. During their prepared remarks, H. Fisker highlighted the Company's progress on Fisker's "last-mile delivery and support infrastructure" and reiterated the FY23 production guidance. Gupta-Fisker reiterated 8-12% gross margins for FY23 during her prepared remarks, further noting that "[t]hese numbers could get better as we achieve efficiencies with our suppliers and if input costs keep going further down. We will be self-sustainable as a company with these margins given our asset-light approach."

40. During the question-and-answer portion of the call, Gupta-Fisker responded to an analyst request for more detail on Fisker's gross margin guidance, including whether there was any risk or opportunities concerning the guidance range. Gupta-Fisker began by confirming that "the 8% to 12% gross margins that we have outlined, ***these are actually GAAP accounting base***". In response to whether there was any risk to achieving those margins, Gupta-Fisker stated:

> I think from my point of view, ***to achieve these gross margins, I don't frankly see a risk*** unless battery prices trouble. So I don't frankly see a risk on achieving the gross margins. ***We make these gross margins from the first car***, and I think I've highlighted that multiple times in multiple earning calls, and that is because of our asset-light strategy. And we don't have those huge factory billions of dollars of cost to account or amortize

[8] Homologation is the process of certifying that a vehicle is roadworthy and meets the government's regulatory and safety standards for vehicles to be sold in that specific market. *See, e.g.*, https://carbuzz.com/car-advice/what-does-homologation-mean-and-why-you-should-care/.

against.

41. Later during the question-and-answer portion of the call, an analyst asked, "I think you mentioned earlier that, this is a launch year and maybe there's certain, I guess, treatment of fixed costs[,]" and whether if Gupta-Fisker "want[ed] to elaborate if there's a comment you made around sort of the gross margin treatment initially in the launch year." Gupta-Fisker responded: "No. Because we don't have our own factory, as I explained, all the costs we have are amortized over the period of time[.]"

42. H. Fisker also sat for an interview with CNBC on February 27, 2023.[9] During the interview, H. Fisker was asked:

> Q: …You still believe you have the potential to be profitable this year, which gets into the other question that a lot of people have had with you, with Rivian, with Lucid, the pure EV start-ups, are you confident you can make it through this year without needing capital?
>
> A: So, I think within our guidance we have forecasted less spend than the capital that we have and I think the critical part here, Phil, is that yes, most start-ups, they're not making profit for two or three of four years, so the cash burn is much more dramatic. In our case, ***because of our business model, we are making money on the first cars we ship. We gave a guidance of 8 to 12%, which I think our genius CFO said might be higher than that, what we could do is I could sit back now*** and just forget about all my other programs ***and just sit counting the cash.*** We can make money as we are. We don't have to do anything.

43. Analysts were positively surprised by Fisker's gross margins forecast. For example, Evercore ISI commented that Fisker's FY gross margin guide of 8-12% "is much better-than-expected" in its February 27, 2023 report, and Morgan Stanley similar noted that the gross margin guidance was "far ahead of our previous expectations."

[9] This interview is available to watch at https://www.youtube.com/watch?v=mmdi1AokZQw.

44. Barclays stated in a February 28, 2023 report that while Fisker's FY23 guidance "is impressive on a headline basis, … we find it overly aggressive and we see a number of open questions." The first of these open questions for Barclays replayed to Fisker's gross margin guidance. Barclays stated:

> FSR guided GAAP gross margin to 8-12%, ***well-above our ingoing estimate of a slight negative %.*** We didn't expect FSR to post gross margin similar to other new-entrant EV peers given its use of MGA for contract manufacturing and a corresponding lack of large fixed costs (reducing the drag of fixed cost absorption). Yet we believe the guide was surprising. Indeed, mgmt. noted on the call that in addition to benefiting from outsourcing manufacturing to MGA, declining input costs (including steel, aluminum, and battery raw materials) also play a key role in its guide.
>
> ***We see this guide as ambitious, and we model 2023 FSR GAAP gross margin in the low-to-mid-single %.*** Yet we give credit to this early indicator of the benefits from FSR's choice to outsource manufacturing.

45. In a February 28, 2023 report, Wolfe Research commented that "Fisker was one of the worst performing stocks in 2022, down 54%. And coming into Monday's print FSR shares declined by an additional 22% YTD. Investors had clearly turned bearish. And with this backdrop, the company's 2023 guidance drove a sizable relief rally, with the shares up 30% on Monday." Wolfe Research cited Fisker's Ocean production guidance of 42,400 vehicles in FY2023 and gross margins of 8-12% for 2023 as among the drivers of the relief rally. TD Cowen noted in its March 2, 2023 report that the Company's gross margin guidance for FY23 "is above the current consensus estimate of 8.3%, which is a key focal point for investors …, given the recent mishaps of fellow EV start-ups[.]"

46. On May 5, 2023, Fisker announced that H. Fisker had delivered the first Ocean to a customer earlier that day in Copenhagen. On May 8, 2023, Bloomberg reported that the Company was facing delays delivering the Ocean due to software

integration problems, and that the software was prone to glitches.[10] H. Fisker indirectly denied these claims during Fisker's 1Q23 earnings call on May 9, 2023.

47. On May 9, 2023, in the Company's 1Q23 earnings announcement, Fisker lowered its expected FY23 vehicle output to 32,000-36,000 vehicles, citing the "current homologation and supply chain timelines." However, Defendants reiterated an 8-12% gross margin range for FY23.

48. Later the same day, Fisker held its earnings conference call with investors and analysts. Despite cutting its production guidance by at least 15%, Defendants remained confident, with H. Fisker expressing his excitement to "shift gears from a startup into a phase of becoming a revenue-generating car company, and that is happening as we speak." Fisker-Gupta confirmed that "[w]e still maintain and anticipate gross margins for the full year 2023 in the 8% to 12% range[.]"

49. During the question-and-answer portion of the call, in response to an analyst question concerning recent price cuts by competitors (which can also compress, or lower, gross margins), H. Fisker again highlighted Fisker's asset-light model: "we're also in a unique situation where we make money on our vehicles from the get-go because we're putting a fixed manufacturing fee. So I don't think we are under the same pressure as some of our competitors out there." That analyst followed-up by asking for "additional color on margins for the year." Gupta-Fisker responded that, "I think in terms of our sort of asset-light strategy that pretty much remains intact for the whole year, so I would say that those gross margins are fairly intact."

50. Barclays noted that Fisker's anticipated gross margin seemed "aggressive" in a May 9, 2023 report. Raymond James commented in a May 9, 2023 report that "1Q23 marks the final pre-revenue quarter (we think)." In a second report

[10] Sean O'Kane, *Fisker's Debut SUV Delayed by Lingering Software Problems*, Bloomberg, May 8, 2023 (available at https://www.bloomberg.com/news/articles/2023-05-08/fisker-software-struggles-hamper-debut-model-deliveries?embedded-checkout=true).

dated May 11, 2023, and after Fisker's earnings call, Barclays commented that "FSR's guide to solidly positive gross margins on vehicle sales from the start in 2023 demonstrates the benefits of its asset-light business model." Later in the report, Barclays explained that while they appreciate the value of Fisker's asset-light business model which avoids the costs of unused capacity "amid the ramp," "we see gross margins tending more towards the low/mid single digit % range in 2023."

51. On July 7, 2023, Fisker announced that in 2Q23 it produced 1,022 Ocean SUVs, explaining that a few suppliers had challenges ramping to the targeted levels, but that the Company had exceeded targeted levels of 80 units per day by the end of June 2023. However, by the start of the Class Period on August 4, 2023, Fisker again announced a reduction in its FY23 production forecast to 20,000-23,000 total units citing a "short-term capacity constraint at one supplier."

52. Furthermore, and unbeknownst to the public, in the initial months of delivery, Ocean vehicles reportedly lost power while being driven on public roads in more than 100 separate incidents, including Oceans driven by a Fisker board member and Gupta-Fisker (*see also* ¶83, *infra*).[11] And, also unbeknownst to the public, and as Fisker later admitted in a declaration submitted by Fisker's Chief Restructuring Officer in the Bankruptcy Action (D.E. 37, the "First Day Declaration"), by August 2023, it "became apparent that the Company was facing potential financial distress." At that point, Fisker began exploring a partnership with a large original equipment manufacturer, reportedly with Nissan.

53. Thus, by the start of the Class Period, it was crucial for Defendants to offer the market good news. But Fisker was only able to report total revenue of $825,000 on the 11 cars sold during 2Q23, as disclosed in Fisker's August 4, 2023

---

[11] Sean O'Kane, *Fisker Ocean owners flagged sudden power loss and brake problems for months, internal documents show*, Tech Crunch, Feb. 8, 2024 (available at https://techcrunch.com/2024/02/09/fisker-ocean-braking-power-loss-problems-investigation/).

2Q23 earnings announcement, and instead highlighted Fisker's gross margins: "[f]irst vehicles delivered achieved a 7.5% gross margin; excluding early-stage investor vehicles, gross margin was 18.5%." H. Fisker proclaimed: "[o]ur second quarter marked an important milestone for Fisker as we started deliveries of our first Fisker Ocean vehicles to customers. We are currently in a quarter that truly marks the inflection for Fisker – ***our business model has now been proven, by the fact that we are already making a positive profit margin on the first vehicles we are selling***[.]"

54. In an August 4, 2023 first look report, Barclays noted that "[h]eadline 7.5% gross margin +'ve, but rev of just $825k on 11 units delivered far below" its estimates.

55. During the earnings call with investors and analysts held later on August 4, 2023, H. Fisker began the call by emphasizing Fisker's 2Q23 gross margin:

> I don't know of any EV start-up that ever made a double-digit profit margin on the very first cars that we have delivered. And I think that really sets the stage for where we're going in the future.
>
> And of course, it's interesting to see that nobody is really mentioning that anywhere in the news. So I think its very, very important to mention it here. And I know our CFO is going to talk about this as well, because it really highlights our excellent engineering teams, how they executed the Ocean, to build the materials of that vehicle and what the possibilities are in the future for this vehicle and for our future vehicles, quite frankly.

56. In her prepared remarks, Gupta-Fisker walked participants through Fisker's 2Q23 gross margin in detail:

> Second quarter revenue totaled $825,000 driven primarily by initial Ocean vehicle sales. During the quarter, as I mentioned earlier, we delivered 11 vehicles of the 60 vehicles handed by Magna to us.
>
> But we had a unique situation during this period as 3 of those vehicles were sold to some early-stage investors' who had provided Fisker with capital very early on at lower interest rates in return for a free-based vehicle. And they paid the difference between the base and Ocean One price. And this was not Henrik and myself.

> This population represents up to 30 potential vehicles. Our second quarter cost of goods sold totaled $763,000, reflecting some costs associated with initial production ramp. Consistent with what we have guided before, we saw a positive gross margin for the quarter of $62,000 or 7.5% despite the discounted early-stage investor vehicles and early operational costs that negatively impacted our margins in the quarter.
>
> Excluding these early-stage investor vehicles, our gross margin was an unprecedented never done before by any other start-up on the first initial vehicles, an 18.5% an astounding 18.5%.

57. Gupta-Fisker ended her prepared remarks by reiterating that "[w]e anticipate gross margins for the full year 2023 in the 8% to 12% range despite exceeding targets in Q2, provided input costs do not change dramatically."

58. During the question-and-answer portion of the August 4, 2023 earnings call, an analyst asked how Fisker was able to achieve its gross margins when other competitors had been faced with unfavorable pricing from suppliers. Gupta-Fisker touted Fisker's "different business model" focused on "an asset-light strategy," among other aspects.

59. During the August 4, 2023 call, an analyst from TD Cowen commented: "Congratulations on the strong margins. So thanks for the detail so far on the call."

60. The August 4, 2023 earnings call closed with comments from H. Fisker, who again highlighted the positive gross margins, and pointed out that negative gross margins may give rise to liquidity concerns: "I'm also really excited about our positive gross margins, quite frankly, because normally in an EV start-up, you are running obviously companies running 2 or 3 years with massive losses, which obviously means you need to raise a lot of money just to cover those losses. So we are not in that position."

61. Thus, despite the disappointing news concerning Fisker's production, the positive gross margin numbers reassured the market. For example, TD Cowen noted in an August 4, 2023 report that the lowered production guidance "was not the reassurance investors were looking for" but that "[t]he reiteration of its 8-12% gross

margin guidance for 2023 is a positive, reiterating the company's underlying profitability profile, and it's 18.5% gross margin excluding discounted early-stage investor deliveries was very impressive and should be viewed positively as profitability per vehicle remains a key focal point for investors." On August 7, 2023, Evercore ISI called 2Q23 results a "mixed-bag," citing "production guide decreased 7k more than previewed but power of contract manufacturing shown through 7.5% gross margin on minimal vehicle sales[.]"

62. Similarly, Barclays commented in an August 8, 2023 report that "2Q earnings was an interesting contrast for FSR. On one hand, its positive gross margin print and sharp reduction in opex made clear the benefits of its asset-light business model that mgmt has long touted, and we believe this deserves credit." The report continued: "Yet on the other hand the surprisingly low deliveries total and considerable 2023 production guide cut on supply chain issues reinforced our view that the ramp of the Ocean will be challenging."

## C. The Truth Begins To Emerge

### 1. Fisker Announces That Its 3Q23 Financial Results Would Be Delayed Due To First Chief Accounting Officer Resignation

63. On November 8, 2023, before the market opened, Fisker announced it was delaying the release of its 3Q23 financial results. The Company stated that "[t]he timing of the appointment of a new chief accounting officer effective November 6, 2023 and the departure of the former chief accounting officer effective October 27, 2023 has delayed the completion of the financial statements and related disclosures."

64. Fisker had previously reported in a Form 8-K filed with the SEC on September 22, 2023, that on September 19, 2023, John Finnucan, the chief accounting officer ("CAO"), provided his notice of intent to resign from the Company on September 19, 2023. The Company further stated in this report that "[t]o help facilitate an orderly transition to the next chief accounting officer of the Company, Mr. Finnucan will remain an employee of the Company through at least October 27,

2023."

65. On this news, the Company's share price fell $0.38, or 8.7%, to close at $3.99 per share on November 8, 2023, on unusually heavy trading volume.

**2. Fisker Announces Negative Gross Margins For 3Q23 And That There Were Material Weaknesses In the Company's Internal Controls**

66. Then, on November 13, 2023, after the market closed, Fisker announced its third quarter 2023 financial results in a press release, reporting $91.0 million net loss despite $71.8 million revenue. Fisker highlighted that "Q3 2023 was Fisker's first quarter with meaningful automotive sales revenue. Total revenue in the quarter was $71.8 million, ***gross margin was -17% on a GAAP basis (adjusted gross margin was 9%)***[.]" Later in Fisker's earnings release, Defendants further explained that the adjusted gross margin of 9% "exclude[d] an inventory valuation adjustment associated with lower levels of production during the ramp-up phase which we expect to continue until we reach full production." The earnings release further disclosed that GAAP cost of goods sold was $83.92 million, which included ***the $18.226 million inventory valuation adjustment***.

67. Also on November 13, 2023, after the close of market, the Company announced it would be unable to timely file its 3Q23 10-Q. The Company filed a Form NT 10-Q with the SEC, which revealed that Fisker had material weaknesses in its internal control over financial reporting. Specifically, it stated:

> As previously disclosed, the timing of the appointment of a new chief accounting officer effective November 6, 2023 and the departure of the former chief accounting officer effective October 27, 2023 delayed the completion of the Company's financial statements and related disclosures, and delayed the completion of the Company's quarterly assessment of the effectiveness of its disclosure controls and procedures.
>
> In the course of completing the preparation of the Report, the Company determined that it has material weaknesses in the Company's internal control over financial reporting. These material weaknesses will be discussed in the [3Q23 10-Q].

68. The Company held its earnings call in connection with the 3Q23 financial results after the close of market on November 13, 2023. During the call, Gupta-Fisker provided more color on the inputs for gross margin:

> [T]urning to our Q3 results, balance sheet and outlook for the remainder of 2023. Our third quarter revenue totaled $71.8 million, driven primarily by initial Ocean vehicle sales. During the quarter, we delivered 1,097 vehicles. Our third quarter cost of goods sold totaled $83.9 million, which included $18.2 million of noncash inventory adjustment impact associated with initial production ramp. As our production ramp continues, we expect inventory adjustments to diminish. In the quarter, GAAP gross margin was negative 17% and non-GAAP gross margin was 9%, which excludes the inventory adjustment. We have additional impacts from FX, geographic mix and higher input costs with a first-in first-out inventory treatment that collectively shaved another few points of the margin, which would have ended up in the mid-teens if they were added back.
>
> The positive adjusted gross margin demonstrates the benefit of our unique vehicle capabilities within the company and points towards a faster path towards positive EBITDA.

69. During that call, Gupta-Fisker responded to an analyst request to talk about the delay in filing the 10-Q, explaining that "Q3 was a highly complex quarter." Specifically, Gupta-Fisker stated:

> Q3 was a highly complex quarter. Went from $800,000 of revenue to $71 million of revenue. In multiple countries, ForEx, very complex accounting along with convertible notes and accounting for derivatives. So we experienced quite a lot of complexity in the business, and as you rightly pointed out, personnel changes as well.
>
> We, of course, continue to understand all these different areas. We are continuing to hire. We do have already 3 controllers in place, 2 in the U.S., 1 in Europe, and we continue to strengthen the team. We continue to add more experts within the team. Some other areas that were extremely complex were because of contract manufacturing, ***things like raw material inventory accounting and finished goods inventory accounting***, things that we had not done before and extremely complex as you look at IT integrations with Magna, in-house integrations.

> So these unfortunately growing pains and we are addressing all these different areas so we can also mature our systems, hire more people, hire more talent to address all these different areas, and it's a work in progress. We are working tirelessly, very hard to get the queue done, so more to come on that.

70. On this news, the Company's share price fell $0.77, or 18.7%, to close at $3.34 per share on November 14, 2023, on unusually heavy trading volume.

71. CNBC reported on November 14, 2023 that "Shares of electric vehicle startup Fisker sank Tuesday after a disappointing earnings report and a regulatory filing that raised concerns about the company's previous financial statements." Later in the article, CNBC commented that "Monday's filing raises the possibility that the company could be forced to restate some of its past financial reports."[12]

72. Analysts likewise noted concern. For example, on November 14, 2023, BNP Paribas issued a research note stating, at it "tread[s] cautiously" because "gross profit [is] now negative (LCNRV does not discriminate asset intensity)."[13] BNP Paribas further noted that "LCNRV represented a -$18.2M drag in the quarter. We expect to see a -$45M headwind in 4Q23 and -$100M-$105M in 2024." BNP also emphasized that "we do not like the aesthetics of FSR's recent Chief Accounting Officer departure, followed by Mon.'s announced 10Q filing delay, citing "material weakness in internal financial reporting controls." (emphasis in original).

73. Barclays's November 14, 2023 report was titled "3Q earnings review – Efforts continue, though challenges abound," and commented that "while we appreciate how far FSR has come, we see greater obstacles ahead and remain UW." As to the gross margins, Barclays stated:

---

[12] John Rosevear, *Fisker shares sink 18% after EV maker discloses 'material weaknesses' in financial reporting*, CNBC.com, Nov. 14, 2023 (available at https://www.cnbc.com/2023/11/14/fisker-shares-down-q3-earnings-material-weakness.html).

[13] LCNRV is an accounting term that means "lower of cost or net realizable value."

- GAAP gross margin of -17% sharply below Barc. at 8%, although adj. gross margin noted to be 9%, inline with Barc.; that said, ***FSR adjustment to gross margin included an inventory-related charge that goes beyond common adjustment related to SBC and is likely incomparable to adj. gross margin figures of peers.***

74. Barclays also commented that "the material weakness disclosed in FSR internal controls can likely also be mostly attributed to operating with a very compact team where disruption from both leadership changes and the increasing complexity of FSR's business can be difficult to overcome.... we'd hope the accounting challenges are one-time in nature[.]"

75. Bank of America Securities similarly stated in its November 14, 2023 report: "In our view, the delayed earnings release as well as FSR's challenges in delivering vehicles suggest the company has much work to do in building out its operations, including at the corporate level.... [F]uture results could be impacted if business operations are sub-optimal."

76. Wolfe Research also found Fisker's cost of goods sold as a fundamental "challenge" to operations. In its November 20, 2023 note, Wolfe Research stated that the Company "*need[s] to achieve costs improvement* – "Fisker's 8.5% Gross Margin in Q3 translates to $60k COGS per vehicle for the Ocean." However, to keep margins in that range after the vehicle price cut, "we'd need to see an $8-$9k/unit COGS reduction vs. current levels." Similarly, CFRA posited in its November 21, 2023 note that "we have major concerns about FSR's viability" and that "it will be difficult for FSR to generate a profit due to the modest price tag of the Ocean ($37.5K starting price tag for the base model)."

### 3. Fisker Loses Its *Second* Chief Accounting Officer After Just Eight Days On The Job

77. Then, on November 20, 2023, after the market closed, the Company disclosed that its then recently-hired Chief Accounting Officer, Florus Beuting, had resigned on November 14, just one day after the third quarter earnings release and

after a mere eight days on the job—or only six business days. On this news, the Company's share price fell $0.35, or 15%, to close at $2.00 per share on November 21, 2023, on unusually heavy trading volume.

78. Analysts were spooked. For example, in a November 20, 2023 report, Bank of America Securities placed Fisker "Under Review in light of recent events that give us less confidence in the company's financials and, subsequently, our earnings forecasts." Evercore ISI stated in a November 22, 2023 Global Automotive report that, with respect to Beuting resigning "still without audited financials[,]" "we typically refrain from inflammatory language, but it is fair to say this continues to be nothing short of a PR/stock/media investor disaster/circus w/ stock reaching all-time low $2. **Time is fleeting to rectify…**[.]" (emphasis in original).

### D. Post-Class Period Events Further Reveal Fisker's Abysmal Gross Margins, Financial Results, And A Litany Of Other Troubles

79. On November 22, 2023, the Company filed its 3Q23 10-Q, which revealed that "approximately $20 million of expenses that were related to services performed after the start of production of salable vehicles. The expenses were incorrectly recorded primarily as selling, general and administrative expenses in our preliminary earnings results, but were later determined to be associated with production set-up activities and are now appropriately reflected in cost of revenues." As a result, cost of revenues for 3Q23 increased to $104.548 million for the quarter, and ***consequently Fisker's GAAP gross margin was actually -46% and adjusted gross margin (i.e., even excluding the $18.226 million inventory valuation adjustment) was actually -20%.*** The 3Q23 further stated that "[a]dditionally, other inventory adjustments were recorded resulting in a $4.0 million increase in net loss subsequent to the preliminary earnings results."

80. The 3Q23 10-Q also revealed that Fisker had material weaknesses related to inventory accounting. Specifically, the report stated:

The Company's material weaknesses are as follows:

–The Company did not design and maintain an effective control environment commensurate with its financial reporting requirements. Specifically, the Company has experienced a change in key accounting personnel and, as a result, lacked a sufficient number of professionals with an appropriate level of accounting knowledge, training and experience to appropriately analyze, record and disclose accounting matters timely and accurately. In addition, the Company did not design and maintain effective controls for communicating and sharing information between the operations, accounting, information technology, finance and legal departments. Specifically, there are insufficient controls to ensure that the accounting department is consistently provided with complete and adequate support, documentation and information, and that matters are resolved in a timely and effective manner.

–***The Company did not design and maintain effective controls in response to the risks of material misstatement over the accounting for inventory and related income statement accounts***. Specifically, controls over the accounting for inventory and related income statement accounts were not sufficient to respond to changes to the risks of material misstatement to financial reporting due to changes in the business.

These material weaknesses contributed to the following additional material weakness:

–The Company did not design and maintain effective controls related to the accounting for certain non-routine, complex or unusual events or transactions. Specifically, the Company did not design and maintain effective controls to timely analyze and account for the financial statement effects of variable interest entities and valuation of convertible debt and the related derivative liability.

81. In late 2023, as explained in the First Day Declaration, as consumer demand for electric vehicles waned, "Fisker made the decision to cut the price of the Ocean by approximately 11% in an effort to adapt to the competitive realities. This, in turn, had a negative impact on Fisker's margins."

82. On January 8, 2024, Fisker announced that Angel Salinas, who was joining from PwC (Fisker's then auditor), had been named Fisker's CAO effective immediately:

> Salinas comes to Fisker after more than two decades at [PwC], most recently as an Assurance Partner, where he served as audit signing partner on numerous clients and oversaw audit teams in the United States, Canada, India, Mexico, and Argentina. Throughout his career at PwC, Salinas has focused on complicated audit, compliance, and regulatory matters, leading large teams of accounting professionals.

83. On February 9, 2024, a Tech Crunch article[14] reported that since Fisker first started delivering its Ocean vehicles to customers in summer 2023, internal documents reviewed by Tech Crunch show that "Fisker Ocean SUV customers have reported more than 100 separate loss-of-power incidents," including that an Ocean vehicle lost power while both Gupta-Fisker and another Fisker board member were out driving the vehicle, due to a variety of issues. The article further reported that "[p]roblems with the Ocean SUV, however, are not limited to the vehicle suddenly losing power, a review of nearly 200 documents shows." These problems included: sudden loss of break power; issues with key fobs causing customers to get locked in/out of the vehicle; the Ocean's front hood flying up at high speeds; and battery malfunctions. Tech Crunch further report that the National Highway Traffic Safety Administration was investigating the braking problems, and that multiple lawsuits concerning these issues had been filed and claimed that Fisker violated its warranty by failing to timely repair the vehicles.

84. On February 29, 2024, Fisker announced its preliminary 4Q23 and FY23 financial results in a press release. These resulted included Fisker's fourth quarter gross margin, which was -35%, "reflecting a combination of operating losses and a non-cash fair value adjustment related to its 2025 notes." The Company had produced 10,193 Fisker Oceans and delivered 4,929 vehicles during full year 2023.

---

[14] Sean O'Kane, *Fisker Ocean owners flagged sudden power loss and brake problems for months, internal documents show*, Tech Crunch, Feb. 8, 2024 (available at https://techcrunch.com/2024/02/09/fisker-ocean-braking-power-loss-problems-investigation/).

85. The February 29, 2024 press release also revealed there was a substantial doubt about Fisker's ability to continue as a going concern. Several analysts dropped coverage of the Company because this signaled that Fisker was likely to file for bankruptcy.

86. Fisker also held an earnings call on February 29, 2024 with investors and analysts. During her prepared remarks, Gupta-Fisker explained that the ***-35% gross margins for 4Q23*** included "some nonrecurring items in the cost of goods sold that negatively impacted margins, which includes an inventory valuation charge and a supplier capacity expense on an adjusted basis." She further explained that "adding back the deferred revenue and removing the inventory charge and supplier capacity expense and gross margin would have been positive." Later in the call, in response to an analyst question, Gupta-Fisker stated that "We're not providing any gross margin guidance specifically for 2024. But we do expect to achieve on a non-GAAP basis, single digit margins, and we expect to go from mid to high single digits over time once a dealer model is fully rolled out[.]"

87. On March 1, 2024, the Company filed a notice with the SEC stating that it could not timely file its fiscal 2023 Form 10-K, which revealed additional material weaknesses "in revenue and the related balance sheet accounts." Moreover, Fisker could not timely file the report due to a "change in key accounting personnel."

88. On March 25, 2024, the Class A common stock was delisted from the NYSE for failure to maintain a stock price above $1.00 per share. Analysts dropped their coverage.

89. On March 27, 2024, an article in Tech Crunch reported that "Fisker temporarily lost track of millions of dollars in customer payments as it scaled up deliveries, leading to an internal audit that started in December and took months to

complete[.]"[15] The article stated that although the Company was "ultimately able to track down a majority of those payments or request new ones from customers whose payment methods had expired[,]" "the disarray, which was described to TechCrunch by three people familiar with the internal payment crisis, took employees and resources away from Fisker's sales team[.]" The article explained that Fisker struggled to keep track of these transactions due to lax internal controls, led to instances of vehicles being delivered without collecting any form of payment, "put the company in a position where it couldn't accurately say how much revenue it had generated," and was "one of the reasons Fisker has yet to file its annual financial report for 2023."

90. On April 23, 2024, Fisker filed its Form 10-K for FY23. Therein, the Company revealed that, in addition to weaknesses identified in connection with the third quarter 2023 report, the Company "did not design and maintain effective controls in response to the risks of material misstatement over the accounting for … revenue and related balance sheet accounts." Specifically, the controls for "revenue and related balance sheet accounts were not sufficient to respond to changes to the risks of material misstatement to financial reporting due to changes in the business." Moreover, "[t]hese material weaknesses resulted in material audit adjustments to revenue, accounts receivable, deferred revenue, inventory, costs of goods sold, convertible debt and derivative liability balances during the year ended December 31, 2023." Also, for fiscal 2023, "the Company recorded a write down of inventory totaling $232.7 million which includes consideration for reductions in the selling price of vehicles in inventory."

91. On May 7, 2024, Fisker announced that PricewaterhouseCoopers LLP

[15] Sean O'Kane, *Fisker lost track of millions of dollars in customer payments for months*, Tech Crunch, Mar. 27, 2024 (available at https://techcrunch.com/2024/03/27/fisker-misplaced-payments-internal-audit-bankruptcy/).

("PwC"), the Company's independent registered public accounting firm, was declining to stand for re-appointment for the fiscal year ending December 31, 2024. PwC had served as Fisker's auditor since 2021. PwC's departure led the Company to announce on May 13, 2024 that they would be unable to complete its quarterly filing for 1Q24 on time.

92. On June 19, 2024, the Bankruptcy Action was commenced when Fisker filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Code.

93. Finally, on August 16, 2024, Fisker disclosed in its Statement of Financial Affairs filed in the Bankruptcy Action (ECF No. 431) that the Company had received a subpoena from the SEC.

### E. Defendants Were, At A Minimum, Deliberately Reckless In Reporting And Touting Positive Gross Margins During The Class Period

#### 1. Defendants Repeatedly Displayed Their Intimate Familiarity With Fisker's Gross Margins

94. As Fisker moved into a revenue producing company, Defendants routinely assured the market that they were intimately familiar with Fisker's gross margins, and that there was little risk that gross margins would be anything but positive due to the Company's asset-light strategy. For example, on the February 27, 2023 earnings call, Gupta-Fisker was asked if there was any risks in achieving the provided 8-12% gross margin guidance range. She responded: "I don't frankly see a risk on achieving the gross margins. We make these gross margins from the first car, and I think I've highlighted that multiple times in multiple earning calls, and that is because of our asset-light strategy. And we don't have those huge factory billions of dollars of cost to account or amortize against."

95. Later during the question-and-answer portion of the call, an analyst asked if certain costs were treated differently after launch, and if that would have an effect on gross margin. Gupta-Fisker responded: "No. Because we don't have our

own factory, as I explained, all the costs we have are amortized over the period of time[.]" She further elaborated that if the analyst was putting together a gross margin model, "I would not simulate it based on other vertically integrated EVs."

96. Likewise, during the May 9, 2023 earnings call, H. Fisker stated in response to an analyst question that Fisker was "in a unique situation where we make money on our vehicles from the get-go because we're putting a fixed manufacturing fee. So I don't think we are under the same pressure as some of our competitors out there." Gupta-Fisker responded to a follow-up question regarding gross margins: "I think in terms of our sort of asset-light strategy that pretty much remains intact for the whole year, so I would say that those gross margins are fairly intact."

97. Additionally, in the August 4, 2023 earnings announcement, H. Fisker was quoted as saying: "our business model has now been proven, by the fact that we are already making a positive profit margin on the first vehicles we are selling[.]" Later that day, H. Fisker closed the August 4, 2023 earnings call by saying, in relevant part: "I'm also really excited about our positive gross margins, quite frankly, because normally in an EV start-up, you are running obviously companies running 2 or 3 years with massive losses, which obviously means you need to raise a lot of money just to cover those losses. So we are not in that position." H Fisker made this statement notwithstanding the fact that Defendants became aware that the Company was facing "financial distress" in August 2023, according to the First Day Declaration.

98. Moreover, during these earnings calls, Gupta-Fisker displayed her intimate familiarity with how gross margins were calculated. For example, on February 27, 2023, Gupta-Fisker stated that Fisker's gross margins were calculated in accordance with GAAP: "the 8% to 12% gross margins that we have outlined, ***these are actually GAAP accounting base***." Gupta-Fisker expanded on what gross margins included: "They include stock-based compensation. So we have taken into account all the investments we have made. And we have factored those in when we look at these gross margins."

99. Later during the question-and-answer portion of the call, an analyst asked, "I think you mentioned earlier that, this is a launch year and maybe there's certain, I guess, treatment of fixed costs[,]" and whether Gupta-Fisker "want[ed] to elaborate if there's a comment you made around sort of the gross margin treatment initially in the launch year." Gupta-Fisker responded: "No. Because we don't have our own factory, as I explained, all the costs we have are amortized over the period of time[.]"

100. On the August 4, 2023 earnings call, Gupta-Fisker walked participants through Fisker's 2Q23 gross margins (*see* ¶56, *supra*). And during the question-and-answer portion of this call, in response to an analyst's question, Gupta-Fisker confirmed her awareness of, and familiarity with, gross margins. Specifically, she provided more detail about whether Fisker could achieve its positive gross margin even though competitors had faced unfavorable pricing from suppliers (which would, all else equal, compress gross margin):

> But to answer your question on gross margins, the first critical topic is to design and engineer a vehicle where you have thought about gross margins.
>
> You have thought about material input, you have thought about the number of parts. So we -- from the get-go created an organization that thought about selling a $37,500 car, not $100,000 car. So the entire organization thinks about a few parts.
>
> The entire organization thinks about the steel stamp body, how can, we engineer the car for more efficiency. So that's the first topic. The second topic is that we've seen battery costs go down. So the input costs on batteries went down from Q1 from Q2 to Q3.
>
> So I expect those trends to continue to further go down. And I think number three, what's really critical is to look at volumes in terms of the program lifetime. So from a program lifetime, we have a 50,000 annual volume. And those volumes are fairly straightforward.
>
> We also, by the way, don't amortize our investments. I can't comment on what other start-ups do, but legacy -- OEMs do amortize their

> investments. They also amortize their ED&D that they in-house spend, which we don't amortize, because we actually spend the money with our suppliers.
>
> So again, from our perspective, we have an asset-light strategy, a very different business model to other start-ups or legacy OEMs.

### 2. Defendants Were Aware that 3Q23 Gross Margins Would Be Adversely Impacted

101. As of August 4, 2023, five weeks into Fisker's third quarter, Defendants were aware that 3Q23 gross margins would be adversely impacted by excess fixed production overhead costs that could not be fully allocated to inventory due to the Company's limited vehicle output during the quarter. Put simply, more costs ("fixed production overhead"), spread over fewer units ("limited vehicle output"), necessarily increases COGS. Indeed, the Company would later acknowledge that they were forced to record an $18.2 million inventory valuation adjustment in cost of revenues due to the ramp up in production which impacted the allocation of fixed production overhead costs. The $18.2 million charge had a significant impact on the Company's reported gross margins with Fisker reporting a GAAP gross margin of negative 17% for 3Q23.

102. The inventory valuation adjustment stemmed from GAAP inventory accounting rules in accordance with Accounting Standards Codification Topic 330, *Inventory* ("ASC 330").[16]

103. Specifically, ASC 330 states that under the "full absorption" inventory

[16] GAAP compliance is required under federal securities laws to ensure that public companies like Fisker issue reliable and accurate financial statements and public disclosures. Indeed, financial statements filed with the SEC that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and contained with FASB's Accounting Standards Codifications ("ASC"). Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.

costing method employed by Fisker, "the allocation of fixed production overhead [costs] … is based on the ***normal capacity*** of the production facilities." ASC 330-10-30-3 defines "normal capacity" to be "the production expected to be achieved over a number of periods or seasons under normal circumstances." Guidance from PwC, Fisker's auditor, specifically contemplates a ramp-up production phase in determining "what constitutes normal capacity for the relevant production facility." The guidance states:

> This is particularly true when operations are in an emerging growth stage (e.g., a ramp-up period for a new facility producing a first-of-a-kind product for the company). While the lower production volumes during this ramp-up period may not be reflective of any particular abnormality in the company's operations, it is unlikely that the lower volumes represent the "production expected to be achieved over a number of periods under normal circumstances."[17]

104. Importantly, ASC 330-10-30-6 explains that "[t]he amount of fixed overhead allocated to each unit of production shall not be increased as a consequence of abnormally low production or idle plant." ASC 330-10-30-7 unequivocally states that "[u]nallocated overheads shall be recognized as an expense in the period in which they are incurred."

105. Defendants unquestionably knew that Fisker was in a ramp-up phase during 3Q23, in which ***actual production*** would significantly lag the ***normal production*** capacity. As a result, Defendants were thus fully aware that the Company would have unallocated fixed overhead production costs in 3Q23, and, as a result, would not be allocated to inventory and would instead need to be expensed as cost of goods sold under ASC 330. Thus, the 3Q23 inventory charge and the hit to 3Q23 GAAP gross margins, were entirely foreseeable as of August 4, 2023. In fact, after

---

[17] This guidance can be found at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/inventory/Inventory-Guide/Chapter-1-Inventory-costing/1_4_Full_absorption_costing.html#pwc-topic.dita_99b3b6e6-41ee-49a1-9906-2c705b827989.

recording the charge in 3Q23, Defendants fully acknowledged that the unallocated fixed production overhead costs, and resulting hit to gross margins, were foreseeable going forward while Fisker remained in the ramp-up phase. Specifically the Company noted in the November 13, 2023 earnings press release that the inventory charges, and resulting hit to GAAP gross margins, were "***expect[ed] to continue until we reach full production***."

### 3. The Misstatements In Fisker's 3Q23 Earnings Release Did Not Involve Complex Accounting

106. Although Defendants claimed that "Q3 was a highly complex quarter" involving "very complex accounting," the specific accounting transactions related to the 3Q23 misstatements (*see* Sec. V.B, *infra*) were relatively simple and straightforward and were of such prominence and magnitude that it would be absurd to suggest that Defendants were without knowledge of these matters.

107. Defendants deployed simple expense misclassifications to understate COGS and overstate the gross margins that were reported in the November 13, 2023 preliminary financial statements. Specifically, during the quarter, the Company failed to properly record expenses associated with production set-up activities that were incurred ***after*** the Company had begun producing salable vehicles. As admitted in the 3Q23 10-Q, "$20 million of ***expenses that were related to services performed after the start of production of salable vehicles***" were erroneously classified as SG&A expenses rather than COGS. Indeed, the Company had transitioned from pre-production to final production of salable vehicles during 2Q23. As such, Defendants were aware that all production expenses incurred during the third quarter, including production set-up activities, should be classified as COGS, and not SG&A or R&D.

108. As a result of the erroneous accounting, Fisker *overstated* the reported 3Q23 gross margin in its November 13, 2023 preliminary financial statements. On Fisker's November 13, 2023 earnings call, Gupta-Fisker again falsely stated that "GAAP gross margin was negative 17% and non-GAAP gross margin was 9%, which

excludes inventory adjustment." But, because the Company understated COGS by $20,628,000, the Company's actual GAAP gross margin was ***negative 46%*** and its actual non-GAAP gross margin was ***negative 20%***.

109. The 3Q23 10-Q also included the misclassification of certain other expenses that resulted in Fisker overstating its reported operating income and net income in its November 13, 2023 preliminary financial statements. Specifically, the Company failed to record certain R&D and SG&A expenses during the quarter, and instead capitalized these expenses into inventory. As a result of this erroneous accounting, Fisker understated its reported expenses and overstated its reported operating income.

110. Notably, the impact of both accounting errors, which stemmed from straightforward expense classifications, had the effect of understating reported expenses. Meanwhile, the errors caused the Company's reported GAAP gross margin to be overstated by 170% and the Company's reported Net Loss, both before and after accounting for taxes, to be *understated* by 5%. So, in sum, Fisker's final 3Q23 reported financials were *materially worse* than the preliminary 3Q23 results were. The below chart summarizes the impacts from these 3Q23 accounting misstatements.

| **Fisker Inc.<br>(Data in thousands of dollars, except percentages)** | | | | | |
|---|---|---|---|---|---|
| **Results of Operations - 3Q2023** | **Original 3Q2023 Results, per Form 8-K dated November 13, 2023** | **Corrected 3Q2023 Results, per Form 10-Q filed November 22, 2023** | **Change** | **Percentage Overstated or Understated** | **Overstated or Understated** |
| Revenue | 71,800 | 71,800 | - | 0% | N/A |
| Cost of Goods Sold (COGS) | 83,920 | 104,548 | 20,628 | 25% | COGS Understated |
| Gross Profit (or Gross Margin as used by the Company) | (12,120) | (32,748) | (20,628) | 170% | Gross Profit Overstated |
| Gross Margin (Expressed as a Percentage) | -17% | -46% | -29% | 170% | Gross Margin Overstated |
| Operating Costs and Expenses: | | | | | |
| Selling General, and Administration (SG&A) | 78,022 | 57,650 | (20,372) | 26% | SG&A Overstated |
| Research & Development (R&D) | 9,423 | 13,428 | 4,005 | 43% | R&D Understated |
| Total Operating Costs and Expenses | 87,445 | 71,078 | (16,367) | 19% | Total Operating Costs and Expenses Overstated |
| Loss From Operations | (99,565) | (103,826) | (4,261) | 4% | Loss From Operations Understated |
| Total other income (expense) | 10,442 | 10,442 | 0 | 0% | N/A |
| Net loss before income taxes | (89,123) | (93,384) | (4,261) | 5% | Net loss before income taxes Understated |
| Provision for taxes | (1,835) | (1,835) | 0 | 0% | N/A |
| Net loss | (90,958) | (95,219) | (4,261) | 5% | Net loss Understated |

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A. False And Misleading Statements And Omissions Relating To Fisker's 2Q23 Financial Results

111. On August 4, 2023, the first day of the Class Period, Fisker issued a press release announcing its second quarter 2023 financial results. On the same day, the press release was also filed with the SEC as exhibit 99.1 to Form 8-K, which was signed by Gupta-Fisker. The August 4, 2023 press release included statements from H. Fisker, who was quoted as saying: "We are currently in a quarter that truly marks the inflection for Fisker – ***our business model has now been proven, by the fact that we are already making a positive profit margin on the first vehicles we are selling*****[.]**"

112. The August 4, 2023 press release also stated that "***Fisker anticipates an 8-12% gross margin range for full year 2023, provided input costs do not change dramatically.***"

113. Later on August 4, 2023, Fisker held an earnings call to discuss these financial results. During his prepared remarks, H. Fisker stated: "And talking about profitability, ***I don't know of any EV start-up that ever made a double-digit profit margin on the very first cars that we have delivered. And I think that really sets the stage for where we're going in the future.***"

114. During her prepared remarks on the August 2, 2023 earnings call, Gupta-Fisker provided an outlook for the remainder of 2023, stating: "***We still anticipate gross margins for the full year 2023 in the 8% to 12% range despite exceeding targets in Q2, provided input costs do not change dramatically.... this guidance balances our asset-light model***[.]"

115. The foregoing statements emphasized in ¶¶111-114 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that: (1) by the time these statements were made, Fisker's gross margins were dramatically

being adversely impacted by excess fixed production overhead costs that could not be fully allocated to inventory due to lower levels of production during Fisker's ramp-up in production, and (2) due to these large, excess, fixed production overhead costs, Fisker was not an asset-light business, but in fact, required significant investment in assets to operate.

116. During the question-and-answer portion of the August 4, 2023 earnings call, analysts pressed Defendants about Fisker's purported "asset-light" business model and how that squared with Fisker's competitors who bore substantial production costs. For instance, a Senior Analyst from Needham & Company, Christopher Pierce, asked how Fisker managed to avoid pricing pressures during its ramp-up phase when other electric vehicle companies could not, as well as how Fisker's business model would affect gross margins going forward:

> And then just lastly, on the gross margin, I believe other competitors or other start-up EV OEMs have talked about unfavorable pricing that they're receiving from suppliers, given their small supplier ramp for initial production. So I'm just curious how you're able to kind of achieve these gross margins?
>
> Is the Magna relationship helping you guys with your suppliers achieved better cost per unit when you make the vehicle? Or I guess the broader question is, as you increase production, should gross margins go higher from here? Or are you seeing the benefits you're already seeing that the cost per part benefits because of the Magna relationship. And that's how you're able to achieve those gross margins now is kind of how the question.

In response, Gupta-Fisker focused on positive trends for Fisker's gross margins and touted Fisker's purported "asset-light" business model and sought to distinguish Fisker from more asset-intensive competitors:

> But to answer your question on gross margins, the first critical topic is to design and engineer a vehicle where you have thought about gross margins.
>
> You have thought about material input, you have thought about the number of parts. So we -- from the get-go created an organization that

thought about selling a $37,500 car, not $100,000 car. So the entire organization thinks about a few parts.

The entire organization thinks about the steel stamp body, how can, we engineer the car for more efficiency. So that's the first topic. The second topic is that we've seen battery costs go down. So the input costs on batteries went down from Q1 from Q2 to Q3.

So I expect those trends to continue to further go down. And I think number three, what's really critical is to look at volumes in terms of the program lifetime. So from a program lifetime, we have a 50,000 annual volume. And those volumes are fairly straightforward.

We also, by the way, don't amortize our investments. I can't comment on what other start-ups do, but legacy -- OEMs do amortize their investments. They also amortize their ED&D that they in-house spend, which we don't amortize, because we actually spend the money with our suppliers.

So again, from our perspective, we have an asset-light strategy, a very different business model to other start-ups or legacy OEMs.[18]

117. Gupta-Fisker's response in ¶116 above omitted to state material facts necessary to make the statements not misleading, because she failed to disclose the following adverse facts: (1) by the time Gupta-Fisker made this statement, Fisker's gross margins were dramatically being adversely impacted by excess fixed production overhead costs that could not be fully allocated to inventory due to lower levels of production during Fisker's ramp-up in production; and (2) due to these large, excess, fixed production overhead costs, Fisker was not an asset-light business, but in fact, required significant investment in assets to operate.

118. The August 4, 2023 earnings call closed with comments from H. Fisker, who again highlighted the positive gross margins: "***I'm also really excited about our positive gross margins, quite frankly, because normally in an EV start-up, you are***

[18] The Acronym "ED&D" stands for engineering designing and development costs. And the Acronym "OEM" stands for original equipment manufacturer, so a "legacy OEM" just means a traditional car company like Ford or GM.

***running obviously companies running 2 or 3 years with massive losses***, which obviously means you need to raise a lot of money just to cover those losses. ***So we are not in that position***."

119. H. Fisker's statement emphasized in ¶118 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because he failed to disclose that: (1) by the time this statement was made, Fisker's gross margins were dramatically being adversely impacted by excess fixed production overhead costs that could not be fully allocated to inventory due to lower levels of production during Fisker's ramp-up in production; and (2) due, in significant part to Fisker's large, excess, fixed production overhead costs, Fisker was in a "position" to have "massive losses," a fact Defendants knew as established by, *inter alia*, the First Day Declaration which stated that Fisker was aware it was facing potential "financial distress" in August 2023.

**B. False And Misleading Statements And Omissions Relating To Fisker's 3Q23 Financial Results**

120. On November 13, 2023, Fisker issued a press release announcing its third quarter 2023 financial results. The November 13, 2023 press release was also filed with the SEC on that same day as exhibit 99.1 to Form 8-K, which was signed by Gupta-Fisker. One of the bulleted highlights at the top of the press release stated, in relevant part: ***"[G]ross margin was -17% on a GAAP basis (adjusted gross margin was 9%)***[.]"

121. The November 13, 2023 press release also included "Third Quarter 2023 Financial Highlights," including: "***Gross margin was -17% on a GAAP basis; adjusted gross margin was 9%***, which excludes an inventory valuation adjustment associated with lower levels of production during the ramp-up phase which we expect to continue until we reach full production."

122. Another financial highlight listed in the November 13, 2023 press release was: "***Net loss totaled $91.0 million***[.]"

123. The November 13, 2023 press release further including Fisker's financial results for 3Q23, reporting (1) ***costs of goods sold of $83.92 million***; (2) ***gross margin of -$12.12 million***; (3) ***net loss before income taxes of $89.123 million***; and (4) ***net loss of $90.958 million***.

124. Later on November 13, 2023, Fisker held an earnings call to discuss the 3Q23 financial results. During her prepared remarks, Gupta-Fisker reported:

> Our third quarter ***cost of goods sold totaled $83.9 million***, which included $18.2 million of noncash inventory adjustment impact associated with initial production ramp. As our production ramp continues, we expect inventory adjustments to diminish. ***In the quarter, GAAP gross margin was negative 17% and non-GAAP gross margin was 9%***, which excludes the inventory adjustment. We have additional impacts from FX, geographic mix and higher input costs with a first-in first-out inventory treatment that collectively shaved another few points of the margin, which would have ended up in the mid-teens if they were added back.
>
> ***The positive adjusted gross margin*** demonstrates the benefit of our unique vehicle capabilities within the company and points towards a faster path towards positive EBITDA. Our Q3 operating expenses totaled $87.4 million, which was down 38% year-over-year and down 1% over quarter as launch-related R&D expenses continue to taper off while marketing sales and service investments increased. Loss from operations was $99.6 million, a 29% year-over-year improvement and a 13% quarter-over-quarter increase. ***Net loss totaled $91 million*** or $0.27 loss per share compared to $0.49 loss per share last year.

125. The foregoing statements emphasized in ¶¶120-124 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that, as later admitted the 3Q23 10-Q: (1) $20.628 million in expenses related to "services performed after the start of production of salable vehicles" were erroneously "recorded primarily as selling, general and administrative expenses" rather than cost of goods sold; and (2) certain R&D and SG&A expenses were not recorded during 3Q23, and were instead capitalized as inventory. As a result:

a. Fisker's 3Q23 cost of goods sold was actually $104.548 million, understating Fisker's originally reported costs of goods sold of $83.92 million by $20.628 million, or 24.6%;

b. Fisker's 3Q23 gross margin was actually -$32.748 million, understating Fisker's originally reported gross margin of -$12.12 million by $20.628 million, or 170.2%;

c. Fisker's 3Q23 gross margin percentage was actually -46%, understating Fisker's originally reported gross margin percentage of -17%;

d. Fisker's adjusted gross margin percentage, was not "positive," so it was not positive 9%, but was actually -20%;

e. Fisker's 3Q23 net loss before income taxes was actually $93.384 million, understating Fisker's originally reported net loss before income taxes of $89.123 million by $4.261 million, or 5%; and

f. Fisker's 3Q23 net loss was actually $95.219 million, understating Fisker's originally reported net loss of $90.958 million by $4.261 million, or 5%.

126. During the Q&A portion of the November 13, 2023 earnings call, Gupta-Fisker was asked: "talk about the delay in the 10-Q. Obviously, there's some statements on material weakness. Again, just given the personnel changes, how long before that's rectified as well?" Gupta-Fisker responded:

> Q3 was a highly complex quarter. Went from $800,000 of revenue to $71 million of revenue. In multiple countries, ForEx, very complex accounting along with <u>convertible notes and accounting for derivatives</u>. So we experienced quite a lot of complexity in the business, and as you rightly pointed out, personnel changes as well.
>
> We, of course, continue to understand all these different areas. We are continuing to hire. We do have already 3 controllers in place, 2 in the U.S., 1 in Europe, and we continue to strengthen the team. We continue to add more experts within the team. Some other areas that were extremely complex were because of contract manufacturing, things like <u>raw material inventory accounting and finished goods inventory</u> accounting, things that we had not done before and extremely complex

> as you look at IT integrations with Magna, in-house integrations.
>
> So these are unfortunately growing pains and we are addressing all these different areas so we can also mature our systems, hire more people, hire more talent to address all these different areas, and it's a work in progress. We are working tirelessly, very hard to get the queue done, so more to come on that. (Underline emphasis added).

127. Gupta-Fisker's foregoing response in ¶126 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because: (1) she failed to disclose that, as explained in Section IV.E.3, *supra*, many of the accounting errors were not complex, but instead involved simple expense misclassifications intended to falsely inflate Fisker's gross margins; and (2) she made a half-true statement by referencing convertible note and inventory accounting (both balance sheet items), while omitting that the Company also had a material weakness in "inventory and ***related income statement accounts***".

## VI. ADDITIONAL SCIENTER ALLEGATIONS

128. As alleged herein, Defendants acted with scienter because Defendants knew or were deliberately reckless in disregarding the fact that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants' knowledge and/or deliberately reckless disregard for the truth is further supported by the following allegations.

### A. Fisker Was Tightly Controlled By Its Husband And Wife Executive Team

129. Fisker admits that it is a "controlled company" under NYSE rules because H. Fisker and Gupta-Fisker hold more than 50% of the voting power for the Company. Fisker has a dual class structure for its common stock, and in addition to

holding Class A common stock, H. Fisker and Gupta-Fisker combined own 100% of Fisker's outstanding shares of Class B common stock. Fisker's dual class structure affords class "B" shares ten votes per share, compared to one vote per share afforded to class "A" shares. Additionally, as explained in the Company's 2022 annual report filed on SEC Form 10-K, H. Fisker and Gupta-Fisker thus collectively "hold greater than 90% of the voting power of Fisker's capital stock on an outstanding basis and will be able to control matters submitted to its stockholders for approval[.]"

130. Fisker's 2022 annual report also admitted that H. Fisker and Gupta-Fisker are a "vital part" of the Company's operations.

131. Indeed, in arbitration and litigation between Fisker and former Fisker employee, Fabio Albano, Judge Steele made the following finding:[19] "Judging from the Fiskers' demeanor, and the testimony of various witnesses regarding their management styles, the Arbitrator infers that even the development of those milestones was far more likely the product of ***top-down pressure*** or possibly mandate, as opposed to any realistic assessment of achievable goals."

### 1. Defendants Controlled The Company's Messaging To The Investing Public

132. Defendants, by virtue of their receipt of information reflecting the true facts regarding Fisker, their control over, and/or receipt and/or modification of Fisker's allegedly materially misleading misstatements and omissions and/or their associations with the Company which made them privy to confidential proprietary information concerning Fisker, participated in the fraudulent scheme alleged herein.

133. The successful execution of this scheme required systematic coordination and top-down command and control, which could not be done without the knowledge and approval of the Company's highest ranking executives. Indeed,

[19] *Dr. Fabio Albano v. Henrik Fisker, Dr. Geeta Fisker, Fisker Ink., and Does 1 through 10*, Case No. 20TRCV00731, Los Angeles Superior Court (hereinafter, "the Albano Matter").

the significance of the corporate actions required to participate in this scheme could not have been accomplished by low-level employees acting alone.

134. Through H. Fisker's role as founder, Chairman of the Board and CEO, and Gupta-Fisker's role as co-founder and CFO, Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to Fisker during the Class Period. H. Fisker and Gupta-Fisker further signed and/or certified Fisker's quarterly reports filed with the SEC. *See* ¶¶29, 31, 173, 174. H. Fisker and Gupta-Fisker also attended conference calls and/or spoke on behalf of the Company during the Class Period. *See, e.g.*, ¶¶53-58, 113-118, 124, 126.

135. Defendants also participated in the drafting, preparation and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendants were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

136. During their time as senior executive officers and/or directors of Fisker, Defendants were privy to confidential and proprietary information concerning Fisker's financial condition. Each of them also: (i) had access to, *inter alia*, internal corporate documents, and conversations with corporate officers and employees; (ii) attended management and/or Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, each of the Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

137. By executing SOX Certifications (*see* Sec. VI.G, *infra*), H. Fisker and

Gupta-Fisker also undertook an affirmative obligation to ensure the Company's disclosures to the market were true and to obtain the requisite knowledge of material information concerning the Company's financial condition. In fact, through signing the SOX Certifications, H. Fisker and Gupta-Fisker certified that they had designed "disclosure controls and procedures … to ensure that material information relating to the registrant … is made known to us by others … particularly during the period in which [each] report [was] being prepared."

**2. The Company's And Defendants' Public Statements Support A Strong Inference of Scienter**

138. The Company and Defendants' public statements demonstrated that Defendants were all highly sophisticated individuals and in positions to know that their statements were materially false and misleading during the Class Period. For example, the Company's April 27, 2023 Proxy Statement highlighted that H. Fisker "founded and has led Fisker since its inception" and his "in-depth knowledge of our business and industry" and "[a]s President and Chief Executive Officer, Mr. Fisker is also intimately involved in our day-today operations and is thus in a position to elevate the most critical business issues for consideration by the board of directors." And due to H. Fisker's role as Chairman of the Board and CEO, Fisker's "board of directors believes that Mr. Fisker's combined role enables strong leadership, creates clear accountability, and enhances our ability to communicate our message and strategy clearly and consistently to stockholders."

139. The April 27, 2023 Proxy also emphasized the depth of Gupta-Fisker's experience with the Company, noting that not only is she a co-founder of Fisker, but she "has served as our Chief Financial Officer and as a member of the board of directors since October 2020 and as Chief Operating Officer since March 2021" and previously "served as a director and Chief Financial Officer of Legacy Fisker since September 2016…" Indeed, the Company's board touted Gupta-Fisker's "historical expertise gained from serving as our Chief Financial Officer, Chief Operating Officer

and her financial and investing experience" as her qualifications for serving as a director of Fisker.

140. Additionally, statements by Defendants themselves demonstrated how hands-on and deeply and carefully each was involved with the Company's affairs. For example, prior to the Class Period, during the Company's May 9, 2023 earnings call, Gupta-Fisker stated that "we regularly monitor all funding channels and evaluate opportunities across the full spectrum of debt and equity instruments in order to maintain a prudent liquidity profile and appropriate support our asset-light model." Gupta-Fisker further touted the Company's guidance, which "benefits from our asset-light business model and disciplined cost management, while at the same time, supports our prudent investment plans. Should circumstances warrant, we have already identified very strategic cost down levers that we can exercise." Gupta-Fisker also noted that "[w]e're fundamentally agile, and we make quick decisions." H. Fisker similarly echoed that "we're trying to be as transparent as we can" and "we're extremely active, we're agile, we're moving fast."

141. During Fisker's June 6, 2023 annual shareholder meeting, H. Fisker stated that "with our asset-light strategy, we do manage our business extremely prudently throughout the cycle." H. Fisker further stated that "[a]s I've always repeatedly said, we regularly monitor all funding channels, we evaluate every single opportunity across the full spectrum of debt and equity instruments to maintain a prudent liquidity profile, and we appropriately support our asset-light model. My job is to make sure that we are -- we have liquidity to make sure that we have capital for all our different programs and to bring our great products to market."

142. On the first day of the Class Period, during the Company's August 4, 2023 earnings call, Gupta-Fisker stated that "[w]e continue to prudently access the capital markets to support our business plan" and further noted the Company's "guidance balances our asset-light model, disciplined cost management and prudent investment plans."

143. During the November 13, 2023 earnings call, Gupta-Fisker highlighted that "[w]e maintained a very disciplined approach to accessing capital markets to bolster our business strategy." And "[o]ur overall non-GAAP SG&A, R&D, plus CapEx guidance for 2023 remains in the range of $565 million to $640 million with SG&A moving higher and CapEx decreasing. Collectively, this guidance balances our asset-light model, disciplined cost management and prudent investment plans." Gupta-Fisker further stated that Fisker was taking "a conscious, very prudent approach to make sure we manage our inventory, customer expectations, provide a world-class experience and also do proper cash management."

144. The emphasis placed on Defendants' experience and the repeated statements regarding their direct involvement in the Company's affairs supports an inference that at the time they spoke, they knew or recklessly disregarded facts that rendered their statements false and misleading.

**3. Multiple Reports Call Into Question Defendants' Credibility**

145. Gupta-Fisker has, within the past two years, been found to lack credibility by a former Los Angeles Superior Court judge. More specifically, according to pleadings and orders in the Albano Matter, former Judge James A. Steele strongly suggested that Gupta-Fisker lied under oath. For example, in an Interim Arbitration Award dated July 7, 2022, Judge Steele (Ret.) made the following determinations:[20]

- "The Arbitrator did not find credible, nor consistent with substantial other evidence, including Fisker's own documents, Dr. Fisker's testimony that Dr. Albano 'took the lead' in selecting and hiring Ms. Choi."

[20] A copy of the July 7, 2022 Interim Arbitration Award may be found in the November 16, 2022 Declaration Of Christopher Mader, Esq. In Support of Opposition To Petition To Vacate Arbitration Award on file in the Albano Matter.

- "Based on Mr. Welch's testimony, as well as that of all others who testified on the subject, including Dr. Fisker who the Arbitrator has previously stated was found less than credible in numerous instances, the Arbitrator finds that Anna Choi's hiring decision was that of Dr. Fisker."
- "Dr. Fisker's explanation of the events didn't ring true.… Neither Dr. Fisker's testimony nor inferences from all of the available evidence, made Dr. Fisker's version of the events credible."
- "At the very least, Dr. Fisker's conduct at deposition in the QuantumScape matter fell dramatically short of the 'scrupulous regard for the highest standards of conduct and personal integrity' set forth in Section VI.C of Fisker's Employee Handbook."

146. Judge Steele (Ret.) also included the following findings under the headline "According to Dr. Fisker's Sworn Deposition Testimony In The QuantumScape Litigation, Dr. Albano Voluntarily Resigned And Her Contrary Testimony In This Arbitration Should Be Viewed With Skepticism":

According to Dr. Fisker's Sworn Deposition Testimony In The QuantumScape Litigation, Dr. Albano Voluntarily Resigned And Her Contrary Testimony In This Arbitration Should Be Viewed With Skepticism

The Arbitrator also cannot simply ignore Dr. Fisker's sworn deposition testimony in the QuantumScape litigation when Dr. Fisker was specifically asked on June 6, 2019, just 3 weeks after Dr. Albano had been terminated for Cause by her husband, Henrik Fisker, whether or not Dr. Albano was terminated:

Q: Did Dr. Albano resign, or was he terminated from Fisker?
A: He was an at-will employee, and he resigned at will.
Q: So he resigned? He was not asked to leave by Fisker? That was, he left on his own accord?
A: That's correct.

This testimony, which communicated a voluntary resignation from Fisker by Dr. Albano, was never explained by Dr. Fisker. Presumably, Dr. Fisker was under oath requiring her to tell "the whole truth". Fisker took great pains to ensure that Dr. Albano's for cause termination took effect before the effective date of Dr. Albano's voluntary resignation. He was therefore terminated. If there was any question at all about whether Dr. Albano resigned, as opposed to being terminated, at least Fisker's position is and has been that Dr. Albano was terminated and his voluntary resignation was therefore ineffective. For example, Fisker's pleadings in this arbitration, including its May 23, 2019 "Answer to Counter-Claimant's Statement of Claim" at page 2:11 stated: "Counter-Claimant did not resign on May 10, 2019…" and at line 20: "Counter-Claimant was terminated for cause on May 23, 2019". In other words, Fisker has taken the consistent position that Dr. Albano was terminated and Dr. Fisker's response to the first question should have

23

INTERIM ARBITRATION AWARD #1

147. Former Fisker employees who spoke with Car Buzz, a digital publication, also shared sentiments reflecting the lack of Defendants' credibility. In an article published on June 9, 2024,[21] Car Buzz spoke with several former Fisker

[21] Nicole Wakeline, *The Fall Of Fisker: Employees Reveal The Untold Story*, Car Buzz, June 8, 2024 (available at https://carbuzz.com/fisker-fall-employee-interviews/).

employees that "tell the same story of how Fisker's failure came from the top." According to one former Fisker employee interviewed in the Car Buzz article, and who was recently let go in Fisker's then-recent round of layoffs, the problems with the Company was not the car, "but that leadership was doing things that quite simply didn't make sense to anyone." Car Buzz further explained: "This left the husband-and-wife team in charge of major decisions, but with a group of smart, talented employees to give them advice and guidance. The problem is, they refused to listen." The Car Buzz article continued:

> "The actions taken by senior leadership were full of 'I'm going to do whatever I want regardless of what you guys think is right,'" said the former employee. Last minute decisions were common, often without taking the time to make sure things were done right. It was all about getting it done immediately, no matter the consequences. "If Henrik wanted a press release or marketing campaign started even when multiple teams said it was a terrible idea, then it was launched."
>
> ***"When I had real exposure to Geeta, that's when I started to think, oh, maybe I should get out." - Former Fisker Employee***
>
> People tried to speak up but were often met with outbursts that are the stuff of HR nightmares. "She was yelling and screaming. After having that kind of interaction with her and hearing from other people that it was just how she was, I just felt like, what is happening?"
>
> It was bad enough that good people simply left rather than take the abuse. "She went crazy during a meeting all my team were at. I got off the call and then pulled my team together to see if they were okay." Often, the answer was no. "I had one person who left, saying 'no way, my mental health is more important than this job, I'm not doing this.' Micromanagement was the rule of the day." (emphasis in original).

148. A second former Fisker employee interviewed by Car Buzz "shared similar stories about the challenging work environment.... ***"You simply couldn't speak up. You couldn't tell them that they were wrong."*** ...There was no one to complain to either, as everything ended up being reported right back to the people causing the problems in the first place." (emphasis in original).

### B. Defendants Were Motivated to Raise $450 Million in Desperately-Needed Capital Just Before the Truth Was Revealed

149. A convertible note is a security that has both debt and equity attributes. The debt attribute pays a nominal interest rate, and the equity attribute is that at a given price, typically higher than the market price of the stock at the time of investment, the bonds have the right to convert into equity (*i.e.*, common stock).

150. On July 11, 2023 and September 29, 2023, Fisker raised a combined $445.1 million in cash from the issuance of senior convertible notes, both of which were critical to the Company's existence. Again, as noted above, the First Day Declaration establishes that Defendants knew by August 2023 that the Company "was facing potential financial distress," thus making additional capital raises critical to the Company's survival.

151. The first transaction, which closed on July 11, 2023, saw the Company enter into a Purchase Agreement wherein an investor agreed to purchase $340 million in face value of convertible notes. Because the July 10, 2023 notes were issued with a 12% original issue discount, the proceeds to the Company from the July 11, 2023 notes was $300 million.

152. A similar transaction closed on September 29, 2023 where the same investor from the July 11 transaction invested another $170 million. This second transaction also contained a 12% original issue discount, so gross proceeds to the Company was $150 million.

153. Net of transaction costs and discounts, the net proceeds from the two transactions resulted in $445.1 million of additional cash to Fisker.

154. The two convertible note transactions above were also critical to Fisker's ability to secure inventory: at the end of 1Q23, Fisker had only $29 million of inventory on its balance sheet. Yet by the end of 3Q23, Fisker's inventory leapt to $545.6 million.

155. Investors in convertible notes like Fisker's above accept a lower interest

rate than pure debt (*i.e.*, debt not convertible into equity) investors do, like banks, or high-yield bond investors. And the lower rate is because convertible bond investors also have the potential to participate in growth, should the stock price appreciate. On the other hand, convertible bond investors are also lower in the capital structure than are traditional lenders. Thus, future profitability is more important to convertible bond investors: because convertible bond investors want some potential of equity growth that pure debt investors do not care about.[22] In other words, to secure the convertible notes above, Defendants had a specific motive to overstate gross profit because gross profit signals to convertible note investors the possibility of future equity growth, thus inducing their investment. And that motive here is different from typical corporate motives of raising capital that other companies may possess.

### C. Multiple Abrupt Executive Departures Support A Strong Inference Of Scienter

156. The abrupt resignations of multiple Fisker executives – two CAOs and one CTO – during the Class Period further supports a strong inference of scienter. Finnucan joined the Company just prior to the Company going public in October 2020. On September 19, 2023, Finnucan provided notice that he was resigning as CAO, effective October 27, 2023. Finnucan, as the fourth highest paid employee of Fisker, was foregoing substantial compensation as CAO, including a $325,000 base salary, stock awards, and options.

157. On October 8, 2023, Beuting was offered the position of CAO, an appointment that became official on November 6, 2023. Just two days after Beuting's

[22] Typically, lenders only care about repayment, not the growth of the company they are lending to. Take for example, a secured lender. A secured lender may lend against the value of Fisker's fleet of cars. So if Fisker were to fail as a business, a secured lender could still sell the existing inventory of Fisker vehicles that were lent against to recoup its loan. Consequently, that secured lender would likely not care about profitability in the same way that a convertible bond investor would. The secured lender cares about the value of the collateral, not growth.

appointment, Fisker announced a delay in the completion of the Company's financial statements, blaming the delay on the departure of Finnucan and new appointment of Beuting. However, on November 20, 2023, Fisker reported in a Form 8-K that on November 14, 2023, Beuting had provide his notice of intent to resign from Fisker, effective immediately – just one day after Fisker announced its 3Q23 financial results, eight days after Beuting was officially appointed as Fisker's CAO, and eight days before the Company filed its 3Q23 10-Q. Beuting's resignation also caused Beuting to leave behind an annual salary of $350,000, bonus and stock-based compensation, and an initial equity award consisting of restricted stock units that would have vested over four years, valued at $350,000.

158. In addition to the string of CAO departures, Dr. Burkhard Huhnke abruptly resigned as Fisker's CTO on October 30, 2023, effective the very next day. Huhnke was Fisker's third highest compensated executive officer, with a reported base salary of $442,329 in 2022, with a bonus of $340,000 and another $200,000 in stock awards. Huhnke's resignation came just nine days before Fisker announced a delay in completion of the Company's financial statements for 3Q23.

### D. Defendants' Multiple And Inexplicable Accounting Discrepancies Evince Deliberate Recklessness Or Intentional Manipulation

159. Throughout the Class Period and after it, many discrepancies exist in Fisker's financials, including those dealing with or related to cost of revenue (and cost of goods sold), gross profit, and gross margin. The following are illustrative examples:

i. **2Q23 COGS**. When Fisker reported its 2Q23 Cost of Goods Sold, its 2Q23 press release stated that cost of goods sold was $763,000. However, for the same period, 2Q23, Fisker's 10-Q reported that 2Q23 cost of revenues was $760,000. These are the same metrics for the same reporting period and should not be different.

ii. **2Q23 Gross Margin**. Similarly, when Fisker reported its 2Q23 gross margin, its 2Q23 press release stated that gross margin was $62,000.

However, for the same period, 2Q23, Fisker's 10-Q reported that 2Q23 gross margin was $65,000. These are the same metrics for the same reporting period and should not be different.

iii. **3Q23 Net loss**. When Fisker announced its 3Q23 earnings, its press release dated November 13, 2023 reported a net loss of $90.9 million, but its 10-Q for the same reporting period reported a net loss of $95.2 million. *See* ¶110, *supra*. These are the same metrics for the same reporting period and should not be different.

iv. **FY23 COGS**. When Fisker reported its FY23 results, its earnings release stated that FY23 cost of goods sold was $375.8 million. However, Fisker's FY23 10-K stated that FY23 cost of goods sold $558.8 million, a difference of $182.9 million. These are the same metrics for the same reporting period and should not be different, ***let alone by $182.9 million***.

v. **FY23 Gross Margin**. Similarly, when Fisker reported its FY23 gross margin, its FY23 press release stated that gross margin for the year ended 2023 was negative $102.9 million. However, for the same period, FY23, Fisker's 10-K reported that FY23 gross margin was negative $285.9 million. These are the same metrics for the same reporting period and should not be different, ***let alone by $182.9 million***.

vi. **FY23 SG&A expense**. When Fisker reported its FY23 results, its FY23 press release reported FY23 SG&A expenses of $216.9 million. However, for the same period, Fisker's FY23 10-K reported that FY23 SG&A expenses were $249.1 million, ***an increase of $32.2 million***. These are the same metrics for the same reporting period and should not be different, ***let alone by $32.2 million.***

vii. **FY23 Interest Income**. When Fisker reported its FY23 interest income, the Company's press release stated that interest income was $24.1

million. However, for the same period, FY23, Fisker's 10-K stated that FY23 interest income was $24.7 million. These are the same metrics for the same reporting period and should not differ. Moreover, interest income should not be a difficult metric to calculate because it is just the sum total of interest that a bank pays Fisker on its cash balances. Presumably, Fisker does not even need to calculate the interest it receives, it just tallies the interest that appears on statements that the bank provides it.

viii. **FY23 Inventory write down**. In Fisker's FY23 10-K, the Company disclosed that it recorded a write down of total inventory to net realizable value of $232.7 million for the year. This massive $232.7 million write down is not mentioned in Fisker's FY23 earnings report. Moreover, the $232.7 million write down of inventory does not match the $182.9 million cost of goods sold discrepancy noted in ¶159(iv) above. In other words, it is not as if the inventory write-down explains the discrepancy between the audited FY23 10-K and the unaudited FY23 cost of goods sold metrics.

ix. **FY23 Net Loss**. When the Company reported FY23 results, the Company's earnings release stated that FY23 net loss was $761.9 million. However, for the same period, FY23, Fisker's 10-K for the year ending 2023 stated that the Company reported net loss of $939.6 million. These are the same metrics for the same reporting period and should not differ by any amount, ***let alone by $177.9 million.***

x. **"Cost of Goods Sold" vs. "Cost of Revenues**." How Defendants defined "cost of goods sold" and "cost of revenue" was both inconsistent and flip-flopped throughout the Class Period. For example, in its annual report for the year ended 2022, a line called "Cost of Goods Sold"

appeared on Fisker's Income Statement.[23] Beginning in its 2Q23 financial results, Fisker stopped reporting "Cost of Goods Sold" and instead reported "cost of revenues" in its place on Fisker's income statement in its 10-Qs (but not its press releases). Compare Figures 1 and 2 below.[24]

**Figure 1**:

**Fisker Inc. and Subsidiaries**
**Condensed Consolidated Statements of Operations**
**For the Three Months ended March 31, 2023 and 2022**
*(In thousands, except share and per share data)*
**(Unaudited)**

| | Three Months Ended March 31, 2023 | Three Months Ended March 31, 2022 |
|---|---|---|
| **Revenue** | $ 198 | $ 12 |
| **Cost of goods sold** | 164 | 11 |
| **Gross margin** | 34 | 1 |
| **Operating costs and expenses:** | | |
| Selling, general and administrative | 44,648 | 21,992 |
| Research and development | 76,999 | 101,460 |
| Total operating costs and expenses | 121,647 | 123,452 |
| Loss from operations | (121,613) | (123,451) |

[23] And while Fisker had not yet incurred any such expenses at that time, Fisker stated that once it begins commercial production, it expected cost of goods sold to include "mainly vehicle components and parts, including batteries, direct labor costs, amortized tooling costs and capitalized costs associated with the Magna warrants, and reserves for estimated warranty expenses."

[24] In its 2Q23 10-Q, Fisker represented that Cost of Revenues "primarily relates to the cost of production of vehicles and includes direct parts, material and labor costs, machinery and tooling depreciation, amortization of capitalized manufacturing costs, shipping and logistics costs, reserves for estimated warranty costs related to the production of vehicles, adjustments to write down the carrying value of inventory when it exceeds its estimated net realizable value ("NRV") as needed, adjustments for excess and obsolete inventory, and losses on firm purchase commitments, as needed."

**Figure 2**:

**Fisker Inc. and Subsidiaries**
**Condensed Consolidated Statements of Operations**
**For the Three and Six Months ended June 30, 2023 and 2022**
*(In thousands, except share and per share data)*
**(Unaudited)**

| | Three Months Ended June 30, 2023 | Three Months Ended June 30, 2022 |
|---|---|---|
| **Revenues** | $ 825 | $ 10 |
| **Cost of revenues** | 760 | 8 |
| **Gross margin** | 65 | 2 |
| **Operating costs and expenses:** | | |
| Selling, general and administrative | 42,267 | 17,521 |
| Research and development | 45,982 | 71,160 |
| Total operating costs and expenses | 88,249 | 88,681 |
| Loss from operations | (88,184) | (88,679) |

xi. Yet despite the differences in definitions used from 1Q23 to 2Q23 in Fisker's form *10-Qs*, ***all*** Fisker's quarterly *press releases* in 2023 (including 1Q 2023) still used "cost of goods sold." *E.g.*, Figure 3 below. And because Fisker's 10-Qs for 2Q23 and 3Q23 used "cost of revenue" – that means Fisker's 2Q23 and 3Q23 earnings results ***used two different definitions for the same reporting metrics during the same period***s, depending on whether it was for a press release or a 10-Q, which is a highly unusual departure from generally accepted public company reporting practices. Compare Figures 3 and 4 below.

**Figure 3** (2Q23 Press Release):

**Second Quarter 2023 Financial Results***

**Fisker Inc. and Subsidiaries**
**Unaudited Condensed Consolidated Statements of Operations**
(amounts in thousands, except share and per share data)

| | Three Months Ended June 30, 2023 | Three Months Ended March 31, 2023 | Three Months Ended June 30, 2022 |
|---|---|---|---|
| Revenue | $ 825 | $ 198 | $ 10 |
| Costs of goods sold | 763 | 164 | 8 |
| Gross margin | 62 | 34 | 2 |

**Figure 4** (2Q23 10-Q):

Fisker Inc. and Subsidiaries
Condensed Consolidated Statements of Operations
For the Three and Six Months ended June 30, 2023 and 2022
*(In thousands, except share and per share data)*
(Unaudited)

| | Three Months Ended June 30, | |
|---|---|---|
| | 2023 | 2022 |
| Revenues | $ 825 | $ 10 |
| Cost of revenues | 760 | 8 |
| Gross margin | 65 | 2 |

xii. In sum, Defendants inconsistent “cost of goods sold” versus “cost of revenue” usage are as follows:

- **2022 10-K.** Fisker’s 2022 10-K purported to use “cost of goods sold” to measure its production costs for its vehicles;
- **1Q23.** Fisker’s 10-Q used cost of goods sold and its press release used cost of goods sold;
- **2Q23.** Fisker’s 10-Q used cost of revenue while its press release used cost of goods sold;
- **3Q23.** Fisker’s 10-Q used cost of revenue while its press release used cost of goods sold;
- **4Q23.** Fisker’s press release used cost of goods sold, for full year 2023 results; and
- **FY23.** Fisker’s 10-K used cost of goods sold (so it departed from the Company’s practice used in its 10-Qs for 2Q23, and 3Q23) and its FY23 press release also used cost of goods sold.[25]

[25] In its FY23 10-K, the Company defined cost of goods sold as “primarily relates to the cost of production of vehicles and includes direct parts, material and labor costs, depreciation of machinery and tooling, amortization of capitalized manufacturing (footnote continued)

xiii. **Fisker incorrectly reports "Gross Profit" as "Gross Margin."** Depending on the period, Fisker reports the first three lines of its income statement, from top to bottom, as "Revenue," "Cost of Goods Sold," and then "Gross Margin." Fisker's use of the term "Gross Margin" is technically incorrect because gross margin is not reported on an absolute basis (*i.e.*, expressed as a dollar value), gross margin is expressed as a percentage of revenue (so it should never be greater than 100%). What Fisker refers to as "Gross Margin" is in fact "Gross Profit" as that term is understood by investors and any other company that properly reports its financials.

### E. Former Fisker Employee Accounts Corroborate A Strong Inference Of Scienter

160. Former Employee ("FE") 1 was employed by Fisker from 2022 until 2024 in the accounting department, which during the majority FE1's tenure was headed by former CAO John Finnucan, who reported to Gupta-Fisker.

161. In FE1's role, FE1 contributed to the Company's financial statements. FE1 stated that the financial statements required the input from several functions, including Fisker's Investor Relations group and former CAO, Finnucan. FE1 got the information for the financial statements from Fisker's SAP accounting system, as well as from members of Fisker's accounting department.

162. FE1 further recalled that Fisker had been experiencing accounting staff turnover, including an increase in headcount during 2023. FE1 explained that this staff turnover included Finnucan leaving Fisker, that Fisker had hired two new

---

costs, shipping and logistics costs, reserves for estimated warranty costs related to the production of vehicles, adjustments related to write down the carrying value of inventory when it exceeds its estimated net realizable value, as needed, provisions for excess and obsolete inventory, adjustments associated with lower levels of production during the ramp-up phase, and losses on firm purchase commitments, as needed."

controllers, several managers, and that the new CAO, Beuting, quit just two weeks after coming on the job, which reflected that Beuting may have been uncomfortable with what was going on.

163. FE1 recalled that there were "some meetings and calls" at a high-level regarding accounting for 3Q23, and that there were several adjustment relating to inventory and COGS. FE1 stated that PwC may have been uncomfortable with how Fisker was reporting its COGS, which contributed to the multiple late journal entries and the late filing of the 3Q23 10-Q. FE1 stated that although Fisker had gone forward with the 3Q23 earnings release, which was unaudited, PwC would not sign off on the 3Q23 10-Q by the SEC filing deadline. FE1 further explained that the ensuing efforts to correct the various entries related to COGS, and that there were 20 plus adjustments, or correcting entries, that had to be made before the financial statements were finally filed. FE1 believes that one of the controllers was working with PwC to determine the adjusting entries.

164. FE1 stated that generally, many at Fisker, including Gupta-Fisker, would provide feedback to the financial statements.

165. FE1 also stated that as of August 2023, FE1 had some concerns about the integrity of Fisker's financial statements because of how Fisker had rolled-out and implemented SAP. FE1 stated that the implementation of SAP may have been rushed, and explained that understanding trial balances as generated by the SAP application had been "a struggle" beginning in 2023. FE1 clarified that there were not necessarily errors, just that the ways the trial balances were presented were, to FE1 and Finnucan, a struggle to work with.

166. FE2 was a former Analyst at Fisker from March 2022 until March 2024. During FE2's employment at Fisker, FE2 reported to Rene Hagedorn, Director, and later, VP of Finance, who in turn reported to Gupta-Fisker.

167. In FE2's role, FE2 was responsible for building revenue forecasts based on inputs received from other departments, as well as putting together other "ad hoc"

reports at the request of Hagedorn or Gupta-Fisker.

168. FE2 stated that in the six weeks following Hagedorn's departure (FE2 recalled that Hagedorn left Fisker in early 1Q24), FE2 worked closely on a going concern model. FE2 explained that one of the red flags which concerned FE2 in the going concern modeling pertained to Fisker pursuing an OEM partnership with Nissan. FE2 explained that Fisker had hired Ernst & Young to take Fisker's "homegrown model" (*i.e.*, the Ocean) and "revamp it" into essentially a brand-new model. In 1Q24, FE2 worked with Ernst & Young for about a week-and-a-half, but "within days," H. Fisker and Gupta-Fisker wanted to use the new vehicle and financial models as something that could be presented to investors, despite, as FE2 stated, there being "no time to vet the numbers." FE2 stated that instead, H. Fisker and Gupta-Fisker were "rushing things" and constantly asking for "things and changed numbers," and also used the model in conversations with Nissan.

169. FE2 further commented that Gupta-Fisker "could get at times very hands-on for an executive at her level," which included "dealing with analysts" like FE2. FE2 explained that this was because Gupta-Fisker would directly email FE2 requests for reports. FE2 characterized these requests as "Geeta's concern of the week."

**F. Post-Class Period Events Support Scienter**

170. On May 7, 2024, Fisker announced that PwC was declining to stand for re-appointment for the fiscal year ending December 31, 2024. PwC had served as Fisker's auditor since 2021. PwC's departure led the Company to announce on May 13, 2024 that they would be unable to complete its quarterly filing for 1Q24 on time.

171. Additionally, according to a June 21, 2024 filing in the Company's bankruptcy proceeding, unbeknownst to investors, "it first became apparent that the Company was facing potential financial distress" in August 2023. This led Fisker to seek "a potential partnership with, or investment from, a large original equipment manufacturer…."

172. Then, on August 16, 2024, the *Los Angeles Times* reported that "Fisker Inc. has received a subpoena from the Securities and Exchange Commission, indicating the bankrupt Southern California electric vehicle maker could be under investigation by Wall Street's top cop, according to a court filing." The court filing referenced by the Los Angeles Times is a Statement of Financial Affairs filing made on August 15, 2024 in Bankruptcy Court in the District of Delaware (ECF 431) (page 49 of 51).

**G. Defendants' SOX Attestations Support Scienter**

173. Attached as Exhibits 31.1 and 31.2 to Fisker's 2Q23 10-Q were the certifications, signed by H Fisker and Gupta Fisker, respectively, and in which Defendants each certified the accuracy of the 2Q23 10-Q in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"). These certifications included representations that they were responsible for establishing and maintaining the Company's disclosure controls and procedures and had:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

174. In addition, attached as Exhibits 32.1 and 32.2 to Fisker's 2Q23 10-Q were certifications pursuant to Section 906 of SOX, signed by H Fisker and Gupta Fisker, respectively, which certified, "to my knowledge, that: "[2Q23 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the information contained in the [2Q23 10-Q] fairly presents, in all

material respects, the financial condition and results of operations of the Company."

175. By signing the above SOX Certifications, Defendants confirmed their responsibility for the accuracy of Fisker's financial statements.

## VII. LOSS CAUSATION

176. The market for Fisker's securities was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions and engaged in a scheme to deceive the market that artificially inflated the price of Fisker's publicly-traded securities. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

177. During the Class Period, Plaintiffs and members of the Class purchased Fisker securities at artificially inflated prices and were damaged thereby. Accordingly, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

178. Artificial inflation in FSR's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on November 8, 2023; November 13, 2023; and November 20, 2023. As a direct result of these partial disclosures, the price of Fisker's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

179. On November 8, 2023, before the market opened, Fisker announced that the completion of the Company's financial statements would be delayed due to the appointment of a new chief accounting officer ("CAO") and the departure of the Company's former CAO. The Company advised it "expects to file its Form 10-Q by November 14, 2023." On this news, the Company's share price fell $0.38, or 8.7%, to close at $3.99 per share on November 8, 2023, on unusually heavy trading volume.

While the price of Fisker stock declined by 8.7%, the NASDAQ OMX Global Auto Index[26] declined by only 0.9% over this same period.

180. Then, on November 13, 2023, after the market closed, Fisker reported a gross margin of -17%. The Company further delayed the filing of its 3Q23 10-Q. On this news, the Company's share price fell $0.77, or 18.7%, to close at $3.34 per share on November 14, 2023, on unusually heavy trading volume. In comparison, the NASDAQ OMX Global Auto Index fell by only 2.9%.

181. On November 20, 2023, after the market closed, the Company disclosed that its new CAO resigned just one day after the 3Q23 earnings had been released. On this news, the Company's share price fell $0.35, or 14.89%, to close at $2.00 per share on November 21, 2023, on unusually heavy trading volume. In contrast, the NASDAQ OMX Global Auto Index declined by only 1.3%.

## VIII. CLASS ACTION ALLEGATIONS

182. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased the publicly traded Class A common stock of Fisker, and/or purchased publicly traded call options on such stock, and/or wrote publicly traded put options on such stock, between August 4, 2023 and November 20, 2023, inclusive, and who suffered economic losses as a proximate result of the alleged wrongdoing (the "Class"). Excluded from the Class are: (a) persons and entities that suffered no compensable losses; and (b)(i) Defendants; (ii) present and former parents, subsidiaries, assigns, successors, predecessors and affiliates of Fisker or Defendants, as applicable; (iii) any person who served as an officer and/or director of Fisker during the Class Period and their Immediate Family Members; (iv) any entity in which the

[26] The NASDAQ OMX Global Auto Index was identified by Fisker's April 27, 2023 Proxy Statement as a peer group of the Company. The NASDAQ OMX Global Auto Index is a market-capitalization weighted index that currently tracks the performance of 34 of the largest and most liquid companies engaged in the manufacturing of automobiles.

Defendants have or had a controlling interest, including, but not limited to, family foundations; (v) any trust of which a Defendant is the settler or which is for the benefit of a Defendant and/or their Immediate Family Members; (vi) Defendants' and Fisker's D&O liability insurance carriers; and (vii) the legal representatives, heirs, successors, and assigns of any person or entity excluded under provisions (i) through (vi) hereof. For the avoidance of doubt: (a) "affiliates" are persons and entities that directly or indirectly through one or more intermediaries, control, are controlled by, or are under common control with one of the Defendants; and (b) "Immediate Family Members" are children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law; with "spouse" meaning a husband, a wife, or a partner in a state-recognized domestic relationship or civil union.

183. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fisker's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Over 600 million shares of Fisker Class A common stock were traded publicly during the Class Period on the NYSE. As of November 17, 2023, Fisker had 218,201,457 shares of Class A common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Fisker or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

184. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

185. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and

securities litigation.

186. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made and disseminated by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Fisker;

c. whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d. whether Defendants engaged in a scheme to defraud investors;

e. whether the price of Fisker securities were artificially inflated because of Defendants' conduct complaint of herein; and

f. what extent the members of the Class have sustained damages and the proper measure of damages.

187. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

188. The market for Fisker's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Fisker's securities traded at artificially inflated prices during the Class Period. On September 15, 2023, the Company's share price

closed at a Class Period high of $6.98 per share, and on September 18, 2023, Fisker's share price hit an intraday Class Period high of $7.05 per share. Plaintiffs and other members of the Class purchased or otherwise acquired Fisker's securities relying upon the integrity of the market price of the Company's securities and market information relating to Fisker, and have been damaged thereby.

189. During the Class Period, the artificial inflation of Fisker's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and omissions about Fisker's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Fisker and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

190. At all relevant times, the market for Fisker's securities was an efficient market for the following reasons, among others:

a. Fisker shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Fisker filed periodic public reports with the SEC and/or the NYSE;

c. Fisker regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the

financial press and other similar reporting services, and by directly emailing its financials to investors who requested such alerts on Fisker's website; and/or

d. Fisker was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e. The average daily trading volume for Fisker's securities during the Class Period was approximately 9,035,043 shares with 218,201,457 shares of Class A common stock outstanding as of November 17, 2023 and a market capitalization reaching over $2.39 billion during the Class Period.

191. As a result of the foregoing, the market for Fisker's securities promptly digested current information regarding Fisker from all publicly available sources and reflected such information in Fisker's share price. Under these circumstances, all purchasers of Fisker's securities during the Class Period suffered similar injury through their purchase of Fisker's securities at artificially inflated prices and a presumption of reliance applies.

192. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

193. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

194. The statements and omissions alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they are still not protected because: (i) they were not identified as "forward-looking statements" when made; (ii) and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and/or (iii) Defendants explicitly disclaimed such cautionary guidance by, for instance, saying "I don't frankly see a risk on achieving gross margins."

195. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fisker who knew that the statement was false when made.

## XI. CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

196. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

197. During the Class Period, Defendants carried out a plan, scheme and

course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Fisker's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

198. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fisker's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

199. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fisker's financial well-being and prospects, as specified herein.

200. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fisker's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fisker and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class

Period.

201. Each of Defendants' primary liability and controlling person liability arises from the following facts: (i) Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

202. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fisker's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

203. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Fisker's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Fisker's securities during the Class Period at artificially high prices and were damaged thereby.

204. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Fisker was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Fisker securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

205. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of The Exchange Act**
**Against All Defendants**

207. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

208. Defendants acted as controlling persons of Fisker within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

209. In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

210. As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons of Fisker, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: July 9, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By: */s/ Leanne H. Solish*
Kara M. Wolke
Ex Kano S. Sams II
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff, Named Plaintiff Sachiv Mehta, and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe
Shao-Jia Chang
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

*Additional Counsel for Lead Plaintiff, Named Plaintiff Sachiv Mehta, and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of July, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Leanne H. Solish*
Leanne H. Solish